## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DIAGNOSTIC RESOURCE GROUP, LLC  *     **U.S. District Court Civ. No. L-02-3020**
      Plaintiff                        Removed from Baltimore County Circuit
                                       Court Case No.: 03-C-02-006016

v.                       *

TOSHIBA AMERICA MEDICAL      *
 SYSTEMS, INC.
           Defendant      *

        *     *     *     *     *     *     *     *     *

### SUPPLEMENT OF June 26, 2003 TO
### DEFENDANT TOSHIBA'S MOTION FOR SUMMARY JUDGMENT
### ON BASIS OF STATUTE OF LIMITATIONS

Now comes, Defendant Toshiba America Medical Systems, Inc. ("Toshiba"), by its

counsel, Brooke Schumm III, Daneker, McIntire, Schumm, Prince, Goldstein, Manning &

Widmann, P.C. and moves for summary judgment because Counts I and II comprising the case

are barred by the statute of limitations:

<u>Procedural Introduction</u>

On March 26, 2003, the Honorable Benson E. Legg, speaking for the Court, stated he

believed the Court should first address the issue of the applicability of the statute of limitations.

Judge Legg stated he would set a schedule first on the Motion for Summary Judgment by

Toshiba. He stated that Toshiba could simply adopt by reference its prior Summary Judgment

Motion [Defendant Toshiba's Motion for Summary Judgment on Basis of Statute of Limitations

and Contract Terms Limiting Damages filed December 13, 2002] (the "Summary Judgment

Motion"), Reply [Toshiba's Reply to Plaintiff's Response to Defendant Toshiba's Motion for

Summary Judgment on Basis of Statute of Limitations and Contract Terms Limiting Damages

filed (the "Reply")] and Supplement [Supplement to Defendant Toshiba's Motion for Summary

Judgment on Basis of Statute of Limitations with Additional Documents Produced by Plaintiff (the "Supplement")] (Docket Numbers 17, 24, 29) and supplement those filings as needed.

## Introduction

Resummarizing the earlier introductions, the Plaintiff's claims are barred because suit was filed almost five years after the date of the contract, and more than four years after an "OPART" magnetic resonance imaging system was delivered to Plaintiff Diagnostic Resource Group ("DRG").

The additional material in this Supplement relates to admissions from a complaint by Plaintiff on the same subject matter (which was not produced in discovery by Plaintiff) and admissions by Ms. Kimberly Stehman, a radiation technologist and office manager at DRG, and Dr. Phillip Templeton, a radiologist associated with DRG.   The same claims were asserted in the Circuit Court for Baltimore County in November, 1999 against Toshiba in Baltimore County Case No. 03-C-99-010638 filed November 1, 1999.  The case was apparently dismissed for want of prosecution (hereafter referred to as the "Baltimore County Complaint").

## Undisputed Facts

1.      The facts stated in the Summary Judgment Motion, Reply,  and Supplement, and supporting affidavits thereto are adopted herein.

2.      For purposes of this Motion, the relevant date of the DRG Complaint for limitations purposes is May 30, 2002.

3.      The goods involved are a magnetic resonance imaging machine called an OPART ("MRI" or OPART MRI").   The sale price was $850,000.00.  The sale was financed through a typical finance lease by a third party, Tokai Financial Services, Inc. ("Tokai"). The successor in interest to Tokai Financial Services, Inc. was De Lage Lange.  Nothing

2

was ever paid for the OPART MRI by DRG to either the equipment lessor or its

successor nor to Defendant Toshiba America Medical Systems, Inc.

4.    The sale of the goods at issue in this lawsuit occurred pursuant to a writing between the

parties dated July 21, 1997, signed by Jeffrey Lowe, the President of the Debtor. (the

"Contract").  See Exhibit A-1 to Summary Judgment Motion .  The 2nd page of the

Contract containing terms and conditions of sale has been enlarged and is attached as

Exhibit A-2 to that Motion and as Exhibit A-2 to this Supplement.

5.    The warranty under the Contract expired one year from the date of installation, i.e. on

April 1, 1999.  The Contract provided in Paragraph 8:

