# EXHIBIT A

| DATE | PT.NAME | SCAN | INS. | TYPED | FAX | DR.SIG |
|---|---|---|---|---|---|---|
| 4/10 | Ruth J... | Brain | Medi | | | |
| 4/21 | Mildred M... | Brain | Medi | | | |
| 4/23 | Mary S... | Brain | Medi | | | |
| ✳ 4/24 | John K... | Lumbar C Gd. | All PPO | | | |
| (T) 4/24 | Barbara Re... | Rt. knee | United Healthcare | ✓ | ✓ | A.S |
| 4/24 | Angela L... | Brain | Medi | | | |
| (T) 4/27 | Erin Pl... | Rt. knee | Fed BCBS | ✓ | ✓ | A.S. |
| 4/29 | T-...Linda | Brain (P.t.) | Freestate | | | |
| ✳ 4/30 | G...Robert | T-Spine-C Gd | Prudential | | | |
| ✳ 4/21 | G... Robert | C-Spine Gd | Prud. | | | |
| (T) 4/30 | Alma K... | L.Spine | BCBS | ✓ | ✓ | M.Z |
| 5/1 | A...Wm | Cervical Spine | BCBS POS | | | |
| | " " | Lumbar Spine | | | | |
| (T) 4/29 | Shia S... Ellen | Rt.Forearm | BCBS | ✓ | ✓ | A.S |
| 5/1 | Ellen A... | Brain | BCBS | | | |
| (T) 5/1 | Mildred Bl... | Hip | BCBS | ✓ | ✓ | A.S |  412.80 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

All of ortho is read.

Kathy- they are reading but leave Mr. Kline there + (✳)
Mr. Cruer is not there.

000607

Case 1:02-cv-03020-RDB    Document 43-2    Filed 06/26/2003    Page 3 of 27

Cindy A.          5-28-98    R/knee      Lukeso

Sharon R          5-28-98    L/wrist     John Gordon

Have a Great
Day !!

**Exhibit A-2**

# FROM ORIGINAL MOTION FOR SUMMARY JUDGMENT (Exhibit A-2)

# TERMS AND CONDITIONS OF SALE

**1.   GENERAL TERMS.**   Unless otherwise specified on the face of this document, this Quotation/Order ("Agreement") will remain valid only if accepted by Customer no later than 60 days from date of submission to Customer.

**2.   TITLE AND RISK OF LOSS.**   Unless otherwise specified on the face of this document, title and risk of loss to the Equipment purchased under this Agreement will pass to Customer: (a) if Toshiba is to provide installation, upon Toshiba's completion of installation, or (b) if Toshiba will not provide installation, upon delivery by Toshiba to a common carrier at Toshiba's facility from which the Equipment is shipped.

**3.   TERMS OF PAYMENT.**   Unless otherwise specified on the face of this document, prices stated are F.O.B. Tustin, California or other facilities of Toshiba in the U.S.A. from which the Equipment may be shipped, freight prepaid and charged.   All taxes which are levied on or payable by Toshiba in connection with the sale, use, or possession of the Equipment to or by the Customer (excluding income taxes), and transportation charges (including rigging) for the shipment to installation site will be paid by the Customer in addition to the quoted price.   Terms of the payment for Therapy, C.T., Nuclear, and X-Ray will be cash - 10% upon execution of this Agreement, 70% upon delivery, balance due upon completion of installation and/or availability for first use, whichever is earlier.   Terms of payment for Ultrasound and Mobil X-Ray will be cash - 10% upon execution of this Agreement, 90% NET upon completion of installation and/or availability for first use, whichever is earlier All invoices paid after due date will be assessed a late payment charge of the lesser of 1 1/2% per month or the maximum rate permitted by law.

**4.   DELAYS.**   With the exception of Ultrasound and Mobile X-Ray products, if Customer changes the scheduled delivery date specified on the face of this document ("Scheduled Delivery Date") during the period of 120 days preceding such date, Customer will nevertheless pay the 70% installment of the purchase price payable upon delivery, on the Scheduled Delivery Date as if delivery had been made on such date.   In addition, Customer will pay all extra costs incurred by Toshiba as a result of such delay,

TOSHIBA'S OBLIGATION [...] CUSTOMER'S SOLE AND [...] FORTH IN THIS SECTION [...] WARRANTIES, EXPRESSED [...] WARRANTIES OF THE MER[...] The warranty set forth in this Se[...] resulting from misuse, repairs per[...] of anyone other than Toshiba.

**9.   LIMITATION OF LIABI[...]** BE LIABLE FOR CONSEQUEN[...] ECONOMIC LOSS ARISIN[...] CONTEMPLATED IN THIS [...] LIKELIHOOD OF SUCH DAMA[...] TO CUSTOMER (WHET[...] INCLUDING NEGLIGENCE, [...] RELATING TO THE TRANSA[...] AGGREGATE AMOUNT ACT[...] AGREEMENT.

**10.   SECURITY INTEREST.** [...] interest pursuant to the Uniform [...] proceeds of it) until full payment [...] irrevocable special power of atto[...] Customer's behalf, for the purpose [...]

**11.   REMOVAL OF EQUIPM[...]** Customer will not remove any par[...]



completion of installation and/or availability for first use, whichever is earlier. **Terms of payment for Ultrasound and Mobil X-Ray will be cash - 10% upon execution of this Agreement, 90% NET upon completion of installation and/or availability for first use, whichever is earlier** All invoices paid after due date will be assessed a late payment charge of the lesser of 1 1/2% per month or the maximum rate permitted by law.

**4.   DELAYS.**   With the exception of Ultrasound and Mobile X-Ray products, if Customer changes the scheduled delivery date specified on the face of this document ("Scheduled Delivery Date") during the period of 120 days preceding such date, Customer will nevertheless pay the 70% installment of the purchase price payable upon delivery, on the Scheduled Delivery Date as if delivery had been made on such date. In addition, Customer will pay all extra costs incurred by Toshiba as a result of such delay, including, without limitation, storage and transportation. Storage fees will be charged at commercially comparable rates for storage on Toshiba's site. If delivery is delayed by 12 months or more from the Scheduled Delivery Date, through no fault of Toshiba, the price set forth in this Agreement may be increased by Toshiba to a level equal to the higher of the prevailing price in effect at the time of the revised delivery date or 1 percent (1%) per month (or portion of it) for each month (or portion of it) that delivery is delayed. However, such 12-month period will be tolled for any days during which the delay in delivery is caused solely by Toshiba.

**5.   ACCEPTANCE BY TOSHIBA.**   This Agreement will not be binding on Toshiba unless and until it is accepted by Toshiba as evidenced by the signature of an authorized representative of Toshiba on the face of this document. Toshiba's acceptance is expressly made conditional upon Customer's assent to the terms and conditions contained in this document. All different or additional terms and conditions which may be contained in Customer's bid documents, purchase order or any other documents furnished by Customer are hereby objected to and deemed material unless accepted in writing by an authorized representative of Toshiba. Toshiba will give Customer a fully executed copy of this Agreement upon acceptance by Toshiba.

**6.   EQUIPMENT INSTALLATION.**   Toshiba will install all Equipment purchased under this Agreement and connect them to existing power and/or plumbing lines at no additional charge to Customer, except that Customer agrees to pay overtime premium for any labor performed beyond Toshiba's normal working hours. Customer will be responsible for electrical wiring, plumbing, carpentry, plastering, printing, or all other site preparation required prior to installation and connection of the Equipment by Toshiba. Customer will provide space at the installation site for the safe storage of Toshiba's tools, test equipment and other materials used for installation at no charge to Toshiba. Customer shall, at its cost, obtain all permits and licenses required by governmental authorities in connection with the installation and operation of the Equipment. In the event delivery and/or installation of any part of the Equipment is delayed or interrupted because of strike or other labor dispute involving trade unions having jurisdiction over Customer's premises, Customer agrees to negotiate with such trade unions and arrange for the timely completion of such delivery and/or installation. Customer will reimburse Toshiba for any expense incurred as a result of any such labor dispute. The Equipment may

...ACTION TO THE ...AG... AGGREGATE AMOUNT A... AGREEMENT.

**10.   SECURITY INTEREST** interest pursuant to the Unifor... proceeds of it) until full paymen... irrevocable special power of at... Customer's behalf, for the purpo...

**11.   REMOVAL OF EQUI...** Customer will not remove an... lease, transfer or otherwise pa... or any part of the Equipm...l.

