# EXHIBIT C

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MARYLAND
 3
 4   ---------------------------x
 5   DIAGNOSTIC RESEARCH         x         VOLUME 1
 6   GROUP, LLC,                 x
 7        Plaintiff              x      U.S. District Court
 8   v.                          x      Civil No. L-02-3020
 9   TOSHIBA AMERICA MEDICAL     x
10   SYSTEMS, INC.,              x        Court Case No.
11        Defendant              x        03-C-02-006016
12   ---------------------------x
13
14           Deposition of JEFFREY LOW
15               Baltimore, Maryland
16            Thursday, March 13, 2003
17                   2:20 P.M.
18
19   Job No. 1-13715
20   Pages 1 - 152
21   Reported by:  Sharon D. Livingston, CSR-RPR
22
```

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 2

1  Deposition of JEFFREY LOW, held at the
2  offices of:
3
4  LAW OFFICE OF LEONARD J. SPERLING
5  Commercentre West, Suite 212
6  1777 Reisterstown Road
7  Baltimore, Maryland 21208
8  (410) 653-0141
9
10  Pursuant to Notice, before Sharon D.
11  Livingston, Registered Professional Reporter and
12  Notary Public of the State of Maryland.

Page 3

1            APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFF:
4     SAMUEL SPERLING, ESQUIRE
5     LAW OFFICE OF LEONARD J. SPERLING
6     Commercentre West, Suite 212
7     1777 Reisterstown Road
8     Baltimore, Maryland 21208
9     (410) 653-0141
10
11  ON BEHALF OF THE DEFENDANT:
12     BROOKE SCHUMM, III, ESQUIRE
13     DANEKER, MCINTIRE, SCHUMM, PRINCE,
14       GOLDSTEIN, MANNING & WIDMANN, P.C.
15     1 North Charles Street, Suite 2450
16     Baltimore, Maryland 21201
17     (410) 649-4747
18
19  ALSO PRESENT: JOHN HUTTON

Page 4

1              C O N T E N T S
2  EXAMINATION OF JEFFREY LOW           PAGE
3     By Mr. Schumm                       6
4
5              E X H I B I T S
6     (Attached to Deposition Transcript)
7  LOW DEPOSITION EXHIBITS              PAGE
8  1  Defendant Toshiba's Notice of      6
9     Deposition of Custodian of Documents
10 2  Defendant Toshiba's Request for   30
11    Production of Documents
12    (Remarked)                        31
13 3  Copy of checks numbered 2314 and 2311   61
14    Bates number 100095
15 4  Copy of checks numbered 2309 and 2310   61
16    Bates number 100096
17 5  Copy of checks numbered 2307 and 2308   62
18    Bates number 100097
19 6  Copy of checks numbered 2287 and 2286   63
20    Bates number 100101
21 7  Document headed Open MRI MD Imaging,   124
22    LLC, Bates number 102021

Page 5

1           EXHIBITS CONTINUED
2     (Attached to Deposition Transcript)
3  LOW DEPOSITION EXHIBITS              PAGE
4  8  Fax dated 8-11-99 from Nader Rad to   141
5     Jeffrey H. Kreshtool; Quotation/Orders
6     and Order Details, Bates numbers
7     102301 through 102314
8  9  Letter dated 7-8-99 from Jeffrey H.   147
9     Kreshtool to Robert McAveney; fax
10    dated 10-12-99 from J. Eric Atherholt
11    to Jeffrey H. Kreshtool; correspondence
12    dated 11-11-99 from Robert M. Rodolico
13    to Jeffrey Low, Kim Stehman; fax
14    cover sheet; fax dated 11-12-99 from
15    Jeffrey H. Kreshtool to Nader Rad;
16    facsimile transmittal sheet dated
17    11-15-99; fax dated 11-15-99 from
18    Jeffrey H. Kreshtool to Rick Atherholt
19    Bates numbers 102315 through 102322

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 6

1    PROCEEDINGS
2        JEFFREY LOW,
3   having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR DEFENDANT
5   BY MR. SCHUMM:
6       Q   Mr. Low, could you spell your name and give
7   your residence and business address for the record,
8   please.
9       A   Jeffrey Low, L-o-w. My current business
10  address is 1122 Kennilworth, K-e-n-n-i-l-w-o-r-t-h,
11  Drive, and that's Towson, T-o-w-s-o-n, Maryland.
12      Q   And what's your residence address?
13      A   8402 Topping, T-o-p-p-i-n-g, Road,
14  Pikesville, P-i-k-e-s-v-i-l-l-e, Maryland.
15         (Low Deposition Exhibit 1 was marked for
16  identification and attached to transcript.)
17  BY MR. SCHUMM:
18      Q   Mr. Low, I'm going to show you what I've
19  marked as Exhibit 1. This is an unsigned copy of
20  Defendant Toshiba's Notice of Deposition of Custodian
21  of Documents, which I served on your counsel.
22         Have you ever seen that document before?

Page 7

1       A   I believe so, yes.
2          MR. SCHUMM: Off the record.
3          (Discussion off the record.)
4   BY MR. SCHUMM:
5       Q   Can I direct your attention to the third
6   page of that Exhibit 1, please. If you could go down
7   that list. Let's just take each category. Documents
8   associated with the allegations, paragraph by
9   paragraph, of the complaint.
10         Are you the custodian of those records?
11  Who would be the person who would be the custodian of
12  those records?
13      A   I don't have those on my --
14         MR. SPERLING: If there's stuff that you
15  don't have, have you given it to me?
16         THE WITNESS: Yes.
17         MR. SPERLING: Okay.
18  BY MR. SCHUMM:
19      Q   Okay. That's fair. Sort of as a ground
20  rule, we probably ought to make this kind of clear.
21  If you gave it to your attorney, I'll ask you what
22  happened to it, if you don't have it, but if you say,

Page 8

1   hey, I gave it to my attorney, then I simply have to
2   ask Mr. Sperling, and I take it all that stuff's been
3   turned over to me? And he'll either say, well, I
4   extracted three privileged documents or yeah, I
5   handed you the pile when we were all here a couple of
6   weeks ago. So back at the line of questioning here.