> "For the warranty period described below by product, Toshiba, as its only
> obligation, will replace or repair, at Toshiba's option and without charge to
> Customer during Toshiba's normal working hours (if Customer requests warranty
> service outside such hours, Customer will pay overtime premium for labor, any
> component of the equipment determined by Toshiba to be defective in materials
> or workmanship, provided such defect is reported to Toshiba within the warranty
> period.  Toshiba's warranty period is as follows: (a) X-Ray and Therapy- 6
> months from the date of completion of installation; (b) Ultrasound, C.T., Nuclear,
> ***MRI-1 year from the date of installation;*** (c) Probes-12 months from the date of
> completion of installation.  Toshiba does not warrant that operation of the
> Equipment will be uninterrupted.  Components not manufactured by Toshiba,
> including but no limited to X-Ray tubes, monitors, glassware, VTRS, cameras,
> computer equipment, and software will be furnished subject only to the
> manufacturer's warranty, if any, and without any warranty whatsoever by
> Toshiba.  During the warranty period, Toshiba will furnish free of charge any
> upgrades, including software required to correct any defect in the Equipment or as
> required under applicable laws.
> TOSHIBA'S OBLIGATION TO REPAIR OR REPLACE DEFECTIVE PARTS
> WILL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR A
> BREACH OF THE WARRANTY SET FORTH IN THIS SECTION.  SUCH
> WARRANTY WILL BE IN LIEU OF ALL OTHER WARRANTIES,
> EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE
> WARRANTIES OF THE MERCHANTABILITY AND FITNESS FOR A
> PARTICULAR PURPOSE.  The warranty set forth in this Section will not apply
> to, and Toshiba will not be liable for any defects resulting from misuse, repairs
> performed by unauthorized third parties, accidents, acts of God, or neglect of
> anyone other than Toshiba. [emphasis supplied]."

3

Exh. A-2 at ¶8.

6.    Further, Paragraph 19 entitled "ENTIRE AGREEMENT," contained an integration

clause:

"This Agreement contains the entire agreement between the parties and supersedes all
prior or concurrent agreements between the parties, whether oral or written, relating to its
subject matter. The provisions of this agreement may not be modified unless in writing
and executed by both parties."

Exh. A-2 at ¶19.

7.    No written modification of the warranty or of the limitation of damages occurred.

8.    The warranty expired in April, 1999.    Without modifying the specific terms, the

warranty can be generically described as a "replace or repair" warranty on the Toshiba

manufactured parts for one year.  Thereafter, Toshiba had no contractual duty to

Diagnostic Resource Group.

9.    Upon Subpoena for documents by Plaintiff, De Lage Lande (successor to Tokai), the

medical equipment finance company produced the attached document indicating that a

lawsuit had been previously filed and dismissed against Toshiba America Medical

Systems, Inc.  See Exh. K.    (New exhibit numbering begins at the end of the

Supplement's exhibit numbers).

10.    On investigation, a copy of the complaint was obtained from the Circuit Court for

Baltimore County, Case No. 03-C-99-010638.  Exh. L.  The filing date of the Complaint

was November 1, 1999.

11.    The Baltimore County Complaint is styled Diagnostic Resource Group, LLC v. Toshiba

America Medical Systems, Inc., and Toshiba America Medical Credit, Inc.

4

12.    The Plaintiff's Baltimore County Complaint in paragraph 7 states: "The Toshiba OPART

MRI was delivered and installed at DRG's office in Baltimore County, Maryland, but

never performed satisfactorily."  See Exh. L, ¶7, p. 2.

13.    Ms. Kimberly Stehman, the radiation technologist, testified on March 18, 2003:

```
 5    Q   When patients came in, you said you had to
 6  obtain billing information from them.
 7        What do you mean by billing information?
 8    A   Who their insurance company was.
 9    Q   And what's the purpose of obtaining that
10  information?
11    A   So that it could be billed.
12    Q   Okay.  Tell me how the billing process
13  worked.
14    A   Bills were submitted to the insurance
15  companies for MRIs.
16    Q   Now, if you had a problem with a scan,
17  would you send a bill to the insurance company?
18    A   Depends on if it was a complete scan or if
19  it wasn't.
20    Q   Well, if you sent a bill, was it a complete
21  scan?
22    A   Yes.
```

Stehman Dep.  3/18/2003 at 52.

Ms. Stehman had earlier testified:

```
 1    Q   Take me through kind of a typical day.  A
 2  patient appears.  Sort of what happens?  You know,
 3  how was the office physically laid out, and so on,
 4  and so forth?
 5        MR. SPERLING:  Bel Air location?
 6        MR. SCHUMM:  Bel Air Road.
 7    A   When they walked into the office, they were
 8  at the reception desk.  Paperwork was filled out
 9  there as far as information that was needed from
10  them.
11    Q   And what kind of information would that be?
12    A   Name, address, phone number, billing
13  information, metal questionnaire.
14        MR. SPERLING:  Did you say medical
```

5

15  questionnaire?
16      THE WITNESS:  Metal.
17      MR. SPERLING:  Oh, metal.
18      THE WITNESS:  Metal.
19  BY MR. SCHUMM:
20    Q   What does that mean?
21    A   Before anyone can go and have an MRI scan,
22  we need to find out if there's any metal in their