**12.   REMEDIES OF TOS...** Agreement or under any other a... an assignment for the benefit of... or if the financial responsibility... or if Customer otherwise breach... without prior notice or demand... any obligation (including wit... Remedy above), and/or take in... price of the Equipment will b... Toshiba will be given by... performance or repossession of... Equipment with proceeds to b... collection. Customer wi...ee... to it by law.

**13. . ATTORNEY'S FEES** ...litigation costs incurred by Tos... limitation, any action or proceed...

**14.   EXCUSED PERFORM...** performance resulting directl... without limitation, strikes or c... catastrophes, inclement weather... Toshiba's suppliers, or laws, reg... will apply even though such cau... Agreement has been delayed for...

representative of Toshiba. Toshiba will give Customer a fully executed copy of this Agreement upon acceptance by Toshiba.

**6. EQUIPMENT INSTALLATION.** Toshiba will install all Equipment purchased under this Agreement and connect them to existing power and/or plumbing lines at no additional charge to Customer, except that Customer agrees to pay overtime premium for any labor performed beyond Toshiba's normal working hours. Customer will be responsible for electrical wiring, plumbing, carpentry, plastering, printing, or all other site preparation required prior to installation and connection of the Equipment by Toshiba. Customer will provide space at the installation site for the safe storage of Toshiba's tools, test equipment and other materials used for installation at no charge to Toshiba. Customer shall, at its cost, obtain all permits and licenses required by governmental authorities in connection with the installation and operation of the Equipment. In the event delivery and/or installation of any part of the Equipment is delayed or interrupted because of strike or other labor dispute involving trade unions having jurisdiction over Customer's premises, Customer agrees to negotiate with such trade unions and arrange for the timely completion of such delivery and/or installation. Customer will reimburse Toshiba for any expense incurred as a result of any such labor dispute. The Equipment may contain certain components which may have been remanufactured. However, such components will meet the manufacturer's specifications for new components as of the date of completion of installation.

**7. EQUIPMENT OPERATION AND INDEMNITY.** Customer agrees that all Equipment purchased under this Agreement will be operated exclusively by duly qualified technicians and/or medical doctors in a safe and reasonable manner in accordance with Toshiba's written instructions, applicable laws and regulations, and for the purposes for which such Equipment was intended. Customer agrees to defend, indemnify and hold Toshiba and Toshiba's officers, directors and employees harmless from and against all claims, demands, lawsuits, liabilities, judgments, and costs (including reasonable attorney's fees, expert fees, and other litigation costs) arising out of or in connection with the operation of the Equipment by Customer, unless caused by Toshiba's sole negligence.

**8. LIMITED WARRANTY AND REMEDY.** For the warranty period described below by product, Toshiba, as its only obligation, will replace or repair, at Toshiba's option and without charge to Customer during Toshiba's normal working hours (if Customer requests warranty service outside such hours, Customer will pay overtime premium for labor), any component of the Equipment determined by Toshiba to be defective in materials or workmanship, provided such defect is reported to Toshiba within the warranty period. Toshiba's warranty period is as follows: (a) X-Ray and Therapy - 6 months from the date of completion of installation; (b) Ultrasound, C.T., Nuclear, MRI - 1 year from date of completion of installation; (c) Probes - 12 months from date of completion of installation. Toshiba does not warrant that operation of the Equipment will be uninterrupted. Components not manufactured by Toshiba, including but not limited to X-Ray tubes, monitors, glassware, VTRS, cameras, computer equipment, and software will be furnished subject only to the manufacturer's warranty, if any, and without any warranty whatsoever by Toshiba. During the warranty period, Toshiba will furnish free of charge any upgrades, including software required to correct any defect in the Equipment or as required under applicable laws.

Equipment with proceeds to be collection. Customer will pay to it by law.

**13. ATTORNEY'S FEE** litigation costs incurred by To limitation, any action or proce

**14. EXCUSED PERFOR** performance resulting direct without limitation, strikes catastrophes, inclement weat Toshiba's suppliers, or laws will apply even though  such Agreement has been dela

**15. SOFTWARE.** Agreement, and any update is being furnished to Custom copy, reproduce, or transcribe written consent. upon Toshi in a form designated by Toshi

**16. CANCELLATION.** Toshiba's prior written conse and all damages suffered by 7 amount equal to twenty perc

**17. ASSIGNMENT.** Toshiba's prior written const

**18. EXPORT REGULAT** be controlled under the U.S.  U.S. Department of Comme indirectly, in contravention of

**19. ENTIRE AGREEMI** and supersedes all prior or co its subject matter. The provi by both parties.



*TERMS (Top 2nd Column)*

# ND CONDITIONS OF SALE

TOSHIBA'S OBLIGATION TO REPAIR OR REPLACE DEFECTIVE PARTS WILL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR A BREACH OF THE WARRANTY SET FORTH IN THIS SECTION. SUCH WARRANTY WILL BE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF THE MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. The warranty set forth in this Section will not apply to, and Toshiba will not be liable for any defects resulting from misuse, repairs performed by unauthorized third parties, accidents, acts of God, or neglect of anyone other than Toshiba.

9.    LIMITATION OF LIABILITY.    TOSHIBA WILL NOT UNDER ANY CIRCUMSTANCES BE LIABLE FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR EXEMPLARY DAMAGES OR ECONOMIC LOSS ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT, EVEN IF TOSHIBA IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. IN NO EVENT WILL TOSHIBA'S LIABILITY TO CUSTOMER (WHETHER BASED ON AN ACTION OR CLAIM IN CONTRACT, TORT, INCLUDING NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE) ARISING OUT OF OR RELATING TO THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT EXCEED THE AGGREGATE AMOUNT ACTUALLY PAID BY CUSTOMER TO TOSHIBA UNDER THIS AGREEMENT.

10.    SECURITY INTEREST.    Toshiba hereby reserves and Customer grants to Toshiba a security interest pursuant to the Uniform Commercial Code, in and to the Equipment (and all products and proceeds of it) until full payment of the purchase price is received.  Customer hereby grants to Toshiba its irrevocable special power of attorney to execute and file financing statements or other documents, on Customer's behalf, for the purpose of protecting the security interest of Toshiba.

11.    REMOVAL OF EQUIPMENT.    Until Toshiba has received full payment of the purchase price, Customer will not remove any part of the equipment from Customer's premises, nor will Customer sell,

document, this
r than 60 days

ument, title and
if Toshiba is to
ill not provide
rom which the

nt, prices stated
Equipment may
by Toshiba in
cluding income
will be paid by
Nuclear, and X-
ance due upon
of payment for
0% NET upon
s paid after due
maximum rate

stomer changes
ate") during the
tallment of the
been made on
of such delay,

**10.    SECURITY INTEREST.**    Toshiba hereby reserves and Customer grants to Toshiba a security interest pursuant to the Uniform Commercial Code, in and to the Equipment (and all products and proceeds of it) until full payment of the purchase price is received. Customer hereby grants to Toshiba its irrevocable special power of attorney to execute and file financing statements or other documents, on Customer's behalf, for the purpose of protecting the security interest of Toshiba.

**11.    REMOVAL OF EQUIPMENT.**    Until Toshiba has received full payment of the purchase price, Customer will not remove any part of the equipment from Customer's premises, nor will Customer sell, lease, transfer or otherwise part with possession of, or permit any lien or encumbrance to be placed on all or any part of the Equipment.

**12.    REMEDIES OF TOSHIBA.**    If Customer fails to make any payment when due under this Agreement or under any other agreement between Customer and Toshiba, or becomes insolvent or makes an assignment for the benefit of creditors, or if a petition in Bankruptcy is filed by or against Customer, or if the financial responsibility of Customer becomes impaired or unsatisfactory in Toshiba's judgment, or if Customer otherwise breaches any or the terms and conditions of this Agreement, then Toshiba may, without prior notice or demand, defer shipments, cancel the balance of the order, suspend performance of any obligation (including without limitation, all obligations set forth under Limited Warranty And Remedy above), and/or take immediate possession of the Equipment delivered, until the full purchase price of the Equipment will be paid by Customer or, at Toshiba's discretion, until security satisfactory to Toshiba will be given by Customer. Any costs incurred by Toshiba as a result of suspending performance or repossession or collection will be payable by Customer. Toshiba may sell repossessed Equipment with proceeds to be applied to unpaid balance and expenses incurred in sale, repossession and collection. Customer will pay any remaining deficiency. Toshiba may exercise any other rights available to it by law.