7       A   Number 1, my attorney would have that.
8       Q   Okay. So whatever you had that had to do
9   with the allegations in the complaint you gave to
10  your attorney, and based on what he said before,
11  we're just going to assume, Mr. Sperling, that you've
12  given me all this stuff unless you say they're
13  somehow withheld.
14         MR. SPERLING: I'll say if otherwise.
15  BY MR. SCHUMM:
16      Q   Number 2. Documents associated with the
17  conduct of the business of DRG.
18      A   That would also be in the hands of my
19  attorney.
20      Q   And you would have been the former
21  custodian of that, or would anybody else be the
22  custodian of any of those records?

Page 9

1       A   Myself or Ms. Stehman.
2       Q   Did you ask her for her stuff to be given
3   to you or to Mr. Sterling?
4       A   I had asked everything to be given to Mr.
5   Sperling.
6       Q   So to the best of your knowledge, she's not
7   holding any documents?
8       A   At this point I don't think so.
9       Q   What about any accountant that you had in
10  the business, did you ask him for records?
11      A   Yes, I have.
12      Q   And where are those records?
13      A   Those records I've asked to have sent also
14  to Mr. Sperling.
15         MR. SPERLING: That would primarily be the
16  tax records.
17         MR. SCHUMM: We don't have those yet?
18         MR. SPERLING: I don't have those yet.
19  BY MR. SCHUMM:
20      Q   When did you make that request of him?
21      A   A couple of weeks ago I believe.
22      Q   Did you know that we served a request for

3 (Pages 6 to 9)

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 10

1 production of documents in November of last year?
2   A   No, I didn't.
3       MR. SPERLING: I'll just represent I made
4 earlier requests, left telephone messages asking for
5 those records.
6 BY MR. SCHUMM:
7   Q   But as of yet we don't have whatever he's
8 got, which we hope includes the tax records?
9   A   Correct.
10  Q   How about documents associated with the
11 financial affairs of Diagnostic Resource Group?
12  A   Those too I've given to Mr. Sperling.
13  Q   Except for the ones that the accountant may
14 not have yet transmitted?
15  A   Correct.
16  Q   What's his name?
17  A   Vince Batyr.
18  Q   Where is he?
19  A   He's in New York.
20      MR. SPERLING: Terrytown.
21 BY MR. SCHUMM:
22  Q   How was it you got hooked up with him in

Page 11

1 New York?
2   A   I'm originally from New York.
3   Q   Okay. Contracts with any third party, have
4 you turned all those over?
5   A   Yes.
6   Q   And third party means anybody other than
7 Diagnostic Resource Group.
8       Do you understand that?
9   A   No.
10  Q   Well, if you had contracts with any person
11 other than Diagnostic Resource Group, except for your
12 lawyer, which you don't have to turn over, have you
13 turned over all those contracts?
14  A   Yes.
15  Q   So that would include contracts with
16 De Lage Landen?
17  A   Uh-huh.
18  Q   Does it also include contracts with
19 Toshiba?
20  A   Yes.
21  Q   Or with another entity called Toshiba
22 America Medical Credit, you've turned over those

Page 12

1 contracts?
2   A   Yes.
3   Q   And what about any contracts that existed
4 between you and any of your affiliates, have you
5 turned all those over?
6   A   Yes.
7   Q   Were there any of those type of contracts?
8       MR. SPERLING: Why don't you define what
9 you mean by affiliate.
10 BY MR. SCHUMM:
11  Q   Affiliate is any company in which you have
12 a financial, employment or ownership interest for
13 purposes of this question.
14      Did you have any contracts with them?
15      MR. SPERLING: By you, you doesn't mean
16 Jeffrey Low? You means DRG?
17      MR. SCHUMM: Yeah, you is always going to
18 mean DRG.
19      MR. SPERLING: So did DRG have any
20 contracts with any other entity in which you had an
21 interest?
22      THE WITNESS: No.

Page 13

1       MR. SCHUMM: Okay. So you had none to turn
2 over?
3       THE WITNESS: Correct.
4       MR. SPERLING: And you've also gotten the
5 property lease, which is a contract.
6       MR. SCHUMM: That's right. I can't
7 remember whether it was signed or unsigned, but I
8 assume it was the copy that you had.
9 BY MR. SCHUMM:
10  Q   Are you the custodian who would know the
11 location of all of DRG's corporate documents,
12 including paper and electronic records?
13  A   I'm one of them, yes.
14  Q   Who would be the other person?
15  A   Ms. Stehman.
16  Q   So there's really two custodians of
17 documents? Is that what you're telling me?
18  A   That's correct. Those records would also
19 be given to Mr. Sperling.
20  Q   Why would she be holding records?
21  A   Ms. Stehman acted as the manager of the
22 center, DRG.

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 14

1  Q  How about computers and computers records,
2  who would be the custodian of those?
3  A  She would be.
4  Q  Where are those computers and computer
5  records?
6  A  I don't know.
7  Q  What efforts were made to locate them?
8  A  Quite a bit.
9  Q  Tell me about them.
10 A  Basically going through our old computer
11 equipment and not finding any information relating to
12 DRG on them and kind of not our understanding where
13 they've gone. Whether it was from a move or what
14 have you, or cleaning out the facility, I don't know.
15 Q  When would this cleaning out to which you
16 referred have taken place?
17 A  Some time after the scanner was removed I
18 guess.
19 Q  So this is after the deinstallation in
20 roughly early November of 1999?
21 A  Correct.
22 Q  And you mentioned a move.

Page 15

1     What other moves would you be referring to?
2  A  That was the move I was referring to.
3  Q  Any other reason why those records would
4  have been lost?
5  A  No.
6  Q  Were there computer records stored on the
7  computers at DRG prior to the move and
8  deinstallation?
9  A  I can't say no, but I'm not quite sure.
10 I'm sure there might be notes and patient information
11 and logs and things like that.
12 Q  When you say notes, what do you mean by
13 that?
14 A  Well, like scheduling and things like
15 that. Like I would guess that my marketing person
16 who logged all her information into the computer had
17 taken notes and so forth on marketing and following
18 up with our DRG's prospective clients.