                          0040
1   body that will interfere or cause them harm before
2   they would enter into the room.
3     Q   Okay.  And there were two suites there.
4         Which suite did folks enter into, patients
5   enter into, when they first came into the
6   receptionist?
7     A   I don't know which suite numbers there were
8   there.  I think it's 6 and 8 or 8 and 10, something
9   like that.  One, if you were looking at the building,
10  it's on the left.  I can tell you that.
11    Q   Okay.  Did it appear to all be sort of one
12  big area for an office?
13    A   Yes.
14    Q   Just happened to have two suite numbers?
15    A   Yes.  Yes.
16    Q   All one big area?
17    A   Yes.
18    Q   Okay.  And then was there a room there that
19  was dedicated to the MRI machine?
20    A   Yes.
21    Q   And was there a room there dedicated to
22  maintenance of other equipment that was adjunct to

                          0041
1   the MRI machine?
2     A   I believe you're probably referring to the
3   computer room?
4     Q   I'm not referring to anything.  I'm just
5   asking you the question.
6     A   I don't know.
7     Q   Were there other rooms there?
8     A   There were, yes.
9     Q   Okay.  And what other rooms would there be
10  that would be adjunct to the MRI machine?
11    A   There was a computer room.  That was the

                            6

12  closest thing to it.
13      Q   Okay.  And what else?
14      A   There was a room that actually had the
15  laser camera in it.
16      Q   I'm sorry.  Could you say that once more?
17  A room with a what in it?
18      A   Laser camera.
19      Q   What does the laser camera do?
20      A   Allows you to print the images from the MRI
21  machine onto film.
22      Q   Anything else?

0042
1       A   There was a file room.  There was a
2   kitchen.  There was a marketing office.  There was
3   changing rooms, bathroom, and one other office and
4   the reception area.

Stehman Dep.  3/18/2003 at 39-42.

        Ms. Stehman continued:

3       Q   What's a patient report?
4       A   Physician has to read the scan and produce
5   a report.
6       Q   And what physician would read the scan and
7   produce a report?
8       A   Any of the number of physicians at
9   University.
10          MR. SPERLING:  Why don't you spell it out.
11  University of?
12          THE WITNESS:  Maryland.
13  BY MR. SCHUMM:
14      Q   And who would those be, their names?
15      A   I'm trying to think who read our reports
16  from over there.  There was a Greg Zoarski, I believe
17  Michael Rothman, Bernadette Stallmeyer, Dr. Resnik,
18  Dr. Mulligan.  They're the ones that come off the top
19  of my head.
20      Q   Okay.  So how did it work that they did a
21  report?  Patient comes in.  Patient gets scanned.
22  Then what happens?
                        0044
1       A   Films are printed.  They were transported
2   down to University of Maryland to be read.

```
3    Q   And then what happened to them?
4    A   They were returned back to us.
5    Q   And they were kept in a file cabinet?
6    A   A room.
7    Q   How were they organized in that room?
8    A   Alphabetically.
```
Stehman Dep. 3/18/2003 at 43-44.


14.    A logbook was kept. Ms. Stehman testified:

```
21    Q   Was that the only logbook that was kept out
22  at the Bel Air Road location?

                        0046
1    A   I believe we -- I'm just guessing. From
2  what I can remember, we probably kept a patient log
3  just so we knew what scans were done on what
4  patient. That's pretty typical of most MR places.
5    Q   Any other logbook?
6    A   No, sir.
```

Stehman Dep. 3/18/2003 at 45-46. (Stehman Dep. Excerpts attached as Exh. M).

15.    Copies of the patient logbook were produced and excerpts from April and May, 1998

attached as Exhibits A, B, and D-I (eye) to the Supplement.

16.    Attached hereto is one of those exhibits behind Exhibit A showing a patient list

commencing April 16, 1998. The Supplemental Motion has the underlying records of

billings for patients for the dates in the patient logbook in Exhibits A, B, and D-I (eye) to

the Supplement.

17.    In his deposition, Dr. Phillip A. Templeton testified he was chairman of radiology at the

University of Maryland Medical System complex in Baltimore City. Templeton Dep. at

25-26. Dr. Templeton was unclear as to what position he held with DRG but signed a

document as Secretary of the Plaintiff.

8

18.    Dr. Templeton's attention was directed to Bates-Stamped documents 8, 9 and 10 (An

application site report for Toshiba's business records prepared by Gloria Sumler on April

28, 1998), Templeton Dep. Exh. 3, Supplement Exh. A, and Exh. N hereto.  After

reviewing Deposition Exhibit 3, Dr. Templeton testified:

18    Q    Okay.  Do you recall having a meeting out
19   there in approximately April of 1998 with the various
20   persons listed?
21    A    Well, there's a lot of people listed here,
22   but I remember being there for actually just a brief

0020

1   period of time.
2    Q    Umh-humh.
3    A    And I remember Kim Stehman and I remember
4   Gloria Sumler who was the applications person.
5    Q    Umh-humh.
6    A    And I'm really not sure who else was or
7   wasn't there at the time.
8    Q    Okay.  Was a gentleman named Mr. Kent
9   Stansbury there?
10    A    He could have been.  I think I met him at
11   some point; I don't know if it was that day.
12    Q    And what was the purpose of the meeting?
13    A    They were doing applications and I just went
14   out to see the system.
15    Q    And did you see the system operate?
16    A    Yes.
17    Q    And did it operate satisfactorily, as best
18   you could tell?
19    A    As far as I recall.