**13.    ATTORNEY'S FEES AND COSTS.**    Customer will be liable for all attorneys' fees and litigation costs incurred by Toshiba to enforce any of its rights under this Agreement, including, without limitation, any action or proceeding to recover delinquent accounts.

**14.    EXCUSED PERFORMANCES.**    Toshiba will not be liable for nonperformance or delay in performance resulting directly or indirectly from any occurrences beyond Toshiba's control, including without limitation, strikes or other labor troubles, acts of God, war, accidents, fires, floods, other catastrophes, inclement weather, transportation, unavailability of materials and labor, delays caused by Toshiba's suppliers, or laws, regulations, or acts of any governmental agency. The foregoing provision will apply even though such cause may occur after performance of the obligations of Toshiba under this Agreement has been delayed for other causes.

**15.    SOFTWARE.**    All rights and interest in any software that may be furnished under this Agreement, and any updates and enhancements to it, will remain the property of Toshiba. Such software

Toshiba's suppliers, or laws, regulations, or acts of any governmental agency. The foregoing provision will apply even though such cause may occur after performance of the obligations of Toshiba under this Agreement has been delayed for other causes.

15.     **SOFTWARE.**     All rights and interest in any software that may be furnished under this Agreement, and any updates and enhancements to it, will remain the property of Toshiba. Such software is being furnished to Customer under a non-exclusive license. Customer will not decompile, modify, copy, reproduce, or transcribe the software nor allow third parties to use the same without Toshiba's prior written consent. upon Toshiba's request, Customer will execute an End-User Software License Contract, in a form designated by Toshiba.

16.     **CANCELLATION.**     Customer may not cancel the order subject to this Agreement except with Toshiba's prior written consent. In the event of such cancellation, Toshiba will be entitled to recover any and all damages suffered by it caused by the cancellation as allowed by law, but in no event less than an amount equal to twenty percent (20%) of the purchase price for restocking charge.

17.     **ASSIGNMENT.**     Customer may not assign any of its obligations under this Agreement without Toshiba's prior written consent.

18.     **EXPORT REGULATIONS.**     This Agreement involves products, and/or technical data that may be controlled under the U.S. Export Administration Regulations and may be subject to the approval of the U.S. Department of Commerce prior to export. Any export or reexport by Customer, directly or indirectly, in contravention of such Regulations is prohibited

19.     **ENTIRE AGREEMENT.**     This Agreement contains the entire agreement between the parties and supersedes all prior or concurrent agreements between the parties, whether oral or written, relating to its subject matter. The provisions of this agreement may not be modified unless in writing and executed by both parties.

SLS-050 (Rev 4/96)

other labor dispute involving
s to negotiate with such trade
installation. Customer will
dispute. The Equipment may
r, such components will meet
letion of installation.

er agrees that all Equipment
ct technicians and/or medical
r instructions, applicable laws
tended. Customer agrees to
employees harmless from and
cluding reasonable attorney's
on with the operation of the

l described below by product,
d without charge to Customer
service outside such hours,
pment determined by Toshiba
ported to Toshiba within the
Therapy - 6 months from the
ar from date of completion of
. Toshiba does not warrant
t manufactured by Toshiba,
ras, computer equipment, and
ny, and without any warranty
free of charge any upgrades,
ired under applicable laws.

# EXHIBIT E

1721

**MD IMAGING, LLC**
**1777 REISTERSTOWN ROAD**
**PIKESVILLE, MARYLAND 21208**
**(410) 653-9993    521976126**

04-29-1998

NO.   1,262

PATIENT INFO. ================================================== CO-PAY

LINDA T.

$708—

REFERRING DR: ALFRED IWANTSCH MD
SOC. SEC. #:
PENDING INSURANCE  :    $0.00

==================================================================

| CURRENT | OVER 30 | OVER 60 | OVER 90 | OVER 120 | STATEMENT |
|---|---|---|---|---|---|
| 1,189.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4/29/1998 |

==================================================================

********* PROCEDURES *********

| | | | |
|---|---|---|---|
| ____74170 CT ABDOMEN W/WO | ____73701 CT LOW/EXTREM WITH | ____73201 CT UP/EXTREM WITH | ____75552 MRI-HEART W/O |
| ____74160 CT ABDOMEN WITH | ____72131 CT LUMBAR W/O | ____S9018 LOW OSMOLAR CONTRAST | ____73721 MRI-LOW EXTREM JOINT |
| ____72125 CT CERV W/O | ____72133 CT LUMBAR W/WO | ____70541 MRA-BRAIN/NECK | ____72148 MRI-LUMBAR W/O |
| ____72127 CT CERV W/WO | ____72132 CT LUMBAR WITH | ____72156 MRI CERVICAL-W/WO | ____72158 MRI-LUMBAR W/WO |
| ____72126 CT CERV WITH | ____70490 CT NECK W/O | ____73720 MRI LOWER EXTREMITY | ____72149 MRI-LUMBAR WITH |
| ____71250 CT CHEST W/O | ____70491 CT NECK WITH | ____70336 MRI TMJ-BILATERAL | ____70540 MRI-ORBIT/NECK |
| ____71270 CT CHEST W/WO | ____70482 CT OR/EAR/SEL W/WO | ____73220 MRI UPPER EXTREMITY | ____72196 MRI-PELVIS/HIP |
| ____70486 CT FACE W/O | ____70480 CT ORB/EAR SELLA W/O | ____70552 MRI-BRAIN W | ____72147 MRI-THORACIC W |
| ____70487 CT FACE WITH | ____72192 CT PELVIS W/O | ____70551 MRI-BRAIN W/O | ____72146 MRI-THORACIC W/O |
| ____70450 CT HEAD W/O | ____76375 CT RECONSTRUCTION | ____70553 MRI-BRAIN W/WO | ____72157 MRI-THORACIC W/WO |
| ____70470 CT HEAD W/WO | ____72128 CT THO/SP W/O | ____72141 MRI-CERVICAL W/O | ____73221 MRI-UP EXTREM JOINT |
| ____70460 CT HEAD WITH | ____72129 CT THO/WITH | ____71550 MRI-CHEST | |

OTHER
SERVICES : _____

DATE OF :
SERVICE : _____

********* DIAGNOSIS *********

| | | | |
|---|---|---|---|
| ___727.67 ACHILLES TENDON | ___718.91 DERANGEMENT SHOULDER | ___722.52 LUMBAR DISC DEG | ___189.1 RENAL PELVIS |
| ___225.1 ACOUSTIC NEUROMA | ___780.4 DIZZINESS | ___724.4 LUMBAR RADICULOPATHY | ___840.4 ROTATOR CUFF-TEAR |
| ___733.42 ASCEPTIC NECROSIS | ___786.00 DYSPNEA | ___721.3 LUMBOSACRAL | ___780.3 SEIZURE |
| ___722.0 CERVICAL (HNP) | ___959.4 HAND INJURY | ___348.8 MASS BRAIN | ___473.9 SINUSITIS |
| ___723.4 CERVICAL RADICULOPAT | ___784.0 HEADACHE | ___786.6 MASS IN CHEST | ___215.9 SOFT TISSUE TUMOR |
| ___786.50 CHEST PAIN | ___599.7 HEMATURIA | ___719.67 MASS-ANKLE | ___717.1 TEAR-ANT HORN OF MED |
| ___385.30 CHOLESTEATOMA | ___726.2 IMPINGEMENT SYNDROME | ___787.01 NAUSEA AND VOMITING | ___727.05 TENOSYNOVITIS |
| ___786.2 COUGH | ___434.91 INFARCTION | ___723.1 NECK PAIN | ___722.11 THORACIC (HNP) |
| ___722.4 DEGENERATION-CERVICA | ___836.2 KNEE MEN TEAR-NOT ME | ___721.8 OSTEOPHYTE | |
| ___717.9 DERANGE KNEE OLD | ___724.2 LOW BACK PAIN | ___719.47 PAIN-ANKLE | |
| ___717.89 DERANGE KNEE OLD OTH | ___722.10 LUMBAR (HNP) | ___719.46 PAIN-KNEE | |

********* LAST DIAGNOSIS *********
___239.6 NEOPLASM/BRAIN

OTHER      :
DIAGNOSIS : _____

SIGNATURE : *on file*

DATE OF ILLNESS  : 4/29/1998
FIRST CONSULTED  : 0/ 0/  0.
LAST VISIT       : 4/29/1998
LAST X-RAY       : 4/29/1998
DATE OF BIRTH    : 10/19/1956  41

RETURN IN ____ DAYS ____ WEEKS ____ MONTHS    NEXT APPOINTMENT : _____

TOTAL CHARGE : 708.