19 Q  And when you referred to patient
20 information, what do you mean?
21 A  I mean just that. I mean patient
22 scheduling as well as possible billing information

Page 16

1  and marketing.
2  Q  And you referred to another category.
3  Notes, patient information. What was the other thing?
4     MR. SPERLING: Maybe just have the court
5  reporter read it back.
6     MR. SCHUMM: Yeah. About three or four
7  questions ago, the response.
8     (Record read by reporter.)
9     MR. SCHUMM: Okay. Thank you.
10    THE WITNESS: I can't be certain though.
11 BY MR. SCHUMM:
12 Q  What about logs?
13    MR. SPERLING: Do you want him to define
14 them or tell you where they are or both?
15 BY MR. SCHUMM:
16 Q  Well, let's start out with do you
17 understand what I -- You used the word logs.
18    What do you mean by the word logs?
19 A  I mean just a place where information for
20 the marketing person categorized or input all of her
21 information on her daily work efforts.
22 Q  What was the name of the person you --

Page 17

1  A  Her name was Debbie.
2  Q  A couple of rules of the game here.
3     MR. SPERLING: Let Mr. Schumm finish his
4  question. Then you answer.
5  BY MR. SCHUMM:
6  Q  You can't give nonverbal answers. You
7  can't shake your head or nod your head or whatever.
8  You want to say something out loud. Make sure you
9  let me finish the question. You might be really
10 surprised what you just said yes to or no to, and we
11 don't want that to happen either.
12 A  Sorry.
13 Q  So at any rate, my question was when you
14 say marketing person, to whom are you referring to?
15 A  Debbie Rittmiller, R-i-t-t-m-i-l-l-e-r.
16 Q  What was her position?
17 A  She was the marketing person, director.
18 Q  When you refer to logs, anything else that
19 would have been kept as logs?
20 A  Not to my knowledge.
21 Q  How about maintenance logs?
22 A  I don't believe those were kept in the

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 18

1  computer. I believe those were just kept between Ms.
2  Stehman and the service rep.
3    Q   And where are those?
4    A   I believe Mr. Sperling should have them.
5    Q   He didn't turn over to me any maintenance
6  logs.
7    A   Okay. I do not have them.
8    Q   Who would have them if you don't have them?
9    A   If I don't have them, Ms. Stehman would
10 have them.
11   Q   Why would she sort of have half the stuff
12 still and you have half the stuff still?
13   A   I don't know why. I think basically
14 because Kim essentially ran the center. I had very
15 little to do with the service personnel that were
16 coming in every day. I had very little to do with
17 operating any of the equipment -- nothing as far as
18 operating the equipment or logging the problems on a
19 daily basis. So Ms. Stehman would have all of those.
20   Q   Were there any logs with respect to
21 scheduling of patients or diaries or calendars with
22 respect to scheduling patients?

Page 19

1    A   I believe so.
2    Q   And where are those?
3    A   Those also would be with Ms. Stehman or
4  would have been turned over to Mr. Sperling.
5        MR. SPERLING: I will represent I've given
6  you a quantum of those.
7  BY MR. SCHUMM:
8    Q   Is it fair to say, Mr. Low, that if Mr.
9  Sperling doesn't have it, relying on the truthfulness
10 of his representation that he turned everything over
11 to me, then it doesn't exist anymore? Is that a fair
12 assumption?
13   A   It's a fair assumption that yes, I would
14 say that unless Ms. Stehman has some items that I
15 don't know about at this point.
16   Q   We'll obviously run through this with her.
17 I didn't realize she was an additional custodian.
18       Next on the list is DRG's records retention
19 policy.
20       Did you have a records retention policy?
21   A   I wouldn't say a policy, no.
22   Q   What was the practice?

Page 20

1    A   Logging patient information, scheduling as
2  we just discussed, and that's about it.
3    Q   If I could just focus you a little bit
4  more. The question is records retention.
5        Did you have a policy or practice relative
6  to storing, hanging on to, and so on, with respect to
7  records?
8    A   No, we did not.
9    Q   Isn't it true that under applicable federal
10 regulations you have obligations to retain patient
11 records for a certain period of time?
12   A   I believe so.
13   Q   And what was done to comply with those
14 regulations?
15   A   Film storage.
16   Q   Where are they stored?
17   A   I believe they're with Ms. Stehman.
18       MR. SPERLING: Still on the record and
19 prior, here at the deposition we had we talked about
20 those backup tapes. I believe, but I cannot vouch,
21 that that's the reference. It's kept on backup
22 tapes?

Page 21

1        THE WITNESS: I believe so, along with some
2  hard copy of film of patient charts.
3  BY MR. SCHUMM:
4    Q   I think when Mr. Sperling and I talked
5  about this before, I don't think he was aware,
6  because he didn't say he was to me, and I'm inclined
7  to think he wasn't aware then. He just said that
8  there were backup tapes around. He didn't know
9  anything about the other ones.
10       MR. SPERLING: I think there were backup
11 tapes.
12       MR. SCHUMM: He's saying there's hard copy
13 film and patient charts. I'm saying I don't think
14 you knew about that.
15       MR. SPERLING: No. Patient charts I did
16 give you. We met in my office on Monday morning.
17       MR. SCHUMM: Some stuff was given to me;
18 that's right.
19       MR. SPERLING: Right. And I gave you some
20 patient charts.
21 BY MR. SCHUMM:
22   Q   What about the hard copies of the scans?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY, INC.
(202) 861-3410 (800) 292-4789 (301) 762-8282 (703) 288-0026 (410) 539-3664

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 22

1  A  I believe Kim has some of the hard copies
2  of the scans.
3     MR. SPERLING:  Destruction and/or removal
4  of any DRG documents.
5  BY MR. SCHUMM:
6     Q  Right.  Would you be familiar with the
7  destruction and/or removal of any DRG documents from
8  1997 to the present?
9     A  No, I wouldn't.
10    Q  Who would know about what would have
11 happened with respect to destruction or removal of
12 documents?