Templeton Dep. 5/19/03 at 19-20.


Dr. Templeton continued:

20    Q    Okay.  I'm going to show you what's been
21   identified as Bates Nos. 607, and attached to it for
22   some reason is Bates No. 479.  But this was produced

9

0021

1    to us by Diagnostic Resource Group as the records from
2    April of 1998, and you can see it has a fax line of
3    5/4/1998. Were you aware that patients were treated
4    immediately after the date that you had the meeting
5    with Ms. Sumler and so on?
6        A    As far as I know, I know they did some
7    patients, yes.

Templeton Dep. 5/19/03 at 20-21. (Templeton Deposition Excerpts attached as Exh. N hereto).

19.    Plaintiff's accountant produced a copy of a general ledger of DRG showing income

earned from patients as early as April, 1998. Exh. P. An account receivable of

$12,702.00 is shown for April, 1998, and income of $708.00 which appears to be the

$708.00 check from Francis produced with the partial patient records production by DRG

bates-stamped 630. See Exh. E. p. 2.


**ARGUMENT**

20.    In sum, Plaintiff admitted in the Complaint filed in the Circuit Court for Baltimore

County, Maryland on November 1, 1999 that the OPART MRI machine had been

delivered and installed. Based on Plaintiff's records, patients were examined and billed

as early as April 16, 1998. Ms. Stehman described how the machine was used, and

records sent to radiologists for reading, and how patients were billed.

21.    There is no possible dispute, much less a genuine dispute, based on the admission in

Plaintiff's Baltimore County Complaint (Exh. L), the patient records (e.g. Exh. A and

Supplement Exh. B, and D-I), Dr. Templeton's testimony (Exh. O), Ms. Stehman's

testimony (Exh. M), and the DRG ledger produced by DRG's accountant showing April

income and receivables (Exh. O and P), that installation was complete at least as of April

16, 1998, because patients were examined, patient scans sent to radiologists for diagnosis, patient scans returned for filing, patients billed, and patients who paid for services. Dr. Templeton says he saw the system in April with Ms. Sumler at the meeting of personnel stated in her report (consistent with Mr. Hutton's affidavit Supp. Exh. J) on April 10, 1998.

22.    Plaintiff's representatives' testimony and documents show that installation was complete in April, 1998.

23.    Under the contract, pursuant to which the machine was purchased for $850,000.00, which is a contract with an "integration clause," (pursuant to which any modification must be in writing), installation was complete at least as of April 16, 1998 based on the patient records.

24.    The warranty expired one year from that date, on April 16, 1999.

25.    Plaintiff filed suit in November 1999 in Baltimore County, Maryland, but the suit was ultimately dismissed.

26.    Plaintiff has now filed suit again against Toshiba in an untimely fashion on May 30, 2002. This is more than three years after the warranty expired, which at latest was one year after April 16, 1998. Plaintiff filed suit more than four years after sale, which at latest was April 16, 1998. Dr. Templeton testified he saw the MRI machine perform scans with Ms. Sumler on April 10, 1998.

27.    Plaintiff's claims are indisputably barred by the Maryland statute of limitations.

<u>Applicable Law</u>

28.    The Maryland statute of limitations is set forth in the Courts & Judicial Proceedings article.

29. The general statute of limitations is three years.

30. For the sale of goods, the Maryland Uniform Commercial Code provides a statute of limitations of four years.

31. Since the Complaint was filed on May 30, 2002, more than four years after the OPART MRI was installed on March 31, 1998, the Complaint is barred by the Maryland statute of limitations.

WHEREFORE, Defendant Toshiba prays the Complaint be dismissed.

/s/ _____
Brooke Schumm III, Esquire
Fed. Bar No.05001
Daneker, McIntire, Schumm, Prince,
  Goldstein, Manning & Widmann, P.C.
One North Charles Street, Suite 2450
Baltimore, MD 21201


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of June, 2003, a copy of the foregoing Statement was mailed to Samuel Sperling, Law Office of Leonard J. Sperling, 1777 Reisterstown Road, Commercentre West, Suite 212, Baltimore, MD 21208.

/s/ _____
Brooke Schumm III

12