TOTAL PAYMENT : 708.

DV0631

CHECK   CASH   CREDIT CARD

#3274 - DEBBIE

PAID

1032.71
499.15
1531.86

2078.-
1531.86

FRANCIS L. S

FIRST NATIONAL BANK OF MARYLAND
ACCOUNTING CENTER  0274
SALISBURY  MARYLAND

3274
55-40/821 7

PAY Seven Hundred Eight and _____ XX/100 DOLLARS

CHECK
AMOUNT

2/14/98   MD Imaging, LLC                          3274       $ 708 00

FOR _____

000630

⑈003274⑈ ⑆052100408⑆

**EXHIBIT K**

05/23/01 07:31:46         RightFAX->       215 239  6060  RightFAX              Page 003

CIRCUIT COURT FOR BALTIMORE COUNTY
Suzanne Mensh
Clerk of the Circuit Court
County Courts Building
401 Bosley Avenue
P.O. Box 6754
Towson, MD 21285-6754
(410)-887-2601, TTY for Deaf: (800)-735-2258
Maryland Toll Free Number (800) 938-5802

RECEIVED
MAY 2   2001
LEGAL

Toshiba American Medical Credit Inc
1055 W Lakes Drive
Berwyn, PA 19312

N O T I F I C A T I O N   O F   C O N T E M P L A T E D   D I S M I S S A L

Case Number: 03-C-99-010638 CN

C I V I L
Diagnostic Resource Group L L C vs Toshiba America Medical Systems Inc, et a

NOTIFICATION TO PARTIES OF CONTEMPLATED DISMISSAL

Pursuant to Maryland Rule 2-507 this proceeding will be "DISMISSED
FOR LACK OF JURISDICTION OR PROSECUTION WITHOUT PREJUDICE," 30 days
after service of this notice, unless prior to that time a written motion
showing good cause to defer the entry of an order of dismissal is filed.

Costs will be assessed in accordance with Maryland Rules.

Suzanne Mensh
Clerk of the Circuit Court

Date Issued:  05/17/01

CC: Jeffrey H Kreshtool Esq
Toshiba America Medical Systems Inc

*Per clerks office on 7/26/02
This case was dismissed
with prejudice 6/4/01
RW*

D 30002

**EXHIBIT L**

C-99-10638

| | | |
|---|---|---|
| DIAGNOSTIC RESOURCE GROUP, LLC | * | IN THE |
| 8817 Belair Road, Suites 104-106 | | |
| Perry Hall, Maryland 21236 | * | CIRCUIT COURT |
| | | |
| Plaintiff | * | FOR |
| | | |
| v. | * | BALTIMORE COUNTY |
| | | |
| TOSHIBA AMERICA MEDICAL | * | Case No. |
| SYSTEMS, INC. | | |
| 2441 Michelle Drive | * | |
| PO Box 2068 | | |
| Tustin, California 92781 | * | |
| | | |
| Serve on: | * | |
| | | |
| MARYLAND STATE DEPARTMENT OF | * | |
| ASSESSMENTS & TAXATION | | |
| 300 W. Preston Street, Room 511 | * | |
| Baltimore, Maryland 21201 | | |
| | * | |
| And | | |
| | * | |
| TOSHIBA AMERICA MEDICAL | | |
| CREDIT, INC. | * | |
| 1055 W. Lakes Drive | | |
| Berwyn, Pennsylvania 19312 | * | |
| | | |
| Serve on: | * | |
| | | |
| MARYLAND STATE DEPARTMENT OF | * | |
| ASSESSMENTS & TAXATION | | |
| 301 W. Preston Street, Room 511 | * | |
| Baltimore, Maryland 21201 | | |
| | * | |
| Defendants | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Case: 03-C-99-010638
CF-Civil Fili
                    80.00
MLSC
                    10.00
Appearance Fee
                    10.00
TOTAL         $100.00

COMMENT:
diagnostic resource group, llc vs. t
america medical systems, inc and tos
medical credit

Receipt #199900021850
Cashier: JJ CLBACOX800
11/01/99   9:06am

## COMPLAINT

The Plaintiff, Diagnostic Resource Group, LLC, by its attorney, Jeffrey H. Kreshtool,

sues the Defendants and states:

1. The Plaintiff, Diagnostic Resource Group, LLC ("DRG"), is a limited liability

FILED   NOV 0 1 1999

company with its principal office in Baltimore County, Maryland.

2. The Defendant, Toshiba America Medical Systems, Inc. ("TAMS"), is a corporation, with its principal office in Tustin, California. TAMS has no office or resident agent in the State of Maryland.

3. The Defendant, Toshiba America Medical Credit, Inc. ("TAMC"), is a corporation with its principal office in Berwyn, Pennsylvania. TAMC has no office or resident agent in the State of Maryland.

4. At all times relevant hereto TAMS was in the business of manufacturing Magnetic Resonance Imaging Machines ("MRI").

5. At all times relevant hereto TAMC was in the business of leasing MRIs and acted as an agent of TAMS.

**COUNT I**

**BREACH OF CONTRACT**

6. On or about September 12, 1997 DRG entered into an agreement with TAMC to lease a Toshiba OPART MRI.

7. The Toshiba OPART MRI was delivered and installed at DRG's office in Baltimore County, Maryland, but never performed satisfactorily.

8. On or about August 17, 1999, TAMS, TAMC and DRG entered into an agreement whereby all parties would release all others from their obligations under the lease.

9. Pursuant to the August 17, 1999 agreement TAMC was to remove the Toshiba OPART from the office of DRG beginning August 18, 1999 at their expense.

10. TAMC has refused to remove the Toshiba OPART despite repeated requests by DRG.

11. DRG has been unable to install a suitable MRI because of TAMC's refusal to remove

the Toshiba OPART.

12. DRG has suffered substantial lost profits and incurred expenses in storing and

maintaining the Toshiba OPART.

WHEREFOR, the Plaintiff, Diagnostic Resource Group, LLC, demands judgment against

the Defendants, Toshiba America Medical Systems, Inc and Toshiba America Medical Credit ,

Inc. in the amount of Seven Hundred Fifty Thousand ($750,000.00) Dollars plus costs.

JEFFREY H. KRESHTOOL
Kreshtool & Kreshtool, P.A.
902 Light Street
Baltimore, Maryland 21230
(410) 752-4957

Attorney for Plaintiff

| | | |
|---|---|---|
| DIAGNOSTIC RESOURCE GROUP, LLC | * | IN THE |
| Plaintiff | * | CIRCUIT COURT |
| v. | * | FOR |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC., et al. | * | BALTIMORE COUNTY |
| | * | Case No. |
| Defendants | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## REQUEST FOR JURY TRIAL

 The Plaintiff Diagnostic Resource Group, LLC, requests a jury trial in the above captioned case.

JEFFREY H. KRESHTOOL
Kreshtool & Kreshtool, P.A.
902 Light Street
Baltimore, Maryland 21230
(410)752-4957

Attorney for Plaintiff

**EXHIBIT M**

1 (Pages 1 to 4)

---

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MARYLAND
3
4    ------------------------x
5    DIAGNOSTIC RESEARCH    x        VOLUME 1
6    GROUP, LLC,        x
7        Plaintiff    x    U.S. District Court
8    v.            x    Civil No. L-02-3020
9    TOSHIBA AMERICA MEDICAL  x
10   SYSTEMS, INC.,      x    Court Case No.
11       Defendant    x    03-C-02-006016
12   ------------------------x
13
14         Deposition of KIMBERLY STEHMAN
15            Baltimore, Maryland
16           Monday, March 17, 2003
17               2:43 P.M.
18
19   Job No. 1-14007
20   Pages 1 - 104
21   Reported by:  Sharon D. Livingston, CSR-RPR
22

---

**Page 2**

1         Deposition of KIMBERLY STEHMAN, held at the
2    offices of:
3
4    LAW OFFICE OF LEONARD J. SPERLING
5       Commercentre West, Suite 212
6       1777 Reisterstown Road
7       Baltimore, Maryland 21208
8       (410) 653-0141
9
10        Pursuant to Notice, before Sharon D.
11   Livingston, Registered Professional Reporter and
12   Notary Public of the State of Maryland.
13
14
15
16
17
18
19
20
21
22