13    A  I don't know.  It might be Kim.
14    MR. SPERLING:  Kim is Ms. Stehman, correct?
15    THE WITNESS:  Ms. Stehman.
16 BY MR. SCHUMM:
17    Q  To the best of your knowledge, what
18 documents would have been destroyed and/or removed
19 since 1997?
20    A  I don't know of any documents that were
21 destroyed to the best of my knowledge.  The only ones
22 removed were the ones that were moved from that

Page 23

1  facility.
2     Q  And where are those records now?
3     A  That would be either with Ms. Stehman.
4     MR. SPERLING:  Or it was given to me, which
5  I gave to Mr. Schumm.
6     THE WITNESS:  Correct.
7  BY MR. SCHUMM:
8     Q  The next item is number 8 on that list.
9     Did you ever have any discussion about
10 retaining records with Ms. Stehman and the importance
11 of retaining them?
12    A  I don't recall having the discussion, but I
13 think that she definitely knew that retention of
14 records is important.  Whether she is under the
15 impression that the backup tapes were adequate I
16 guess --
17    Q  Are you finished with your answer?  You're
18 kind of tailing off there.
19    A  I'm sorry.
20    Q  That's okay.
21    MR. SPERLING:  Handling of medical, medical
22 reimbursement --

Page 24

1  BY MR. SCHUMM:
2     Q  Yeah, let's ask that one, medical
3  reimbursement and patient records.
4     A  What's your question?
5     Q  Are you the custodian of those?
6     A  No, I'm not.
7     Q  Would you have knowledge of that subject?
8     A  No, I would not.
9     Q  What happened to the billing records that
10 would show the revenue generated by Diagnostic
11 Resource Group?
12    A  They would have been on a computer.
13    Q  Where is that computer?
14    A  That would be the computer where the other
15 logs were kept.
16    Q  What happened to that computer?
17    A  As I said, I'm not aware of where that
18 computer is at this point.
19    Q  Is that your answer on behalf of the
20 company?
21    A  Yes.  Actually you know what?  No, it's
22 not.

Page 25

1     Q  Who is the person who's going to respond on
2  behalf of the company?
3     MR. SPERLING:  Who knows the information?
4  Who can speak for the company as to that issue?
5     A  I'm just saying if Ms. Rittmiller knew
6  where there were certain logs and things like that
7  that she had, I don't know about it.
8     Q  Did you ask Ms. Rittmiller?
9     A  Yes.
10    Q  What did she say?
11    A  I believe she told me that she didn't know
12 where they were.
13    Q  What time period would these records all
14 relate to?
15    A  I guess from the time that the scanner was
16 connected to I guess the last time that it was shut
17 down.
18    Q  When was the last time it was shut down?
19    A  I think it was July.  I'm not very good
20 with dates.  July of '99 was it?
21    Q  You have to keep your voice up.  It's your
22 recollection.  You don't get to ask me.

7 (Pages 22 to 25)

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 26

1   A   July of '99.
2   Q   And when you say the scanner was connected,
3   when did that occur?
4       MR. SPERLING: Can you define connected?
5   Because that's a little bit of what this case is
6   about.
7       MR. SCHUMM: That's what he said. It's his
8   word.
9       MR. SPERLING: You define connected.
10  BY MR. SCHUMM:
11  Q   What do you mean by the scanner? You used
12  the word scanner connected.
13      First let me ask you what the time was for
14  it. Then you can explain what you mean by it.
15  A   I guess it was connected I guess somewhere
16  a year prior to that date.
17  Q   Do you know when it was first connected?
18  A   I think it was April of '98. Is that
19  right?
20      MR. SPERLING: Again it's your
21  recollection, not mine, not Mr. Schumm's, not Mr.
22  Hutton's, certainly not the court reporter's.

Page 27

1       THE WITNESS: I haven't asked her.
2       MR. SPERLING: Now, the other question Mr.
3   Schumm had asked was define what you meant by
4   connected.
5   BY MR. SCHUMM:
6   Q   Well, are we finished with the answer for
7   April 1998?
8   A   Sure.
9       MR. SPERLING: Now, what do you mean by
10  connected?
11      MR. SCHUMM: Right.
12      MR. SPERLING: You said the scanner was
13  connected.
14  BY MR. SCHUMM:
15  Q   What do you mean?
16  A   I guess the day they brought the scanner
17  into the office and essentially plugged it in.
18  Q   Finishing up with number 8 again, did you
19  have any discussions with anybody relative to not
20  retaining any documents?
21  A   Absolutely not.
22  Q   But in fact, the documents, based on your

Page 28

1   testimony, in fact weren't retained; isn't that
2   right, at least some of them?
3   A   Some of them; that is correct.
4   Q   And why not?
5   A   I can't answer that. I don't know. I
6   don't think they were not -- when you say some were
7   not retained, there was nobody saying, don't retain
8   these or throw these out. I just don't know at this
9   point where they are.
10  Q   So your position on behalf of Diagnostic
11  Resource Group is that they've gone missing?
12  A   Okay.
13  Q   Is that a fair characterization?
14  A   Yes.
15  Q   And they've gone missing since July of
16  1999; is that also fair?
17  A   No, I don't know when they would have been
18  gone missing.
19  Q   Was it after July 1999, or was it before
20  July 1999?
21  A   I don't know. At that point in July 1999 I
22  did not take an assessment of what records we had and

Page 29

1   what we didn't.
2   Q   Tell me what happened subsequent to July
3   1999 with, as you just testified, the machine shut
4   down? What happened thereafter at the location?
5       MR. SPERLING: You mean the machine
6   shutting down or afterwards or both?
7       MR. SCHUMM: He testified before the
8   machine was shut down, so I'm asking what happened at
9   the location after that time?
10      MR. SPERLING: Okay.
11  A   Not much actually. I'm sorry to be as
12  blunt as that. Not much. It was a facility that was
13  basically just an MRI facility, and without a working
14  MRI, it was not very useful to us.
15  Q   Did you move records out of there
16  immediately after this?