---

**Page 3**

1             A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4       SAMUEL SPERLING, ESQUIRE
5       LAW OFFICE OF LEONARD J. SPERLING
6       Commercentre West, Suite 212
7       1777 Reisterstown Road
8       Baltimore, Maryland 21208
9       (410) 653-0141
10
11   ON BEHALF OF THE DEFENDANT:
12       BROOKE SCHUMM, III, ESQUIRE
13       DANEKER, MCINTIRE, SCHUMM, PRINCE,
14       GOLDSTEIN, MANNING & WIDMANN, P.C.
15       1 North Charles Street, Suite 2450
16       Baltimore, Maryland 21201
17       (410) 649-4747
18
19   ALSO PRESENT:  JOHN HUTTON
20
21   ORIGINAL
22

---

**Page 4**

1             C O N T E N T S
2    EXAMINATION OF KIMBERLY STEHMAN        PAGE
3       By Mr. Schumm            5
4
5             E X H I B I T S
6    (Attached to Deposition Transcript)
7    STEHMAN DEPOSITION EXHIBITS            PAGE
8    1   Toshiba America Medical Systems, Inc.   23
9        Historical Activity Report
10       Bates numbers 000095 through 000102
11   2   MRI Applications Site Reports        24
12       Bates numbers 000008 and 000010,
13       Bates numbers 000001 through 000003
14       Bates numbers 000005 through 000007
15   3   Toshiba work orders            26
16   4   Affidavit of Kimberly Stehman        78
17   5   Toshiba America Medical Systems, Inc.   85
18       Installation Progress Form
19   6   Affidavit of Kim Stehman        87
20
21   (Exhibits #5 and #6 are copies, originals retained)
22

---

**37**

1  to. I said, would you start a scan on another
2  patient?
3     **A**   **It depends on what the problem with the**
4  **machine was, what kind of scan it was on. There's a**
5  **lot of variables that would go into me answering. I**
6  **don't believe it's a simple yes or no answer.**
7     Q   If you called for service, would you
8  continue to treat or do scans on other patients that
9  day?
10     **A**   **Depends on if the machine was able to even**
11  **scan. There's a lot of different reasons why you**
12  **would call service.**
13     Q   Well, let's assume it's able to kind of
14  scan. Would you continue to perform scans on
15  patients?
16     **A**   **What do you mean by —**
17     MR. SPERLING: Objection. I'm going to
18  instruct the witness to answer only to the extent she
19  understands what it means to kind of scan.
20     **A**   **I don't understand what you're asking.**
21     Q   Why was it you were being paid by Maryland
22  Imaging while you were working for Diagnostic

**38**

1  Resource Group?
2     **A**   **I did some work for MD Imaging.**
3     Q   Were you receiving any paychecks from
4  Diagnostic Resource Group?
5     **A**   **Yes, sir.**
6     Q   And approximately how much were you being
7  paid by Diagnostic Resource Group at that period of
8  time?
9     **A**   **You know, I'd have to go back and check my**
10  **taxes. I have no idea how it was split up.**
11     Q   Do any records exist that show how it was
12  split up other than your taxes?
13     **A**   **Not any record. I mean they're the records**
14  **that I would have.**
15     Q   When you say they're the records, what
16  records would it be that you have?
17     **A**   **My taxes.**
18     Q   Would you have any other records?
19     **A**   **No, sir.**
20     Q   Do you have any records of Diagnostic
21  Resource Group?
22     **A**   **No, sir.**

**39**

1     Q   Take me through kind of a typical day. A
2  patient appears. Sort of what happens? You know,
3  how was the office physically laid out, and so on,
4  and so forth?
5     MR. SPERLING: Bel Air location?
6     MR. SCHUMM: Bel Air Road.
7     **A**   **When they walked into the office, they were**
8  **at the reception desk. Paperwork was filled out**
9  **there as far as information that was needed from**
10  **them.**
11     Q   And what kind of information would that be?
12     **A**   **Name, address, phone number, billing**
13  **information, metal questionnaire.**
14     MR. SPERLING: Did you say medical
15  questionnaire?
16     THE WITNESS: Metal.
17     MR. SPERLING: Oh, metal.
18     THE WITNESS: Metal.
19  BY MR. SCHUMM:
20     Q   What does that mean?
21     **A**   **Before anyone can go and have an MRI scan,**
22  **we need to find out if there's any metal in their**

**40**

1  **body that will interfere or cause them harm before**
2  **they would enter into the room.**
3     Q   Okay. And there were two suites there.
4     Which suite did folks enter into, patients
5  enter into, when they first came into the
6  receptionist?
7     **A**   **I don't know which suite numbers there were**
8  **there. I think it's 6 and 8 or 8 and 10, something**
9  **like that. One, if you were looking at the building,**
10  **it's on the left. I can tell you that.**
11     Q   Okay. Did it appear to all be sort of one
12  big area for an office?
13     **A**   **Yes.**
14     Q   Just happened to have two suite numbers?
15     **A**   **Yes. Yes.**
16     Q   All one big area?
17     **A**   **Yes.**
18     Q   Okay. And then was there a room there that
19  was dedicated to the MRI machine?
20     **A**   **Yes.**
21     Q   And was there a room there dedicated to
22  maintenance of other equipment that was adjunct to

41

1   the MRI machine?
2      **A   I believe you're probably referring to the**
3   **computer room?**
4      Q   I'm not referring to anything.  I'm just
5   asking you the question.
6      **A   I don't know.**
7      Q   Were there other rooms there?
8      **A   There were, yes.**
9      Q   Okay.  And what other rooms would there be
10  that would be adjunct to the MRI machine?
11     **A   There was a computer room.  That was the**
12  **closest thing to it.**
13     Q   Okay.  And what else?
14     **A   There was a room that actually had the**
15  **laser camera in it.**
16     Q   I'm sorry.  Could you say that once more?
17  A room with a what in it?
18     **A   Laser camera.**
19     Q   What does the laser camera do?
20     **A   Allows you to print the images from the MRI**
21  **machine onto film.**
22     Q   Anything else?

42

1      **A   There was a file room.  There was a**
2   **kitchen.  There was a marketing office.  There was**
3   **changing rooms, bathroom, and one other office and**
4   **the reception area.**
5      Q   And who was the one other office for?
6      **A   Jeffrey used it, and I used it.**
7      Q   I'm sorry.  Could you repeat that?
8      **A   Jeffrey Low and myself used it.**
9      Q   Okay.  And what was kept in the file room?
10     **A   Patient files.**
11     Q   Any other records?
12     **A   Not to my knowledge.**
13     Q   Where were financial records of the
14  business kept?
15     **A   Probably most of them were in a file**
16  **cabinet.  Yeah, they were in one of the file**
17  **cabinets.**
18     Q   So they were also not just patient files?
19  They were also financial records in the file cabinet?
20     **A   No, sir.  A different file cabinet.**
21     Q   A different file cabinet.  Okay.
22     Any other kind of records maintained at Bel

43

1   Air Road location?
2      **A   Patient reports.**
3      Q   What's a patient report?
4      **A   Physician has to read the scan and produce**
5   **a report.**
6      Q   And what physician would read the scan and
7   produce a report?
8      **A   Any of the number of physicians at**
9   **University.**
10        MR. SPERLING:  Why don't you spell it out.
11  University of?
12        THE WITNESS:  Maryland.
13  BY MR. SCHUMM:
14     Q   And who would those be, their names?
15     **A   I'm trying to think who read our reports**
16  **from over there.  There was a Greg Zoarski, I believe**
17  **Michael Rothman, Bernadette Stallmeyer, Dr. Resnik,**
18  **Dr. Mulligan.  They're the ones that come off the top**
19  **of my head.**
20     Q   Okay.  So how did it work that they did a
21  report?  Patient comes in.  Patient gets scanned.
22  Then what happens?