17  A   No, not immediately.
18  Q   When would they have moved out?
19  A   I don't know. There was a period of time.
20  I don't know the date.
21  Q   When you say a period of time, you mean for
22  a month it sort of sat there, and then things began

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 30

1   to happen as the fall came on in September and so on,
2   and the deinstallation occurred in --
3      A   I would say that's a fair assessment.
4         MR. SPERLING: Let Mr. Schumm finish,
5   please.
6   BY MR. SCHUMM:
7      Q   -- the deinstallation occurred, give or
8   take, in November, and then you formally vacated the
9   premises and turned them back into the landlord?
10     A   That's fairly accurate I would guess.
11        (Low Deposition Exhibit 2 was marked for
12  identification and attached to transcript.)
13  BY MR. SCHUMM:
14     Q   I'm going to show you what's been marked as
15  Deposition Exhibit 2. This is the first request
16  for -- Let me make sure I got the right document
17  here. I think I did not get the right document. I
18  put this on the wrong thing here. I may need to
19  borrow your copy machine for a second.
20        MR. SPERLING: Not a problem. Let's go off
21  the record.
22        (Discussion off the record.)

Page 31

1         (Low Deposition Exhibit 2 was remarked for
2   identification and attached to transcript.)
3   BY MR. SCHUMM:
4      Q   I'm going to show you what's been marked
5   Deposition Exhibit 2, Defendant Toshiba's Request for
6   Production of Documents, which is directed to
7   Plaintiff Diagnostic Resource Group, LLC.
8         Have you seen that document before?
9      A   I believe so.
10     Q   Let's look at number 1. Number 1 is
11  corporate records, articles of incorporation, member
12  owner agreements, by-laws, certificates, minute books
13  and records of capital contributions.
14        Do you have any of those documents?
15     A   No, those documents would be with Mr.
16  Sperling.
17        MR. SPERLING: I'll just represent that I
18  do not have any. They do not exist.
19     A   You're on page 4 I guess?
20     Q   That's right. That's number 1.
21        What happened to those documents, Mr.
22  Sperling? Sorry. Not Mr. Sperling. Mr. Low.

Page 32

1         MR. SPERLING: Let me back up a second.
2   Let me flip to my answers. I looking through my
3   response to the request for production to see what we
4   said. Okay. Go ahead.
5   BY MR. SCHUMM:
6      Q   Do you remember ever having the items set
7   forth in number 1 on page 4; the corporate records,
8   articles of incorporation, member owner agreements
9   and so on?
10     A   I do.
11     Q   What happened to them?
12     A   I don't know.
13     Q   Do you know that the charter of the limited
14  liability corporation was forfeited as of the time
15  this lawsuit was filed?
16     A   No.
17     Q   Who would have been the last person you
18  know of that had these records? And if you need to
19  qualify your answer, I'm not trying to put anybody on
20  the spot. If some of them were in one person's hands
21  and some were in other hands, please clarify that.
22     A   Right. I don't know who would have had

Page 33

1   those, whether myself or Ms. Stehman. I don't
2   recall. And forgive me if I can't recall. It's been
3   a long time.
4      Q   What do you think happened to them?
5      A   I don't think of what happened. I think
6   they are either misplaced is my guess. And again
7   please forgive me. It's been I guess six years or
8   so, five years.
9      Q   Do you have any documents in your personal
10  custody that would reflect money you put into the
11  company?
12     A   No, I do not.
13     Q   Did you put any money into the company?
14     A   I believe I did.
15     Q   How much was that?
16     A   I don't recall.
17     Q   Did you keep corporate minutes?
18     A   I believe we did, yes.
19     Q   Who was the secretary of the LLC who would
20  have kept those minutes?
21     A   It would have been Ms. Stehman.
22     Q   Did Ms. Stehman have an ownership interest

9 (Pages 30 to 33)

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 34

1  in the corporation?
2     A    She did not.
3     Q    Why was she the secretary?
4     A    She was basically the manager, I guess if
5  you want to call her. It was an LLC, so I guess she
6  was not a member of the company, but just someone who
7  handled the daily business of the facility.
8     Q    Who was the managing member of the LLC?
9         MR. SPERLING: Member or members if there
10  were.
11        MR. SCHUMM: Yeah. If there's more than
12  one, that's fine too.
13    A    It was myself and Dr. Templeton.
14        MR. SPERLING: Give a full name.
15        THE WITNESS: Phillip Templeton,
16  T-e-m-p-l-e-t-o-n.
17  BY MR. SCHUMM:
18    Q    Does he have any records of Diagnostic
19  Resource Group?
20    A    I don't believe so, no.
21    Q    Did he invest any money in Diagnostic
22  Resource Group?

Page 35

1     A    I believe he did. I don't recall how much.
2     Q    Do you have any idea how much was
3  invested? Was it a dollar or $10 or $1,000?
4     A    Probably closer to $50,000.
5     Q    Anything else you can recall about the
6  items set forth in number 1?
7     A    No.
8     Q    Does Mr. Kreshtool have any of those
9  documents?
10    A    I don't believe so.
11    Q    Did you ask him?
12    A    I have not. I believe at the time when I
13  changed counsel, everything went to Mr. Sperling.
14    Q    Tell me what efforts have been made to find
15  the documents and produce the documents set forth in
16  number 1.
17    A    Searching any kind of bankers boxes that we
18  might have and going through all old file cabinets
19  and what have you to look for anything related to DRG
20  at all.
21    Q    And where would those bankers boxes be
22  located?

Page 36

1     A    Now those bankers boxes are basically --
2  they've been cleaned up and discarded.
3     Q    How about the old --
4     A    Any of the information relating to DRG from
5  me was given to Mr. Sperling.
6     Q    And what about the old file cabinets?
7     A    I guess the furniture was sold.
8     Q    What happened to the records that were
9  inside the furniture?
10    A    Any records that were related to DRG were
11  taken out. Any other records not pertaining to DRG
12  were --
13    Q    Were?
14    A    Put into other boxes.
15    Q    Where are those boxes?
16    A    I might have a couple in my office.
17    Q    And you've looked through those?
18    A    Absolutely.
19    Q    Now, had these records referred to in
20  number 1 been disposed of prior to July of 1999?