44

1      **A   Films are printed.  They were transported**
2   **down to University of Maryland to be read.**
3      Q   And then what happened to them?
4      **A   They were returned back to us.**
5      Q   And they were kept in a file cabinet?
6      **A   A room.**
7      Q   How were they organized in that room?
8      **A   Alphabetically.**
9      Q   What were the usual operating hours of the
10  premises?
11     **A   About 8:30 to 5:00.**
12     Q   Now, if you experienced a problem with the
13  MRI machine, what was your procedure?
14        MR. SPERLING:  Again at the Bel Air
15  location; is that correct?
16        MR. SCHUMM:  At the Bel Air location,
17  right.  Yeah.  Whenever I ask, I'm asking about the
18  Bel Air location.
19        MR. SPERLING:  Of Diagnostic Resource
20  Group?
21        MR. SCHUMM:  The company, correct.
22     **A   If it wasn't something that -- normally you**

Case 1:02-cv-03020-RDB    DEPOSITION OF KIMBERLY STEHMAN 2003    Page 25 of 37
Document 43-2    Filed 06/30/2003
CONDUCTED ON TUESDAY, MARCH 18, 2003

12 (Pages 45 to 48)

---

45

1  would have to shut the machine down and bring it back
2  up, what we would call reboot, to see if it would
3  clear the error or the problem it was having. If
4  not, then we had to place a service call.
5      Q   Okay. And if you placed a service call,
6  what happened then?
7      A   We had to wait for a phone call to let us
8  know if and when somebody could get there.
9      Q   Did you keep records of service calls
10 placed?
11     A   Yes, sir.
12     Q   Tell me about those records.
13         How were they kept?
14     A   In a logbook.
15     Q   And what did you notate in that logbook?
16     A   The type of problem and the date.
17     Q   Anything else?
18     A   No, sir.
19     Q   Any other information kept in the logbook?
20     A   No, sir.
21     Q   Was that the only logbook that was kept out
22 at the Bel Air Road location?

---

46

1      A   I believe we -- I'm just guessing. From
2  what I can remember, we probably kept a patient log
3  just so we knew what scans were done on what
4  patient. That's pretty typical of most MR places.
5      Q   Any other logbook?
6      A   No, sir.
7      Q   And how were patients scheduled at the
8  location?
9      A   A referring physician would call and make
10 an appointment.
11     Q   Then what happened to that information from
12 the call from the referring physician?
13     A   I believe Mena wrote it on the schedule.
14     Q   Who's Mena?
15     A   She was our receptionist.
16     Q   How do you spell her name?
17     A   M-e-n-a.
18     Q   And what's her last name?
19     A   Damico.
20     Q   And do you know where she lives?
21     A   She used to live -- I think it was
22 Rosedale? I think she was in Rosedale. I think

---

47

1  that's where she lived.
2      Q   And did she keep a calendar of the
3  appointments?
4      A   I believe it was like a -- it was a regular
5  schedule, like times when the patients were due to
6  come in, what kind of scan, who the doctor was.
7      Q   Any other information in there?
8      A   No. Phone number, you know, of the
9  patient. That would be about it.
10     Q   And were the schedules or calendars, were
11 they kept in a book, or how were they compiled and --
12     A   They probably kept them in a binder.
13         MR. SPERLING: Let Mr. Schumm finish his
14 question. You jumped the gun a little bit there.
15         THE WITNESS: Sorry.
16 BY MR. SCHUMM:
17     Q   And where was the binder kept?
18     A   At the front desk.
19     Q   Now, what records for Diagnostic Resource
20 Group were kept off site at another location?
21     A   None to my knowledge.
22     Q   Well, where were the financial records kept

---

48

1  for Diagnostic Resource Group?
2      A   I believe they were right there at Bel Air
3  Road.
4      Q   Well, why would records be faxed back and
5  forth between Maryland Imaging and Bel Air Road
6  location?
7      A   What do you mean what kind of -- why would
8  records? Of what?
9      Q   Just various records. There's just other
10 documents.
11         Do you know why records would be faxed back
12 and forth?
13     A   If an office had something at one and we
14 needed it at the other, they would fax it, but I
15 don't --
16     Q   What kind of records would those have been?
17     A   Could have been billing. Could have been
18 reports.
19     Q   Well, why would billing records --
20         If all the financial records of DRG are
21 kept at Bel Air Road, why would they have to be sent
22 over to Maryland Imaging?

---

**49**

1    A    Crystal, who did our billing, split the
2    time between Bel Air Road and MD Imaging.
3    Q    And was that an even split of time, like 50
4    percent, 50 percent?
5    A    About that I would imagine.
6    Q    Anybody else work at Diagnostic Resource
7    Group who split time between the locations?
8    A    Debbie Rittmiller.
9    Q    What did she do?
10    A    Marketing.
11    Q    And how long was she with Diagnostic
12    Resource Group?
13    A    About a year, year and a half I would
14    imagine. I wouldn't recall the exact dates.
15    Q    How long was she with Maryland Imaging
16    approximately?
17    A    About two years.
18    Q    And what was her background?
19    A    Debbie had done marketing for another
20    company in the Baltimore area here.
21    Q    And do you know where she can be reached or
22    located at this time?

**50**

1    A    No, I don't.
2    MR. SPERLING: For the record, the
3    information on Ms. Rittmiller is contained in the
4    answers to interrogatories, I seem to recall, with
5    her new name, which I'm not even going to try to
6    pronounce, and I think an updated address. It's like
7    Zirziky or something like that.
8    BY MR. SCHUMM:
9    Q    And what specifically would Ms. Rittmiller
10    do?
11    A    She was a marketer. She would go out and
12    visit physicians.
13    Q    Did she work for you?
14    A    She worked for Diagnostic Resource Group.
15    Q    Were you her supervisor?
16    A    Yes.
17    Q    And what was her background prior to coming
18    to Diagnostic Resource Group?
19    MR. SPERLING: Objection, hearsay. Go
20    ahead and answer.
21    A    She did marketing for another company.
22    Q    What other company?

**51**

1    MR. SPERLING: Same objection. Same line
2    of objection only to hearsay.
3    A    It was -- I don't recall the company. It
4    was the first open used to advertise with the
5    Orioles. I don't recall. I think it was open -- I
6    don't recall the company's name.
7    BY MR. SCHUMM:
8    Q    And what was her educational background?
9    A    I don't recall.
10    Q    You were her supervisor, right?
11    A    Correct.
12    Q    And she was doing marketing for you?
13    A    Yes.
14    Q    And you didn't know what her educational
15    background was?
16    A    At this time I don't recall what it is.
17    Q    Did she have a college degree?
18    A    I don't recall.
19    Q    Do you recall anything about Ms.
20    Rittmiller's job qualifications at all?
21    A    At this time?
22    Q    Yes.

**52**

1    A    I don't recall.
2    Q    Where would the records be of her job
3    qualifications?
4    A    I don't know where they are.
5    Q    When patients came in, you said you had to
6    obtain billing information from them.
7    What do you mean by billing information?
8    A    Who their insurance company was.
9    Q    And what's the purpose of obtaining that
10    information?
11    A    So that it could be billed.
12    Q    Okay. Tell me how the billing process
13    worked.
14    A    Bills were submitted to the insurance
15    companies for MRIs.
16    Q    Now, if you had a problem with a scan,
17    would you send a bill to the insurance company?
18    A    Depends on if it was a complete scan or if
19    it wasn't.
20    Q    Well, if you sent a bill, was it a complete
21    scan?
22    A    Yes.

**EXHIBIT N**

# MRI  APPLICATIONS SITE REPORT
Submitted by
Gloria Sumler
April 28, 1998

**Site Number:** R-77
**Customer Name: Diagnostic Resource Group**
**Address:**          8817 Belair #106
                      Perry Hall, Md. 21236
**Telephone:**        (410) 529-4444

**Regional Sales Manager:** Eric Lindsey
**Full Line Sales Specialist:** J.P. Marzullo
**MR Modality Manager:** Mike Ellis
**Regional Service Manager:** Bob Mc Aveny
**Area Service Manager:** John Hutton
**Customer Engineer:** Kent Stansbury

**Doctors:** Phillip Templeton
**Technologists:** Kim Stehman

**Date of Visit:** April 6-10, 1998          **Time Spent on Site:** 5 days
**Date of First Paying Patient (new site only):** No paying patient done.
**Reason for Visit:** New site start-up

**SYSTEM:** OPART: QD Head, Large & Small Body, Extremity, Neck with Extender, Shoulder, Small Belt, T-Spine.  No camera on site.
**SOFTWARE VERSION:** 1.3 rev 4
*********************************************************************
## Clinical Evaluation:
Clinical evaluation was completed all scans met or exceeds system specification except for the angio sequence.  The 3D TOF  COW  scan would not reconstruct.  This was reported to service. All scans were archived to service disk.
Optical disc and mouse pad given to site.
## Applications Issues:
The site was down when I arrived on Monday.   The TCM board had to be replaced and the system was ready Tuesday morning.
This has been an unusually site turn-over.  The site was not clean or prepared for application. No patients were schedule and very few volunteers were available.  The technologist had to leave the site every day from 11 a.m. to 2 p.m. to scan at another site. There was no camera available at the site.
However, the technologist  has previous MR experience and learned the system very quickly. The site has elected to have only one  week of application at this time and use the second week when more staff is hired.