21    A    I don't know that.
22    Q    Were they disposed of prior to that or not?

Page 37

1     A    I don't recall disposing of any of them.
2     Q    Do you recall disposing of any records
3  prior to July of 1999?
4     A    No.
5     Q    Let's go to number 2. Detailed income
6  statements, trial balance records, general ledgers,
7  detailed cash flow statements, essentially what I
8  collectively define as financial records.
9         Where are those records?
10    A    Again Mr. Sperling would have any of those
11  records that I would have.
12    Q    What happened to the 1998 financial
13  records?
14    A    I don't know the 1998 financial records.
15    Q    Was there ever an income statement prepared
16  for 1998?
17    A    I would think yes, but I'm not positive.
18    Q    How about the general ledger, what happened
19  to that?
20    A    That would either be on one of those -- the
21  computer or, you know, as I say, one of those either
22  computer or one of the logs that we might have.

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 38

1   Q   Where is the computer?
2   A   As I said before, I don't know.
3   Q   So it's missing?
4   A   Correct.
5       MR. SPERLING: Just to clarify, is the
6   computer missing or do you not know -- it's on a
7   certain computer, but that computer is missing? Is
8   that what happened or something else?
9       THE WITNESS: It's missing.
10  BY MR. SCHUMM:
11  Q   And you mentioned logs.
12      When you say the word logs, what do you
13  mean by that?
14  A   I mean just an area where -- or some
15  vehicle that in writing was -- the information was
16  written down.
17  Q   What would happen to records of uncollected
18  billings?
19  A   That too would be on the computer.
20  Q   What happened to them?
21  A   That is missing with the computer.
22  Q   How about aged receivables?

Page 39

1   A   The same.
2   Q   And aged payable records?
3   A   That as well.
4   Q   Was that computer disposed of before or
5   after July of 1999?
6       MR. SPERLING: By disposed of, he said the
7   computer I think was missing. You mean went missing?
8       MR. SCHUMM: Well, missing, whatever.
9   Yeah.
10      MR. SPERLING: When the computer was
11  missing. Go ahead.
12  BY MR. SCHUMM:
13  Q   Right. The computer is now gone.
14      Did that occur after July of 1999?
15  A   Yes, I would believe so.
16  Q   What about bank statements, what happened
17  to them, from 1998?
18  A   I gave everything I had to Mr. Sperling.
19  Q   If it's not in what he produced to me, does
20  that mean that they're missing as well?
21  A   That would be correct, or Ms. Stehman might
22  have those.

Page 40

1   Q   Did you ask her for them?
2   A   I believe Mr. Sperling did.
3       MR. SPERLING: Or the bank might have them,
4   to be honest.
5       MR. SCHUMM: Let's go off the record for a
6   second.
7       (Discussion off the record.)
8       MR. SCHUMM: Why don't you read the last
9   question and answer.
10      (Record read by reporter.)
11  BY MR. SCHUMM:
12  Q   So to the best of your knowledge, Mr.
13  Sperling asked Ms. Stehman for the bank records. He
14  produced some bank statements.
15      If they weren't produced, you don't have
16  any idea where they are anymore?
17  A   Correct.
18      MR. SCHUMM: And particularly bank
19  statements, Mr. Sperling, you didn't withhold any
20  bank statements I take it?
21      MR. SPERLING: No.
22  A   Can I say something also that might help?

Page 41

1   Q   Sure. Yeah, you're definitely allowed to
2   illuminate this issue.
3   A   I don't have anything pertaining to DRG any
4   longer. Anything that I had I've given to Mr.
5   Sperling. I don't have any Diagnostic Resource
6   documents whatsoever. I've cleaned out everything.
7   I have gone through every box. I don't have anything
8   pertaining to DRG.
9   Q   So if he hasn't given it to me, it's gone
10  missing for one reason or another?
11  A   Correct. Or somebody else might have had
12  something and didn't give it to him.
13  Q   Who would that be?
14  A   Ms. Stehman, as we've talked about.
15  Q   But you asked her, I take it, to give
16  everything she had to Mr. Sperling?
17  A   Absolutely.
18  Q   So if she withheld it, it was on her own
19  volition, not because anybody in this room told her
20  to withhold it?
21  A   Right.
22  Q   And do you have any reason to believe she

11 (Pages 38 to 41)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY, INC.
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 42

1  would withhold those kind of records?
2    A   Absolutely not.
3    Q   How about revenue records, including
4  records showing -- this is item number 3 -- showing
5  Medicare, Medicaid, private payor, private insurance,
6  governmental or insurance reimbursement, including
7  explanations of benefits?
8    A   I do not have any of those records.
9    Q   And do you have any revenue records for any
10 related party, which I defined as any other company
11 in which you had an ownership interest to or from
12 whom those revenues might have been transferred?
13   A   No.
14       MR. SCHUMM:  There was an objection with
15 respect to this.
16       MR. SPERLING:  Right.
17       MR. SCHUMM:  Doesn't mean I can't ask the
18 question.
19       MR. SPERLING:  Right.  And the objection
20 would be -- I'd say the same objection here as I did
21 then.  Let me just look at it again.  Revenue records
22 to whom or from whom a transfer was made.  In other

Page 43

1  words, if company X was a party in which Mr. Low
2  owned an interest and records or revenue from DRG,
3  LLC, Diagnostic Resource Group, LLC, went to company
4  X, then you would like to see the revenue records for
5  company X; is that correct?
6        MR. SCHUMM:  That's right.  That's in part
7  right.
8        MR. SPERLING:  Now, so first of all, I've
9  given an objection to production of any revenue
10 records, but first of all, I guess the foundation
11 question Mr. Schumm is asking for deposition --
12 correct me if I'm wrong -- is was there any other
13 party -- was there a company X?  Was there somebody
14 from whom -- to whom DRG, Diagnostic Resource Group,
15 LLC revenue went?  Correct me if I'm wrong on that
16 question or if I'm misstating your question.
17       MR. SCHUMM:  That's approximately right,
18 but I'll follow up.
19 BY MR. SCHUMM:
20    Q   Go ahead.  That's a good question.  You can
21 answer.