Item Covered:
1. Magnet/Table
2. Coils, coil's positioning
3. Intercom system
4. Computer room
5. System start up & shut down
6. Schedule, Acquire, Display, File and Utilities icons
7. Configuration default
8. Daily QA
9. Filter and reconstruction
10. Filming setup demonstrated (no camera available)
11. Protocol creation and Memory Storage
12. Archive, delete, and restore
13. MIP

Scans done:
1. Brain
2. Cervical Spine, Carotid
3. Lumbar Spine
4. Knee
5. Shoulder
6. Elbow
7. Abdomen

Image quality is very good. Dr. Templeton and Kim were pleased with all scans performed. Recommended protocols were stored in memory for scans not performed.

*Action Items*:
1. Stay in telephone contact with the site.
2. Advanced scanning technique will be covered on next visit.

**Engineering Issues:**

Jeff Lowe the site owner had several complaints
1. He felt the intercom system is unacceptable because the only way to communicate with the patient is through the headset. Sales and service are also aware of this complaint and they are looking into other options.

2. The swaying motion of the table.

3. The 3D TOF angio sequence would not recon.

000009

*Action Items*:

### Service Issues:

Phil Varone and Kent Stansbury was on site during application training.  I would like to thank them for their diligent work..
The system was down on two occasions during my visit.  The TCM board had to be replaced on day one.  Day four of training  the magnet suffered an uncontrolled ramp down due to an area power outage.  The system was back up the next morning..

*Action Items*:
**None at this time.**

### Sales Issues:

J.P. Marzuloo stopped by the site during application.
*Action Items*:
Talk t o  Jeff Lowe about his concern about the intercom systems.

**Revisit Needed?**
Yes,  week two of application training at the customer request.


**Submitted By: Gloria J. Sumler**

010

**EXHIBIT O**

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF MARYLAND
3    -------------------------X
4    DIAGNOSTIC RESOURCE GROUP,  :
5    L.L.C.              :
6         Plaintiff    : U. S. District Court
7       v.          : Civil No. L-02-3020
8    TOSHIBA AMERICA MEDICAL    :
9    SYSTEMS, INC.        : Court Case No.
10        Defendant    : 03-C-02-006016
11   -------------------------:
12      Deposition of PHILIP ANTHONY TEMPLETON, M.D.
13          Baltimore, Maryland
14          Monday, May 19, 2003
15            10:19 a.m.
16   Job No.: 1-16982
17   Pages 1 - 90
18   Reported by:  Beatriz D. Fefel, RPR
19
20
21
22

**Page 2**

1       Deposition of PHILIP ANTHONY TEMPLETON, M.D.,
2    held at the law offices of:
3
4       LEONARD J. SPERLING
5       1777 Reisterstown Road
6       Commercentre West, Suite 212
7       Baltimore, Maryland  21208
8       (410) 653-0141
9
10
11       Pursuant to agreement, before Beatriz D.
12   Fefel, Registered Professional Reporter and Notary
13   Public of the State of Maryland.
14
15
16
17
18
19
20
21
22

**Page 3**

1          A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4       SAMUEL SPERLING, ESQUIRE
5       LAW OFFICE OF LEONARD J. SPERLING
6       1777 Reisterstown Road
7       Commercentre West, Suite 212
8       Baltimore, Maryland  21208
9       (410) 653-0141
10
11   ON BEHALF OF THE DEFENDANT:
12       BROOKE SCHUMM, III, ESQUIRE
13       DANEKER, McINTIRE, SCHUMM, PRINCE,
14       GOLDSTEIN, MANNING & WIDMANN, P.C.
15       1 North Charles Street
16       Suite 2450
17       Baltimore, Maryland 21201
18       (410) 649-4747
19
20
21
22

**Page 4**

1          C O N T E N T S
2    EXAMINATION OF PHILIP A. TEMPLETON, M.D.    PAGE:
3    By Mr. Schumm              5
4    By Mr. Sperling          69
5    By Mr. Schumm              83
6
7          E X H I B I T S
8       (Attached to the transcript.)
9    TEMPLETON DEPOSITION EXHIBITS:        PAGES:
10    1  10/1/98 Delivery and Acceptance
11       Certificate; Attachment A to
12       Landlord/Mortgagee Waiver; 7/7/99
13       letter to McAveney from Low        9
14    2  "TOSHIBA" problem list      14
15    3  4/28/98 MRI Applications Site
16       Report              28
17    4  4/98 Imaging Center scanning log    28
18
19
20
21
22

Case 1:02-cv-03020-RDB    Document 43-2    Filed 06/26/2003    Page 33 of 37
DEPOSITION OF PHILIP ANTHONY TEMPLETON, M.D.
CONDUCTED ON MONDAY, MAY 19, 2003

5 (Pages 17 to 20)

**17**

1  list, but --
2     Q   Okay.
3     A   -- what it would mean to me is the fact --
4        MR. SPERLING:  I'm just going to object if
5  it's not based on some knowledge that he has.
6        MR. SCHUMM:  Okay.  I can ask him anything I
7  want; he either knows or he doesn't know.
8        MR. SPERLING:  Exactly.  He's asking what
9  you know or other source of information.
10       MR. SCHUMM:  Well, but if he has an
11 understanding I'll ask him what his understanding is
12 based on.
13       MR. SPERLING:  Or if he has an
14 understanding.
15 BY MR. SCHUMM:
16    Q   Go ahead.
17    A   Okay.  My understanding would simply be that
18 because the system needed a generator, there was a
19 yearly cost associated with running that generator
20 that was an incremental cost to the entire operation.
21    Q   Now, to your knowledge, were there other MRI
22 systems that required generators?

**18**

1     A   Well, I don't know the answer to that, to be
2  quite honest.
3     Q   Okay.  Had you or Jeffrey ever gone out to
4  look at a Toshiba MRI system that was being purchased
5  by Diagnostic Resource Group?
6     A   I don't know that Jeffrey and I ever went to
7  look at an MRI system that I can recall, but I have --
8  I did personally myself in the past go look at the
9  OPART system at Toshiba headquarters.
10    Q   Okay.  Had Jeffrey gone to see one of the
11 OPART systems?
12    A   That I'm not sure.
13    Q   Okay.  Did he ever say anything to you that
14 he had or had not?
15    A   I don't remember.  It was quite awhile ago.
16    Q   Yeah.  Okay.  So with respect to these first
17 three items, to your knowledge, what damage did
18 Diagnostic Resource Group suffer?
19    A   Well, again, not being totally specific from
20 knowledge but general understanding, the first issue
21 was that the platform had to be created, and it was a
22 rather lengthy, as I recall, long and inclined

**19**

1  platform.  So I think that probably delayed getting
2  things started and had costs borne by someone, and
3  then the additional issues, which may come later in
4  this list, I'm not positive, but the generator itself,
5  as I recall, was not hooked up by Toshiba when it was
6  installed.  So the first time with the system in
7  operation power went out, and the backup generator did not
8  come on, and I think that was over a weekend, and the
9  system died.
10    Q   I'm going to show you what's been Bate-
11 stamped as Documents 8, 9 and 10, and it says MRI
12 Applications Site Report.
13       MR. SPERLING:  Take a moment to go through
14 it.
15    Q   Yeah, I was going to ask you to do that.
16 You've seen that before, I think.
17    A   I'm sure I have (complying).  Okay.
18    Q   Okay.  Do you recall having a meeting out
19 there in approximately April of 1998 with the various
20 persons listed?
21    A   Well, there's a lot of people listed here,
22 but I remember being there for actually just a brief

**20**

1  period of time.
2     Q   Umh-humh.
3     A   And I remember Kim Stehman and I remember
4  Gloria Sumler who was the applications person.
5     Q   Umh-humh.
6     A   And I'm really not sure who else was or
7  wasn't there at the time.
8     Q   Okay.  Was a gentleman named Mr. Kent
9  Stansbury there?
10    A   He could have been.  I think I met him at
11 some point; I don't know if it was that day.
12    Q   And what was the purpose of the meeting?
13    A   They were doing applications and I just went
14 out to see the system.
15    Q   And did you see the system operate?
16    A   Yes.
17    Q   And did it operate satisfactorily, as best
18 you could tell?
19    A   As far as I recall.
20    Q   Okay.  I'm going to show you what's been
21 identified as Bates Nos. 607, and attached to it for
22 some reason is Bates No. 479.  But this was produced

DEPOSITION OF PHILIP ANTHONY TEMPLETON, M.D.
CONDUCTED ON MONDAY, MAY 19, 2003

6 (Pages 21 to 24)