22    A   No.

Page 44

1    Q   So no revenue from patients who had scans
2  performed up at the White Marsh location, which is at
3  issue in this lawsuit, none of those revenues were
4  deposited into the accounts of anybody else other
5  than a DRG account?
6    A   That is correct.
7    Q   Are you aware that's not consistent with
8  the records in this case that have been produced?
9    A   No.
10   Q   Payroll summaries and payroll records set
11 forth in number 4.  Payroll summaries for each
12 quarter and annual payroll summaries and U.S. tax
13 form 1099 summaries for the end of each year since
14 1996.
15       Where are those records?
16   A   I don't know.  My accountant probably would
17 have a copy.
18   Q   Who is your accountant?
19   A   Vince Batyr.
20   Q   Did you ask him for them?
21   A   I've been trying to get a hold of him
22 lately, and I will continue to do so until I do.

Page 45

1    Q   Have you actually talked to him to ask him
2  for these records?
3    A   No, I have not.
4    Q   When did you start trying to talk to him to
5  ask him for these records?
6    A   I guess several weeks ago.
7    Q   Why didn't you do it last November?
8        MR. SPERLING:  I'll represent that I made
9  the communication last November asking for those
10 records.
11   A   I don't recall why.
12   Q   There's been no response from him in any
13 respect to either of you with respect to the request
14 for the records; is that a fair assumption?
15   A   I think he's been traveling.
16   Q   Where has he been traveling to?
17   A   I think he's been.  I don't know if he has
18 been.  That's typically the only time I don't get a
19 hold of him.
20   Q   Who would have been on the payroll at DRG?
21   A   I guess Ms. Stehman and Ms. Rittmiller.
22 That's probably it.

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 82

1  went on pregnancy leave?
2  A  Yeah.
3  Q  Do you recall when that was?
4  A  No.
5  Q  Was another radiation tech person brought
6  in while she was away on pregnancy leave?
7  A  I don't remember.
8  Q  Do you remember a woman named Jennifer?
9  A  No.
10 Q  Who else would have worked out at the DRG
11 premises?
12 A  I'm sorry. I'm trying to remember. Mena
13 maybe.
14 Q  Could you spell that, and her last name,
15 please?
16 A  I don't remember her last name. M-e-n-a.
17 Begins with a D I think.
18 Q  And what were her job duties?
19 A  Reception, answering the phone, things like
20 that.
21 Q  Anybody else?
22 A  No more than the ones we've mentioned.

Page 83

1  Q  How about Debbie Rittmiller?
2  A  Yes.
3  Q  She worked there full time every day?
4  A  I don't recall her schedule.
5  Q  How often were you out at the Bel Air Road
6  location?
7  A  Quite often.
8  Q  Does that mean once a week, twice a week,
9  more in the beginning, less at the end?
10 A  Yeah, I would say that, less at the end,
11 but three times a week at least depending on how many
12 hours. I don't know. 12 hours at a time. I don't
13 know.
14 Q  And why would you be there 12 hours?
15 A  Making phone calls.
16 Q  What were you making phone calls for?
17 A  Trying to get leads on prospective clients,
18 accounts, things like that.
19 Q  Was this just for DRG or for all your
20 businesses?
21 A  For DRG.
22 Q  You spent 12 hours there three days a week?

Page 84

1  A  I don't know exactly 12 hours. I'm going
2  to say I don't know. I can't recall.
3     MR. SPERLING: Can we take a bathroom break?
4     MR. SCHUMM: Yeah, why don't we take a
5  five-minute break so everyone can run to the rest
6  room and get water and all.
7     (Recess 3:52 P.M. to 4:08 P.M.)
8  BY MR. SCHUMM:
9  Q  We're picking up at 13. Maintenance
10 records for all medical equipment indirectly or
11 directly from Toshiba or medical equipment whose use
12 is related to revenue claimed as damages.
13    Do you have any additional testimony with
14 respect to the maintenance records other than what we
15 talked about before, that they've been disposed of,
16 slash, gone missing?
17 A  No, I did not dispose of anything. They're
18 missing, right.
19 Q  You say you didn't dispose of them, but
20 what you're saying is you didn't intentionally go
21 throw them in the garbage?
22 A  Exactly.

Page 85

1  Q  On the other hand, they may have landed in
2  the garbage, but such is life?
3  A  No.
4  Q  No?
5  A  I don't know. I don't know. The answer is
6  I don't know.
7  Q  But they're gone?
8  A  They're missing, yeah. Believe me, I
9  looked for all these, you know. The maintenance
10 records helps me, you know, and sort of helps DRG in
11 this whole thing, and believe me, I looked for these
12 records, you know, and everything I got I've given to
13 Mr. Sperling.
14 Q  I sort of covered this.
15    Do you have any organization charts of DRG?
16 A  No.
17 Q  Did Ms. Stehman only work --
18    Did any of the employees of DRG work for
19 anybody else at the same time?
20 A  Yes.
21 Q  Who would those have been?
22 A  Ms. Stehman I guess.

22 (Pages 82 to 85)

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 90

1   Q   Okay. I saw you pass something back and
2   forth. You've kind of got to not communicate with
3   your attorneys. I've told my clients that.
4   A   I made this line right here.
5   Q   All right. That's fair enough.
6   A   I was going to doodle. Then I said I'm not
7   going to.
8   Q   Oh, no. Doodling is good. I'm a doodler.
9   A   So am I constantly. I can cross this out
10  if you want.
11  Q   Don't worry about it.
12      Anybody else on the sort of organization
13  chart of Diagnostic Resource Group?
14  A   Not that I recall.
15  Q   Records of Diagnostic Resource Group
16  inventory and supplies, do you have any of those
17  records?
18  A   No, I do not.
19  Q   What happened to them?
20  A   I don't have them. I don't know where they
21  are. I don't know if Ms. Stehman has any of that or
22  not.

Page 91

1       MR. SCHUMM: Is she coming this afternoon
2   or not?
3       MR. SPERLING: I was originally going to
4   ask should we see if she can come this afternoon?
5       THE WITNESS: If you want.
6       MR. SCHUMM: That's not my point. I
7   thought she was coming this afternoon. Then you said
8   she was going to be a little late.