21

1 to us by Diagnostic Resource Group as the records from
2 April of 1998, and you can see it has a fax line of
3 5/4/1998. Were you aware that patients were treated
4 immediately after the date that you had the meeting
5 with Ms. Sumler and so on?
6     A    As far as I know, I know they did some
7 patients, yes.
8     Q    Okay. And in the course of your
9 association, was the machine ever used on patients
10 when it wasn't operating properly?
11     A    When you say my association?
12     Q    Well, you have this sort of -- you're not
13 quite sure of your title --
14     A    Oh.
15     Q    -- in your connection with it, so I'm
16 calling it an association for lack of a better thing.
17 I could say, well, you were secretary of the company,
18 or whatever your position was.
19     A    Well, to try to answer that question as best
20 I can, I know there were times that the system was
21 being used on a patient and it failed, if that's what
22 you mean. And so as far as I know, those scans were

22

1 aborted.
2     Q    Okay. But to your knowledge, was a machine
3 being used for diagnostic purposes on patients when it
4 wasn't operating properly and those results were given
5 back to doctors?
6     A    Not that I know of.
7     Q    Okay. And what would you have done if that
8 was occurring?
9     A    Well, I suppose, in the sense if I -- I'm
10 not sure what you mean when you say not operating
11 properly. In other words, if it was producing
12 diagnostic scans, that's one thing; if it was not
13 producing diagnostic scans, that would be the other,
14 and that would probably be the extent of my
15 involvement. If it was a machine technical problem, I
16 probably wouldn't have necessarily known about it.
17     Q    And what was the normal procedure with
18 Diagnostic Resource Group if there was a technical
19 problem with the machine?
20     A    Well, as far as I would know, and I don't
21 particularly know the procedures --
22     Q    Okay.

23

1     A    -- they obviously would either have to stop
2 scanning the patient and try to reschedule, or call on
3 the service personnel to fix the problem.
4     Q    And to your knowledge, when calls were made
5 to service personnel, were responses given by the
6 service personnel to fix the problem and bring the
7 machine back up to operating order again?
8     A    As far as I know.
9     Q    Did you have any other business connections
10 with Mr. Low?
11     A    Beyond --
12     Q    Diagnostic Resource Group.
13     A    -- Diagnostic Resource Group?  Yes.
14     Q    And what were those other associations?
15     A    Well, again, there were ventures that he did
16 that he considered me a partner in, and I was a
17 partner at least, I guess to the degree that I was
18 named a partner, if you will. It wasn't a financial
19 transaction or contribution or distribution or
20 anything of that nature. But, you know, I know there
21 was a surgery center in New Jersey that was attempted
22 to be put together and, to the best of my knowledge,

24

1 not operational. And there was some imaging center in
2 New York. But, again, as best I know, someone bought
3 that, but it really had no direct involvement or
4 bearing with me in any financial or other way.
5     Q    Did you --
6     A    Very loosely.
7     Q    Did you receive any financial remuneration
8 from any of the businesses with which you were
9 associated with --
10     A    No.
11     Q    -- Mr. Low, for instance, serving as
12 secretary or whatever positions you might have had?
13     A    No.
14     Q    And did you ever receive a K-1 from him, or
15 any tax documents that you would have used in
16 compiling your own personal tax returns?
17     A    The only K-1 document that I recall that I
18 ever got was one from that surgery center in New
19 Jersey.
20     Q    Okay. And have you made an investment in
21 that surgery center?
22     A    No.

Case 1:02-cv-03020-RDB    Document 43-2    Filed 06/26/2003    Page 35 of 37
DEPOSITION OF PHILIP ANTHONY TEMPLETON, M.D.
CONDUCTED ON MONDAY, MAY 19, 2003

7 (Pages 25 to 28)

25

1    Q    Let's see.  Some papers in the file indicate
2    that you were a medical director associated with
3    Diagnostic Resource Group; does that ring a bell?
4    A    It's not impossible.
5    Q    Not impossible, okay.  Got it.
6    A    The title of medical director, I guess,
7    means that the physician of record for the imaging
8    center.  I wasn't definitely sure that I was the
9    medical director of that center; however, it's
10   certainly possible.
11   Q    Okay.  And during this time from, let's say,
12   the beginning of 1998 through the end of 1999, which
13   seems to be sort of the relevant period of events of
14   operation, what was your career and what were you
15   doing?
16   A    I was the chairman of radiology at the
17   University of Maryland.
18   Q    And when you say at the University of
19   Maryland --
20   MR. SCHUMM:  Let's go off the record for a
21   second.
22   (Discussion off the record.)

26

1    BY MR. SCHUMM:
2    Q    When you refer to the University of
3    Maryland, you're referring to the University of
4    Maryland at Baltimore hospital complex located down on
5    Greene and Paca Streets in Baltimore?
6    A    Yes.
7    MR. SPERLING:  Actually, I think the name is
8    different.  Isn't it University of Maryland Medical
9    System?
10   THE WITNESS:  Yeah, it's actually much more
11   complicated than that, because there's actually the
12   School of Medicine --
13   MR. SPERLING:  Right.
14   THE WITNESS:  -- and the Medical System.
15   MR. SPERLING:  And I know they kind of sold
16   it, or something like that, or it's no longer part of
17   the State, or something like that?
18   THE WITNESS:  No, it's a private, not-for-
19   profit.  But, I mean, us as physicians there are both
20   in the role of being in the Medical School as
21   professors and being in the Medical System as clinical
22   chief of the department, so you wear like ten hats

27

1    when you're there, but. . .
2    BY MR. SCHUMM:
3    Q    Okay.  In connection with your association
4    with Diagnostic Resource Group, did you exercise any
5    authority in your role as a secretary or medical
6    director in terms of supervising persons or signing
7    contracts, and so on and so forth?
8    A    I would say outside of this document --
9    MR. SPERLING:  Templeton 1, marked as 1.
10   A    -- 1, I did not really directly supervise
11   personnel or sign other documents or do any other
12   managerial things, no.
13   Q    If I could direct your attention back to the
14   document I showed you a little earlier, the document
15   Bate-stamped 0008, which I guess --
16   MR. SCHUMM:  Why don't we mark that as
17   Templeton, what are we up to, 3?
18   MR. SPERLING:  Why don't we mark that
19   document as 3 and this document as 4.
20   MR. SCHUMM:  And we'll mark Document
21   00607 --
22   MR. SPERLING:  And 479.

28

1    MR. SCHUMM:  -- and 479 as Exhibit 4.
2    (Deposition Exhibit Nos. 3 & 4 were marked
3    for identification and were attached to the
4    transcript.)
5    BY MR. SCHUMM:
6    Q    I think my question was going to be,
7    redirecting your attention to what's been marked as
8    Templeton Deposition Exhibit No. 3, is that a fair
9    recollection of the events that you knew of that had
10   occurred around those dates?
11   A    Well, not exactly.  I never saw this
12   document before.
13   Q    Right.  No, no.  I'm asking you if it's a
14   fair recollection of the events you knew of there.
15   Would you --
16   A    I honestly -- there are a lot of things in
17   this that I couldn't speak to at all.
18   Q    Okay.
19   A    My only recollection of that time is being
20   there for a brief while and perhaps seeing one or two
21   patients scanned.
22   Q    Okay.

**EXHIBIT P**



**Diagnostic Resource Group**
**Accounts Receivable**
**11/30/98**



|         | Income    | AR           | Balance    |
|---------|-----------|--------------|------------|
| Apr-98  | 708.00    | 12,702.00    | 11,994.00  |
| May-98  | 2,665.00  | 23,622.00    | 20,957.00  |
| Jun-98  | 6,253.00  | 33,149.00    | 26,896.00  |
| Jul-98  | 13,562.00 | 43,734.00    | 30,172.00  |
| Aug-98  | 21,324.00 | 40,293.00    | 18,969.00  |
| Sep-98  | 5,236.00  | 44,126.00    | 38,890.00  |
| Oct-98  | 26,372.00 | 57,617.00    | 31,245.00  |
| Nov-98  | 14,691.00 | 52,099.00    | 37,408.00  |
|         | 87,438.00 | 271,018.00   | 183,580.00 |

| Less 90 days | -             | (153,842.00) |       |
|--------------|---------------|--------------|-------|
| Allowance %  | 87,438.00 /   | 117,176.00 = | 0.75  |
|              |               | * 0.25       |       |
| Allowance    |               | 29,738.00    |       |