9       MR. SPERLING: Yes. That's why I assumed
10  we should start with Mr. Low.
11      MR. SCHUMM: And if she was going to come
12  late of course, we should just start with him. So I
13  thought maybe she was coming, and I'm not -- she can
14  come any time she wants today or tomorrow.
15      MR. SPERLING: I'll check with her.
16      (Discussion off the record.)
17  BY MR. SCHUMM:
18  Q   DRG inventory and supplies, I think you
19  said that those records are no longer available and
20  gone missing.
21      I take it they used to exist, but they're
22  no longer in existence; is that right, Mr. Low?

Page 92

1   A   Correct.
2   Q   Patient base analysis and physician
3   referral analysis.
4       Did you ever have any of these records and
5   if they've been turned over to us?
6   A   Yes, and I don't know. Debbie Rittmiller
7   probably would have had that information.
8   Q   But those would have been corporate
9   records; isn't that right?
10  A   They would have been, yeah.
11  Q   And what happened to them?
12  A   I don't know. I don't know if she still
13  has some of them. I don't know.
14  Q   Did anybody ask her?
15  A   Yeah, I spoke to her.
16  Q   Did she have any?
17  A   She's looking.
18  Q   When did you ask her?
19  A   I don't know. A couple of weeks ago.
20  Q   Did anybody ask her last November when I
21  served the production request?
22  A   No, nobody has. I apologize for that.

Page 93

1   Q   Number 17. Records related to all
2   accounting and audit services provided to DRG.
3       Have you produced all the records that you
4   have?
5   A   That I have, yes.
6   Q   And how about the records that DRG has?
7   A   Yes. I will follow up.
8       MR. SCHUMM: Could we go off the record
9   for a second?
10      (Discussion off the record.)
11      MR. SPERLING: I spoke to Ms. Stehman
12  several minutes ago, and Kimberly Stehman thought
13  that she does not have anything that she has not
14  already turned over in her possession. She's going
15  to take a last check this weekend. Her deposition is
16  being taken at 2:30 on Monday. She's going to bring
17  anything that she finds there.
18      MR. SCHUMM: So what we're going to do is
19  when Mr. Low answers on behalf of DRG, he'll be able
20  to say, subject to whatever she might say on Monday,
21  that --
22      MR. SPERLING: DRG does not have something.

24 (Pages 90 to 93)

DEPOSITION OF JEFFREY LOW
CONDUCTED ON THURSDAY, MARCH 13, 2003

Page 142

1  Q  You're referring to the letter of Exhibit
2  8. Continue, please. Thank you.
3  A  Okay.
4     MR. SPERLING: Who's it from? Toshiba to
5  Jeff Kreshtool.
6  A  I recall this portion of it, so I'm
7  assuming on that date, April -- on the July 8th or
8  whatever it was -- July, not April -- July 8th date,
9  that the scanner went down again. I would say that I
10 called, and I do remember the -- something's drawn in
11 my memory about repair the system at our cost. After
12 investigation it was determined that the warranty
13 indeed expired on April 9th, 1999, and that was done
14 after -- nothing like that was ever said to me that
15 you will pay cost for, you know, time and materials
16 until there's an agreement in place. That was never
17 discussed. I do remember this. It was only after
18 the fact that it had gone down in July. And number
19 one, I didn't think it was the responsibility of the
20 business. The business had suffered greatly because
21 of the I guess poor reliability of the scanner, and I
22 strongly felt that that warranty period was up in

Page 143

1  November just as I was told.
2     Q  Who told you it was up in November?
3     A  When this occurred, I had spoken to Gary
4  Hall, and Gary told me that it was his understanding
5  the same, that that year of warranty would start at
6  delivery and acceptance because the reason why it
7  wasn't accepted is because it didn't have a very good
8  reliability record.
9     Q  What did you do to mitigate your damages on
10 July 8th that you felt you were suffering?
11    A  If I can remember correctly, probably tried
12 to call some of our what was left of referring client
13 base to let them know that we had another issue with
14 the scanner and to please bear with us, and that was
15 probably it.
16    Q  What else did you do?
17    A  That's all I recall. I actually tried
18 to -- I would think I tried to get Toshiba to come in
19 and do the work and convince them that this was what
20 they were supposed to do, and I didn't have an
21 understanding of why, if my service plan or warranty
22 had run out back in April, that I had May, June --

Page 144

1  actually it was April 9th it says, so basically
2  two-thirds of April, May and June where Toshiba was
3  continuing to fix -- come out and fix the scanner
4  without mentioning to me about the warranty.
5     Q  How many times do you believe they had to
6  come out and fix the scanner after April 9th?
7     MR. SPERLING: You're not including the
8  July 5th?
9     THE WITNESS: Doesn't matter. I don't know.
10 BY MR. SCHUMM:
11    Q  Are all the records gone that would have
12 shown how many times they would have been called to
13 fix it?
14    A  I believe so.
15    Q  Why are they gone?
16    A  I can't answer that.
17    Q  You have an attorney who says there's a
18 dispute.
19       Why didn't you preserve these records?
20    A  You know, these records are definitely in
21 my -- they would be in my favor. Believe me, this is
22 not something where, you know, if I knew where the

Page 145

1  records were -- we've searched for everything, for
2  all the records of the entire business, and believe
3  me, I would want to find them.
4     Q  That wasn't my question.
5        Why weren't they preserved?
6     A  We thought we were preserving them.
7     Q  But you didn't preserve them, did you, even
8  though you had threatened lost profits and damages?
9     A  Not very well.
10    Q  Why didn't you pay for the repair to the
11 OPART immediately after July 5th?
12    A  I assumed that the business at that time
13 couldn't afford it.
14       MR. SPERLING: Again don't guess. Just
15 what you know.
16 BY MR. SCHUMM:
17    Q  How much money was in the bank account as
18 of that time?
19    A  Don't know.
20    Q  Did you have other businesses that were in
21 a position to lend money to this business to get it
22 repaired?

37 (Pages 142 to 145)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY, INC.
(202) 861-3410 (800) 292-4789 (301) 762-8282 (703) 288-0026 (410) 539-3664