<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF MARYLAND</u>

DIAGNOSTIC RESOURCE GROUP, L.L.C.          *

      PLAINTIFF          *          Case No.: 02-CV-3020-RDB

VS.          *          (removed from Baltimore County
                                     Circuit Court

TOSHIBA AMERICA MEDICAL          *          Case #03-C-02-006016)
SYSTEMS, INC.
                                *

      DEFENDANT          *

---

<u>MEMORANDUM IN SUPPORT OF ANSWER AND OPPOSITION TO DEFENDANT
TOSHIBA'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR
SUMMARY JUDGMENT</u>

      Plaintiff submits this Memorandum in support of its Answer and Opposition to Motion

for Summary Judgment and in support of its cross motion for Summary Judgment.

<u>Introduction</u>

      This case arises from Defendant's refusal to honor its promise to service equipment taken

by Plaintiff from the Defendant, in specific a Toshiba OPART MRI scanner and its related

equipment.    This suit was brought within the period of limitations for the breach of

contract/breach of warranty by the Defendant and interference with economic relations.    The

Court is required, as this is a motion for summary judgment, to draw all reasonable inferences in

favor of the Plaintiff and against the Defendant, the movant in this case.    Additionally, the Court

is not permitted to make determinations of credibility of witnesses in this matter at this stage of

the case.    Based upon these standards, Plaintiff has demonstrated that there are genuine disputed

issues as to material facts in this case and that the Defendant is thus not entitled to judgment as a matter of law.   To the contrary, based upon the uncontradicted testimony in this case, Plaintiff contends that the Court should grant summary judgment in favor of the Plaintiff on the issue of liability.

**Special Note**

This case involves two entities using the name Toshiba.   The equipment in this case was produced by, (and a promise to repair issued by), Toshiba America Medical Systems, Inc.   The promise to repair is found at ¶8 of Exhibit 1 to this Memorandum.   The transaction was effected through a lease, found at Exhibit 12 & 13, whose Lessor was "Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc." Exhibit 12.   Exhibit 12 is signed by Lisa Sparta as manager, for Toshiba America Medical Systems, Inc.   Exhibit 12 page 3.   Therefore, for purposes of clarity, Plaintiff will refer to Toshiba America Medical Systems, Inc. (the Defendant) as TAMS, and to Toshiba America Medical Credit, TAMS's program, as TAMC.[1]

Exhibit 13 lists Tokai Financial Services, Inc. as the Lessor of the equipment and specifically incorporates by reference the lease at Exhibit 12.   It is also signed by Lisa Sparta as

---

[1]The Defendant raised in its Motion the fact that the Plaintiff had not made any payments to TAMC on the lease. The reason for this is simple.   Exhibit 16, pages 5-6, shows that TAMC had stated that there would be a 9 month period from the date of commencement of the lease period where the rental payment would be zero.   The signing date of Exhibit 12 shows a date of February 26, 1999, and thus through nine months from that date no payment was owed.   In any event, Toshiba was paid for the scanner and was bound by its service promise.

a manager.[2]  In and of itself this leads to confusion as to whom the Lessor is and for whom Ms. Sparta serves as an agent.   Was the Lessor TAMS, TAMC or some other entity?   The answer lies in Exhibit 14, which is an agreement between TAMS and Tokai Financial Services, Inc. whereby TAMS leases equipment to its customers and assigns that lease to Tokai Financial Services, Inc.[3]

As part of the agreement, the two agreed, "to operate the business of leasing equipment as provided ... using the Program Identifier, Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc."  Exhibit 14, page 2.  It was further agreed that Tokai Financial Services, Inc., "will service all Contracts on a private label basis in the name of TAMS so that the lease financing program will at all times appear to Lessees to be a proprietary program of TAMS."  Exhibit 14, page 16 §6.1(a).

Thus, TAMS contracted for the acquisition of an OPART by the Plaintiff.   TAMS entered into a lease agreement with the Plaintiff to provide for that equipment's acquisition and then assigned that lease to Tokai Financial Services, Inc.   As the lease was signed by TAMS, and it was agreed that all actions were meant to induce the Lessee (DRG) to believe that the work of Tokai was done as an agent of TAMS, Tokai Financial Services, Inc. is thus considered

---

[2]While Exhibit 12 is dated in 1999 as to the Toshiba signature, pages 5 and 6 of the Exhibit show that the contract was ratified by Toshiba earlier.

[3]  "TAMS desires to make lease and/or rental agreement for the acquisition of medical equipment and licensing of any associated software (Systems) ... for commercial purposes available to its customers (Lessees) ... In order to make lease and/or rental agreements for the acquisition of Systems for commercial or business purposes available to its Lessees, TAMS desires to establish a program with TFS whereby TAMS will sell and/or assign to TFS all of TMS's right, title and interest in and to a lease ...."  Exhibit 14, page 1.

to be the agent of TAMS by principles of apparent agency and agency by estoppel.[4]

**Response to Certain Ancillary Points Raised in Defendants' Motion**

The Defendant raised certain issues in its pleading that are ancillary to the core of this case, but that nevertheless need response.    In Exhibit P to its Motion, the Defendant asserted that the Plaintiff had gained receivables in April, 1998 and on through the end of November of that year.  Exhibit 24, a supplemental Affidavit of Jeffrey Low, states that these billings were not reflective of the scanner's installation being complete at that time, based upon the expected case volume.    See also Exhibit 25, spreadsheet showing expected volume referenced in Exhibit 24 as well.   This document was discussed in Mr. Low's Deposition, Exhibit 18 at 124.    As the charge for each scan was close to 900, the accounts receivable amount clearly shows that the scanner was not able to be used consistently and reliably, problems that began from the time of its delivery.    As such, at that time, the installation of the scanner was not completed.[5]

There was also a reference to a lawsuit that had earlier been brought by the Plaintiff in Baltimore County Circuit Court.    That case sought to have the scanner removed by TAMS and contained a reference to a possible release agreement having been entered into.    This case was not prosecuted as the scanner was in fact removed from the premises.    In fact, there was no release executed, as set forth in Exhibit 18, pages 285-287.

---

[4] TAMS and TAMC did in fact agree that they had no agency relationship, but that does not affect their relationship with a Lessee who was supposed to consider them to be acting as principal and agent.   See also Exhibit 12A which is a printout of pages of TAMS's web site showing a section titled "About Us" which lists TAMC, as a link, again showing to potential customers that TAMC is part of the "Us" of TAMS.   This is admittedly not taken at the time of the transactions that form the basis for this case, but shows the pattern of conduct and activity.

[5] The specific facts showing that installation of the scanner was not completed until the time of acceptance are discussed in detail in this Memorandum.

## TIME PERIOD OF THE PROMISE TO REPAIR

The Defendant, as part of this transaction, promised that for a period of one year from the date of completion of installation, the Defendant would repair or replace any part of the equipment that broke or malfunctioned.    On or about July 5, 1999, there was a break in the equipment provided which Defendant refused to repair.    That is the basis of this case.    There are several sources from which it can clearly be seen that the promise to repair was still in force on July 5, 1999 when the break occurred.    These sources are as follows:

A.    Documents Executed Between the Parties with Regard to the Transaction and Installation;

B.    Documents Executed Between the Parties Relating to the Lease of the Equipment;

C.    Documents Relating to the Status of the Lease Agreement;

D.    Testimony by Kimberly Stehman, Dr. Philip Templeton and Jeffrey Low Relating to the Status of the Equipment and Representations as to the Time the Promise to Fix Would Terminate;

E.    Course of Dealing;

F.    TAMS's Own Documentation and Testimony of TAMS' Representatives.

## THE DOCUMENTS EXECUTED IN THE COURSE OF THE TRANSACTION SHOW THAT DEFENDANT IS LIABLE

### Documents Executed Between the Parties with Regard to the Transaction and Installation

As set forth in the Complaint, and as agreed to by the Defendant, this case involves the lease of a Toshiba OPART Magnetic Resonance Imaging (MRI) scanner to Diagnostic Resource Group, L.L.C.  A copy of the contact, attached hereto as Exhibit 1, shows that the agreement was originally entered into in July, 1997.   As part of the agreement, TAMS promised that:

For the warranty period described below by product, Toshiba, as its only obligation, will replace or repair, at Toshiba's option and without charge to Customer during Toshiba's normal working hours ... any component of the equipment determined by Toshiba to be defective in materials or workmanship.... Toshiba's warranty period is as follows: ... Ultrasound, C.T., Nuclear, MRI- 1 year from date of completion of installation.

Exhibit 1, ¶8

As part of this section, TAMS specifically stated that this promise was to be, "IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF THE MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE." (*Sic* in original).

Thus, TAMS had promised to provide free repairs in the event of malfunction of the OPART system, for a period of one year from the date that installation was complete.[6]   In order to determine the temporal extent of the free service agreement, it is thus necessary to understand when installation would be considered to be complete.[7]

During the course of time that the equipment was provided to the Plaintiff, an Installation

---

[6]Additionally, TAMS specifically stated that it made no promises as to the qualities and capabilities of the equipment at the time of sale, and rejected the warranties referenced in the Uniform Commercial Code, as to which the Code provides that the breach of same occurs at the time of delivery. To the contrary, this case alleges a breach by TAMS of a promise to repair or replace the said equipment, and that right of action could only accrue when TAMS refused to repair or to replace the equipment.

[7]In this regard, Plaintiff cites to Exhibit 1, pages 3 and onwards, which provides information as to the detailed interwoven nature of the equipment with its magnetic infrastructure, cooling infrastructure and computer hardware and software.   This is not an institutional food processor which can be, to quote the Progress Form, "mechanically installed" and have, "power to the system .. turned on," and be completely installed.   This equipment requires calibration in order to be usable for patient care.

Progress Form, (e.g. a form detailing progress in the installation whose completion began the one year time period), was prepared and signed by representatives of all parties. This Form, attached hereto as Exhibit 2, provided that the parties agreed that as of March 31, 1998, the equipment had been mechanically installed and power hooked up to it. See Exhibit 2. The Form continued on to state that, "Final calibration, application training (if necessary) and acceptance will follow." Thus, by this Agreement, prepared by Toshiba America Medical Systems, Inc., (as set out on the top of the document), Defendant indicated that the final step of installation would be acceptance of the equipment.

The only acceptance of the equipment took place in October and November of 1998, and thus the one year service program ran for a period of one year from that time, until October or November of 1999. (There were two acceptances signed of the equipment, one by Dr. Philip Templeton in October, 1998, with multiple conditions attached, and one by Jeffrey Low in November, 1998- attached as Exhibits 8 & 9 respectively.) Thus, as the damage in this case related to a refusal to repair or replace the MRI unit in July, 1999, Toshiba breached its promise to repair or replace the equipment and is liable for damages.

The acceptance, Exhibits 8 & 9, was the only acceptance by any party of the tender of the equipment by Toshiba and Exhibit 2, indicating that there was to be acceptance by Plaintiff of the equipment as part of the installation of same, was prepared by Toshiba after the lease documentation (Exhibit 12) had been created. Thus, the acceptance referenced by Exhibit 2 must refer to the acceptances signed by Plaintiff's personnel at Exhibits 8 & 9.

**Documents Executed Between the Parties Relating to the Lease of the Equipment**

Exhibit 1 was prepared in July, 1997. On September 12, 1997, Toshiba and the Plaintiff entered into a lease agreement, (attached as Exhibit 12), with the Plaintiff by which Toshiba

would provide the equipment to the Plaintiff by way of a lease.     This lease was signed by Toshiba America Medical Systems, Inc.   The Lessor under the lease was to be Toshiba America Medical Credit, Inc. a program of Toshiba America Medical Systems, Inc.   Exhibit 12.

That agreement, attached hereto as Exhibit 12, shows specifically that Plaintiff agreed to accept the equipment once the equipment was operating up to the Manufacturers' Specifications.   Thus, once again, the parties signed an agreement providing that the Buyer would accept the equipment only once it was operating the way it was supposed to operate, which matches the statement in Exhibit 2 that acceptance would follow calibration and training.     At that time, installation would be completed, and thus Exhibit 12 then called for the Buyer to accept the equipment, and Exhibit 2 termed that acceptance as the final step in installation.   At that point, the time period of the repair promise in Exhibit 1 would begin to run.  That agreement is signed by Toshiba America Medical Systems, Inc. and thus TAMS is of course bound by the promises and agreements therein.   Toshiba America Medical Systems, Inc. then assigned the lease of Toshiba America Medical Credit, its program, to Tokai Financial Services.   (See Exhibit 14-Assignment Agreement).   Tokai then signed its agreement with the Buyer, Exhibit 13, specifically incorporating Exhibit 12, the agreement between the Buyer and TAMS.

Thus, these documents signed by the parties clearly show that the one year period during which Toshiba America Medical Systems, Inc promised to provide free service on the system began only at the point where the Buyer had signed its acceptance of the equipment.   The only acceptance of the equipment occurred in October and November of 1998.   (Defendant has never made any assertion that the Plaintiff wrongly postponed its acceptance of the equipment.).   Therefore, the one year period of service extended past the July 5, 1999 date when the Defendant

refused to honor its promise.   Therefore, the Court should enter summary judgment on the issue

of liability in favor of the Plaintiff.

In this case, those steps, calibration, training, and acceptance, took several months to

complete, and in fact they were not completed until October or November when acceptance of

the equipment was signed.[8]   The calibration of the equipment took a long time to complete, as

set forth in the Affidavits of both Jeffrey Low and Kim Stehman, (Exhibit 3-6), both of whom

were designated by Plaintiff as experts in this case.   (See Exhibit 7).[9]   Once the said steps of

calibration and training were completed, meaning that the equipment was performing reliably

and consistently, the Plaintiff signed its acceptance of the equipment.   (Exhibits 8 &9).

In fact, the acceptance signed by Dr. Templeton shows that even at that time the issues

had not all been addressed.   It was only later that these issues were addressed, as evidenced by

the acceptance signed by Jeffrey Low at Exhibit 9.   At that time, the one year period began, and

was still in force as of July 5, 1999.   Therefore, the Court should find for the Plaintiff.

**Documents Relating to the Status of the Lease Agreement**

The documents set forth in the prior two sections show that the installation of the

equipment was not completed until the acceptance of the equipment.   This sections shows that

the underlying transaction was not completed until after July 5, 1998 and thus the one year free

service period had not concluded by the time of the loss that forms the basis for this case.

_____

[8] There were two separate acceptances of the equipment signed.   First, Dr. Philip Templeton
signed an acceptance form in October, 1998 with a list of multiple conditions.   Jeffrey Low
signed an acceptance without written conditions in November, 1998.

[9]See also Exhibit 10 at 9-20 (credentials and experience of Stehman) and Exhibit 18 at 159-173
dealing with credentials and experience of Jeffrey Low another mixed fact/opinion expert).

First, this transaction is structured such that TAMS, which owned the equipment, leased that equipment. Exhibit 12. TAMS assigned its rights in that lease to TAMC. Exhibit 14, page 1. Under the Agreement between TAMS and TAMC, when TAMC paid TAMS the price of the equipment, title in the equipment would then vest in TAMC as Lessor. Exhibit 14, page 14, §5.2d. The acceptance forms signed as Exhibits 8 & 9 clearly state that they constitute authorization for TAMC to take and buy the equipment to be leased. As such, until the signing of, at least, the first acceptance, on October 1, 1998, TAMC did not buy the equipment from TAMS. Therefore, the one year free service period could not have begun before that time.

Moreover, Exhibit 15, a series of internal e-mails received in discovery from the Lessor, (now called De Lage Landen), show that the transaction by which the Plaintiff was to take possession of the equipment had not been agreed to by TAMS's agent, TAMC, until at least September, 1998. Thus, TAMS retained control of the equipment and title to same, and thus the one year free service period did not begin until then, and would have ended after July 5, 1999.

In certain circumstances, the argument could be raised that this delay in approval of the lease was a mere issue of bureaucracy. However, in this case, until the approval of the transaction, the Lessor demanded specific changes to the deal in order for there to be approval of the transaction. Exhibit 16. Thus, as the underlying transaction had not been completed until September, 1998 at the very earliest, it could not be said that the one year service plan began until that time period either. Therefore, on July 5, 1999, the plan was still in effect. Therefore, the Defendant is liable for the damages suffered by its refusal to carry out its representation.

**THE TESTIMONY ADDUCED SHOWS THAT DEFENDANT IS LIABLE**

**Testimony by Kimberly Stehman, Dr. Philip Templeton and Jeffrey Low Relating to the Status of the Equipment and Representations as to the Time the Promise to Fix Would Terminate**.

Kim Stehman, a mixed fact/opinion expert, testified. She worked at the subject company as manager and radiology technician. She has a great deal of experience in the operation of MRI equipment and in the day to day running of diagnostic imaging business. Her experience and credentials are set out in Exhibit 10- pages 9-20. They include both training in the operation of this equipment as well as the performing of MRI scans using the said equipment.

Ms. Stehman explained that as a radiology technician, she could set the parameters for performing scans. These parameters were designed for the specific scanning protocols that were agreed upon by the radiologists who read the scans created by the MRI machine. Exhibit 10 at 61-63.[10] The machine would also be adjusted by the radiology technician for each patient as well. Exhibit 10 at 32. These parameters are not a function of any one particular brand of equipment, but are rather the same throughout the MRI industry. Exhibit 10 at 157.

She further explained that, consistent with her affidavits, (Exhibits 5 & 6), when the equipment was put in by TAMS, there were numerous problems with the equipment. These problems included, *inter alia*, the machine not allowing them to finish their scans, the machine

---

[10]In short, a doctor would seek to have a certain body part of a patient observed by MRI. The radiologists determined the scanning protocols that would be used, (pre-programmed into the machine), in order to obtain the information the doctors requested. The parameters were the means by which the placement of the patient and the equipment was done in order to obtain the type of scan, (protocol), which the radiologists felt should be used.

consistently causing errors in scans, air conditioning and "cold head"[11] not working, scanning protocols that would not run on the machines, coils that would not tune, the machine hanging up, (e.g. stopping a scan), for no reason, similar to a computer freezing and causing data to be lost. Exhibit 10 at 34-37, and 70-72. When these problems occurred, TAMS had told her to see if she could reboot the system, and get it to work properly. She would try that first. Exhibit 10 at 44-45 & 77. If that did not work, then she would have to call for service. Exhibit 10 at 68. Sometimes, TAMS could talk staff through a fix of the machine (e.g. what buttons to push and the like). Exhibit 10 at 31. These problems occurred consistently from the time of the delivery of the system.

If the machine was not properly calibrated, then she would have to call TAMS for service as this could not be done by her. Exhibit 10 at 68. The lack of system calibration was evidenced by the system not allowing sequences to be done, and not working smoothly. Exhibit 10 at 76-77.

If the machine was not calibrated, then it would be impossible to get a diagnostic quality image. Exhibit 10 at 65-67. Ms. Stehman advised that when the machine would allow her to make a scan, she would send the scan to a radiologist. However, at those times she often got complaints that the scans were not of diagnostic quality. Exhibit 10 at 63-67. Ms. Stehman did advise that she had always operated the machinery correctly. Exhibit 10 at 69. When the machine was not calibrated, that meant that it would not allow scans to be run. There were times that the machine would allow other scans to be run though. Exhibit 10 at 68. Even

---

[11]These parts were explained by Kent Stansbury in his deposition. The OPART was designed to work at extremely low temperatures and therefore the magnet (magnetic resonance) had to be kept extremely cold. This required a cold head to perform this function.

though the machine had been put into the location, the said installation was not complete as the machine was not working consistently and producing scans that the radiologists could read. Exhibit 10 at 73-74. In fact, Mr. Jeffrey Low referred to the problems of the machine as being such that Mr. Stansbury, the repair technician basically lived at the imaging center. Exhibit 18 at 138.

This understanding, that acceptance would not occur until the system was wording properly, at which time the installation would be completed, matches with Exhibit 12's provision that acceptance would not occur until the machine was running up to manufacturers' specifications. This machine was not doing so as it was consistently breaking down, and further due to the items referenced on the second page of Exhibit 8.

This list was prepared around the end of September, 1998 detailing the list of problems that had to be fixed for acceptance to be made of the equipment. Exhibit 18 at 208. These were all problems that were present in the machine. Once a machine had been properly set up and calibrated, it would run continuously without constantly breaking down as the machine supplied to the Plaintiff did. Exhibit 10 at 78. As a result of the problems with the machine supplied by TAMS, many days of work were lost to the Plaintiff as well. Exhibit 10 at 77-78 & 147-149.

Ms. Stehman further explained the list of problems that had been identified with the equipment even shortly before the time that Dr. Templeton signed an acceptance of the equipment. Exhibit 10 at 125-156. Ms. Stehman herself initially referred to acceptance being done by Jeffrey Low (Exhibit 5), and in fact Mr. Low did sign an unconditional acceptance in November, 1998. (Exhibit 9).

The fact that the machine would not allow scans to run, or that radiologists complained that the scans were not of diagnostic quality caused multiple problems for the Plaintiff. By way

of example, if a scan was not diagnostic, then the patient would have to have the scan run again, or the patient would go somewhere else and DRG could not bill for the scan. Exhibit 10 at 69. Once these problems had been addressed, only then was an acceptance signed for the machine. Exhibit 10 at 156-157.

Dr. Philip Templeton had been involved with the Plaintiff company. Dr. Templeton had been chair of the radiology department at the University of Maryland Hospital. Exhibit 11 at 25. In that capacity, he had been involved in the purchase of tens of millions of dollars worth of MRI equipment, and was and is very familiar with the process and nature of installation of such equipment. Exhibit 11 at 65-66 and 77. Dr. Templeton had talked to TAMS personnel about the transaction both prior to its occurrence and he had also discussed the problems that were occurring. Exhibit 11 at 77-80.

Certain of the items on the list related to the construction and design of the space in which the MRI equipment was located. In this case, TAMS had done a site survey and had also been responsible for the build out and construction of the site where the MRI machine was installed. See back page of Exhibit 1 indicating TAMS to pay for build out as part of contract, and see Exhibit 17, sample of payment documents received from TAMC in response to Subpoena, showing TAMC as Lessor was paying for the build out of the MRI unit's space, and Exhibit 18 at 289-290 showing that the contractor was paid by TAMC as part of the build out.

Dr, Templeton signed the acceptance certificate at Exhibit 8. This was based upon long discussions with TAMS about the problems that had been occurring with the system supplied to the Plaintiff. Exhibit 11 at 8-10. These involved problems that had been present from the time that the system had first been delivered to DRG. Dr. Templeton, in his deposition, explained the

list of these problems as Ms. Stehman had as well.    Exhibit 11 at 8-19 & 50-65.    Of special

note, Dr. Templeton explained that as (on the second page of Exhibit 8) there was a reference

that the screws in the machine were not placed properly, and thus scans were lost because

patients could not be seated properly in the system.    Exhibit 11 at 56.    Dr. Templeton had told

TAMS of these issues on several occasions.    Exhibit 11 at 79-80 & 43-44.    He also referenced

times that scans had to be stopped while patients were on the machine as the machine would stop

or the scans were not going to be of diagnostic quality.    Exhibit 11 at 20-23.    Dr. Templeton

himself knew of at least a dozen times when he had been advised that the machine supplied by

TAMS could not be made to  properly work.    Exhibit 11 at 49-50.    Mr. Jeffrey Low further

provided his recollection that there were, in the first six months of operations, forty (40) full

days of work lost due to system breakdowns.    Exhibit 18 at 260-263.

Dr. Templeton further stated that an MRI scanner would be expected to be  working

consistently without breaking down, and consistently providing diagnostic quality scans.    Exhibit

11 at 69-70.    This was the normal customer expectation, as well as being the expectation of Mr.

Low on behalf of the Plaintiff.    Exhibit 11 at 56-57 & 87-88.    The machine provided to the

Plaintiff was not working in this manner, Exhibit 11 at 70-71, until, as Ms. Stehman and Mr.

Low stated, around the time of the acceptance of the machine.    (Exhibits 3 through 6).    The

witnesses understood that some scans had been done.    However, the installation was not

completed as the MRI system was not operating in a quality manner and running consistently.

(See Exhibits 4 and 6 as well as the above sections of Exhibit 11).    Therefore, the one year

service plan did not begin until the time of acceptance of the equipment.

This is in accord with Exhibit 12's statement that an acceptance would be signed only

once the equipment was working to manufacturer's specifications, and Exhibit 2's statement that

the acceptance of the equipment would come after the equipment was calibrated, which would be the last step of installation.

Thus, the testimony of both Dr. Templeton and Ms. Stehman shows that from the time that the MRI system was delivered until the time that the acceptance was signed, the system was not properly working.   As such, the installation of the system was not complete.   Therefore, the one year free service plan could not have started until the problems had been corrected, which occurred at the time of the acceptance of the equipment which was in October, 1998 at the earliest.   Therefore, at the time of the damage that forms the basis for this case, the service plan was still in effect.   TAMS refused to repair the system.   Therefore, the Court should find for the Plaintiff on the issue of liability.

The Defendant in its Motion asserted that installation of the equipment had been complete based upon a record of the Defendant indicating that Dr. Templeton had been present and seen some scans being done on April 10, 1998, and had allegedly been pleased with the scans.

Dr. Templeton specifically advised in his deposition that he had only seen a couple of scans at that time, Exhibit 11 at 20-21, and he further stated that the scans performed at that time would most likely have been on joints of the body etc. which was not his field of practice and as to which he did not feel that he was qualified in any event to render an opinions as to the quality of the scans obtained.   Exhibit 11 at 75-77.

**Course of Dealing**

The prior section analyzed the question of when the installation was complete (the start date for the free service plan) through the prism of the status of the equipment at the time it was

delivered:  As the equipment was not working properly, its installation could not be said to be complete.  This section will work, so to speak, in reverse.  The basic question in this case is when the one year period for free service began.  This section will show evidence as to that point.

Dr. Philip Templeton stated that he has a great deal of experience in the purchase and installation of MRI equipment, including transactions with TAMS.  Exhibit 11 at 25, 66, 69-70. Based on that experience, Dr. Templeton testified that the initial service period always began after acceptance of the delivered equipment.   Exhibit 11 at 65-70.   This is evidence of an industry course of dealing which certainly shows that there is no reason to assume that the service plan in this case would start from a different point than acceptance of the equipment. This is especially true given the fact that until that time the Lessor of the equipment would not take the equipment from TAMS, (Exhibit 8 & 9), and the fact that acceptance would be signed at the point that the machine was working to specification, (Exhibit 12).

Ms. Stehman also testified that the industry standard was that the service plan would start only upon acceptance of the equipment.  Exhibit 10 at 87-88.

Additionally, Ms. Stehman testified that Gary Hall, who, in her words is, "one of the persons who worked – see I don't know what part of Toshiba he worked for, so he had Toshiba in his – ... he worked for Toshiba, but I don't know what division of Toshiba," [he in fact works for TAMC], advised her that the one year free service plan would begin from the time of acceptance. Exhibit 10 at 88-89.   See also Deposition of Jeffrey Low, Exhibit 18 at page 143 and 204 to similar effect as to the representation by Mr. Hall and 221-223 as to Mr. Hall and TAMC as being represented to be agents of TAMS.

As stated earlier, the agreement between TAMS and TAMC (TFS) specifically provided

that all servicing would be done so as to make the Lessee think that TFS's work, of which Mr. Hall was a part, was in fact being done on behalf of TAMS.    Therefore, TAMS is held to the representation of Mr. Hall in his capacity as a worker for TFS as an agent of TAMS under principles of apparent agency and agency by estoppel.

Thus, by way of the course of dealing in the industry as well as the specific representations of Mr. Hall on behalf of TAMS, the one year free service period did not begin until the acceptance of the lease.

Additionally, Dr. Templeton as well as Mr. Low stated that TAMS had provided service without charge after April 16, 1999.   See Low Affidavit at Exhibit 3, Exhibit 11 at 66, Exhibit 18 at 223.

Mr. Jeffrey Low had been a member of the Plaintiff company, Exhibit 18 at 34, and ran the company.   He testified that he had complained to TAMS about the problems of the scanner and that TAMS had promised to fix the problems prior to the acceptance of the scanner.   Exhibit 18 at 283.   Mr. Low specifically stated that at no time had he been told that the free year of service had run out in April of 1999, Exhibit 18 at 134, and further stated that under prevailing practice in the industry, he would have been contacted a substantial period prior to the termination of the free service plan to be asked if he wished to have an extended plan.   Exhibit 3.   This did not occur in this case, further indicating that TAMS did not feel that the extended service plan had expired in April, 1999.

**TAMS's Own Documentation and Testimony of TAMS' Representatives**

In the course of the discovery process, the depositions of TAMS corporate designees, John Hutton and Kent Stansbury were taken.   Mr. Hutton is a service manager for TAMS,

Deposition of Mr. Hutton Excerpted at Exhibit 19, at 6.    He described TAMC as the preferred financing vehicle of TAMS (again supporting the notion that TAMS is bound by the representations of TAMC).   Exhibit 19 at 16.

In describing the OPART system, Mr. Hutton emphasized that the system was designed to provide a high degree of reliability in its operation.   Exhibit 19 at 20-22.

Mr. Hutton stated that TAMS had done a survey of the site DRG intended to use for the scanner before its delivery, Exhibit 19 at 26.   The site work was done by an outside vendor and inspected by Toshiba prior to delivery of the equipment.   Exhibit 19 at 28.

In this case, the Defendant has asserted that its limited warranty was a warranty as that term is described in the Uniform Commercial Code, e.g. a promise as to the qualities of the good at the time of delivery.    Mr. Hutton specifically described the "warranty" provided in this contract as being a promise to fix the equipment if it broke, and it was not a promise as to how the equipment would perform.   Exhibit 19 at 31-32.    The cold head that broke down in this case was covered under the free service promise made by TAMS.   Exhibit 19 at 34-40.

Mr. Hutton specifically testified that if the customer did not take an extended service plan at the time of delivery of the equipment, the customer would be contacted prior to the expiration of the one year free service in order to ascertain whether or not the customer wished to purchase an extended service plan.   Exhibit 19 at 44-45 & 48.   Nothing in the record indicates that any contact was made to DRG prior to April, 1999 to see if DRG wished to have an extended service plan, and Mr. Low's Affidavit, Exhibit 3, specifically provides that this did not occur.    This lends further support to the fact that the service plan included with the sale/lease did not expire in  April, 1999 as contended by the Defendant.   If it had, there would have been an offer prior to that time to purchase the extended service plan under the course of dealing used by TAMS.   The

fact that there was no such contact further indicates that even in the mind of TAMS, the service plan did not expire in April, 1999.

Mr. Hutton testified that the service department of TAMS is a business unit with its own budgets and its own revenue generation, through payment for service calls and the procurement of service plans.   Personnel in the service department were reviewed on the basis of their revenue generation as well as customer satisfaction, for purposes of their receipt of bonuses and raises.   Exhibit 19 at 45-48.   Thus, whenever service was performed, they would make sure that bills were sent if the service had to be paid for, in order to earn revenue for TAMS.   Exhibit 19 at 81-82.

Two sets of service records were produced by TAMS in this case.   These included computerized records that were kept from some time period forward, Exhibit 19 at 58.   This document is in the record as Hutton Deposition Exhibit 4 and is attached hereto as Exhibit 20. Mr. Hutton described these records.   There are various pieces of information identifying the department (4132).   Exhibit 199 at 55-56.   There is also an SEG number which identifies the particular piece of equipment at issue (134080).   Exhibit 19 at 60.

The name of the engineer performing service is recorded as well as some notes about the particular service.   Additionally, there is a section for parts, labor and travel list, (e.g. the price that would be paid by a person off the street seeking service).  Exhibit 19 at 59 & 74-75.   This was relevant as the customer in question might have a discount of some type in place.   Exhibit 19 at 76.   For that reason, there is a separate heading for a parts bill and labor bill, indicating the costs to that particular customer.  Exhibit 19 at 74-75.

In the instant case, Exhibit 20, there is no listing under any of the service calls for Parts

list, labor list or travel list.   This is because no bill of any kind was sent to the customer (DRG) because the service calls were under a free service plan.  Exhibit 19 at 77-78.

Mr. Hutton specifically was asked about why no parts bill or labor bill was listed for service calls and advised that, throughout this document, the reason for that would be that no bill was sent to the customer as the service plan (one year free) was in force.   As Mr. Hutton stated, if the customer owed money for the service, such as would be the case if the service was not under a free service plan, then they would make sure that a bill was sent as they were a business unit of TAMS who were charged with generating revenue for the company (same as any other unit).   Exhibit 19 at 81-82.   Exhibit 20 lists no parts or labor bill for periods after April, 1999, including the call in July, 1999.   This shows that even in TAMS's view at the time, the one year service plan was still in force as of July 5, 1999, and certainly did not cease as of April 9, 1999.

There were also hand written work orders issued and created by the individual engineers who performed service.   These orders were filled out at or near the time of service and were reviewed by Mr. Hutton.   They showed data as to what had been done, including whether or not the service call was billable to the customer.   As Mr. Hutton stated, only the manager, such as Mr. Hutton, could make the final determination whether or not the call was billable to the customer.  Mr. Hutton reviewed these work orders and had found them all to be correct and no changes were needed.   Exhibit 19 at 65-73.

The hand written Work Orders were entered into evidence as Stehman Exhibit 4, and were further reviewed in the deposition of Mr. Hutton.   They are entered here as Exhibit 21 and further show that the service calls were not billable to the customer.   This again supports the position of the Plaintiff:   As of July 5, 1999, TAMS considered the one year free initial service plan to be in effect.   These 2 exhibits also show a portion of the large number of problems that

were present in the equipment provided by TAMS further illustrating that the installation of the equipment was in no way complete as of April 16, 1998.

Mr. Kent Stanbury's deposition was also taken, and is excerpted as Exhibit 22.    Mr. Stansbury specifically advised that the item that malfunctioned was a chiller, which, "is essentially like an air conditioner.    It cools a component.    In this particular case it was a cold head of our [TAMS's] magnet."  Exhibit 22 at 20.    Mr. Stansbury further stated that the chiller was considered to be equipment covered under the service plan that TAMS offered.    Exhibit 22 at 26.    He advised further that under the service plan he would try to fix the chiller and, if he could not do so, TAMS would then call the manufacturer and have that manufacturer fix the chiller.    Exhibit 22 at 39.  It should be noted that no exhibit indicates that there was any issue of TAMS refusing to repair the system on July 5, 1999 due to any claim that the service plan did not cover this device.    (Exhibits 20 and 21.)

## LEGAL ANALYSIS

### The One Year Service Plan Was Still in Force on July 5, 1999

The preceding sections each analyzed different portions of the facts, but all show the same conclusion.    The one year free service plan began from the time that installation of the system was completed.    Under normal commercial law, delivery is completed when the system is accepted.

In this case, the combination of all of the documents shows that the parties intended that installation would be considered to be complete only at the time of acceptance.    This is further in accord with the industry standard.  This construction is only logical as until the equipment was ready for use in patient care, the buyer could not tell if there were defects or problems that

needed fixing as part of a warranty plan, rather then being problems that reflected the fact that the installation of the machine was not complete.

Additionally, in this case, the installation was not complete until at the very least the time of acceptance as until that time the system could not be made to work up to the manufacturer's specifications or to normal customer expectations, namely that the system would work reliably in a quality manner and consistently produce quality scans.   This is also in accord with the text of the various documents executed surrounding the transactions that formed the basis for this case.

Furthermore, the facts surrounding the acquisition of the equipment further show that the transaction between TAMS and TAMC was not completed until after July, 19998, and thus the one year service plan could not be said to begin until that time, and would thus have been in force in July, 1999.    This includes the fact hat no extended service plan was offered to the customer after delivery of the equipment but before April 9, 1999 (the date TAMS claims as the one year cut-off) though Mr. Hutton stated that TAMS would have offered an extended service plan prior the cut off of the service plan.    Additionally, this matches the actions of TAMS in continuing to provide service without charge after April 9, 1999.

This was supported as well by the specific representations of Mr. Hall, a TAMC employee.   Customers such as DRG were meant to believe that TAMC in fact was a program (e.g. an agent) of TAMS and in fact did believe that.   Thus, under principles of apparent agency and agency by estoppel, TAMS is bound by his representations that the one year of free service would only begin at the time of acceptance.

This was further supported by the testimony of witnesses, industry course of dealing and the fact that TAMS continued to provide free service after April 9, 1999.   Of course, TAMS's

own documents also show that in the view of TAMS, there was a free service plan in effect after April 9, 1999, and in fact such plan was in force on July 5, 1999.   Therefore, the Court should find TAMS liable.

Witnesses testified that the installation of the equipment was not complete until the time of the acceptance of the equipment due to the specific problems that had plagued the system from the time of its delivery.   This matches the language of the TAMS agreement providing that the service plan began only from the time that the installation was complete, Exhibit 1.   TAMS asserted that the installation was complete once scans could be performed.     However, this contention is belied by the facts that came forth.   The system was able to perform certain scans but could not perform others, and would not perform consistently.   Thus, installation could not be said to be complete as calibration of the system was not done.   Calibration and acceptance of the system were specifically noted by TAMS to be part of the installation of the system.   Exhibit 2.   Therefore, the Court should hold the Defendant liable.

In the instant case, TAMS provided what it termed as a warranty in which it would repair or replace broken components for a period of one year.   This warranty period runs from the time that installation of the equipment is completed, as per Exhibit 1, ¶8.  The time that installation is complete would logically have to be the time that no more work remains to be done for the installation and the equipment is accepted.  This is indicated in the Installation Progress Form, Exhibit 2, as the steps that remained to be done as part of the installation of the equipment sold by TAMS.   This occurred only in October and November of 1998, Exhibit 8 & 9.

Moreover, logically, under basic rules of contract law, the seller must tender complete performance of the items to be sold, and then the buyer accepts performance.   Thus, the

installation of the equipment is not complete until the buyer has accepted the goods provided. Indeed, until acceptance, it cannot be said that a warranty period of any kind[12] would begin to run for reasons as follows:  If, prior to acceptance by the buyer, the buyer found that a part was defective or not working properly, the buyer would not need to invoke a repair clause, but would just reject the delivery as the buyer had not accepted the seller's tender of performance.

Thus, a promise to repair or replace parts logically must first be involved when the buyer has already accepted the tender of performance and can no longer reject the goods supplied by the seller.  Therefore, in this case, the promise to repair or replace, the "warranty," first began at the time that the equipment was fully calibrated and after acceptance of the goods by the buyer,[13] which occurred well after July 4, 1998.  As such, the warranty was still in force as of the July 4, 1999 holiday when the Defendant breached its own promise to repair or replace, and thus this action is properly brought.  The Exhibits further demonstrate that the equipment was not ready for patient care until long after April 1, 1998 and it was further not accepted until October or November, 1998.

Until the equipment was accepted, the warranty period could not start to run, as until that time the equipment could have been rejected by the buyer without the need to invoke a right to demand repairs.  Thus, logically, the warranty could only begin at the time of acceptance of the equipment and was in force on July 4, 1999.   Thus, a reasonable trier of fact could determine that based upon the facts that had occurred with regard to the installation of this device, the

---

[12]Using the loose term of warranty to describe a promise to fix broken parts or components, and not the term "warranty" meaning a promise as to quality of the Maryland Commercial Law.

[13]There has been no allegation by the seller that the buyer somehow wrongly held up acceptance of the equipment.

service plan was still in effect as of the July 4-5, 1999 period that forms a basis for this case, and

thus the Motion for Summary Judgment must be denied, and indeed the Motion of the Plaintiff

granted.

**The Applicable Limitations Period Allows this Case To Be Brought**

Two possible periods of limitation apply to this case.

First, the default three year statute of limitations would apply to this case to require that

suit be brought within three years after the Plaintiff was made aware of the breach of contract by

Defendant, Maryland Courts and Judicial Proceedings Code Annotated §5-101.   Under that

provision, this action is timely brought as the Plaintiff had a contract with TAMS that required

TAMS, "[f]or the warranty period described below by product," to, "replace or repair, at

TAMS's option and without charge to Customer ... any components of the Equipment

determined by TAMS to be defective in materials or workmanship."   Exhibit 1, at ¶8.  Until the

July 4, 1999 holiday, TAMS had been replacing or repairing the components and thus had not

breached the agreement, and further, by TAMS choosing to repair the equipment and not to

provide an entirely new system, it is clear that TAMS was representing to the Plaintiff that it had

the capability of doing so, and thus Plaintiff could not have known that the equipment could not

be repaired.   Indeed, the TAMS "warranty" specifically stated that TAMS was not liable for loss

of profits while performing repairs.

Moreover, as the duty to "replace or repair, at TAMS's option," these components was

TAMS's, "only obligation," under the warranty, the Plaintiff could not have  been aware of any

ability to bring an action while TAMS was in fact following its obligations, and representing that

it could in fact fix the equipment.[14]  Thus, the Plaintiff had notice of the breach of agreement on or about the July 4 holiday, and brought suit less than three years after that time.  Therefore, this action is timely brought.

The second possibly relevant period of limitations is §2-725 of the Maryland Commercial Law Code which provides that an action for breach of the warranties set forth in the Uniform Commercial Code must be brought within four (4) years, applies to a breach of a warranty of performance of the goods, e.g. a warranty that at the time of the sale, goods are properly working, and/or that these goods will continue to work free of defects for a period of time.

In this case, there was no such warranty provided.  Rather, TAMS included a promise that it would repair or replace equipment that was provided to a buyer that it would replace things that broke for a period of one year.  Indeed, the agreement specifically set forth the fact that this promises was, "IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF THE MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE;"

Thus, by its terms, the agreement was not a warranty as that term is expressed in the Maryland Commercial Law Code with regard to warranties in Sections 2-313, 2-314, and 2-315.

In fact, the Maryland Courts have held that language in an agreement that is a promise to provide future repairs is not a warranty but is rather an executory promise to do an act, McCarty

---

[14]By way of example, remedial measures such as fixing the equipment can be taken as evidence that, at least to TAMS, it was in fact feasible to fix the equipment.   This is analogous to Federal Rule of Evidence 407, dealing with remedial measures taken after an accident.

v. E.J. Korvette, Inc. 347 A.2d 253 (Md. App. 1975)[15]  and thus the statement by TAMS is not a warranty as that term is contemplated by the Maryland Commercial Law, but rather an executory contract, controlled by the provisions of the Maryland limitations period of three years from the date of discovery of breach, which was on or about July 4, 1999.

In fact, the Maryland Court of Appeals has explicitly held that an action alleging the failure to repair a sold item as promised was not of the same type or nature as an action asserting that a product had not met the qualities which the seller promised the product to have (which the Court of Appeals called an express warranty).  In these cases, a plaintiff sued for breach of contract, asserting that a truck sold was not of the promised quality and also made a claim for breach as the seller had not fixed the truck as promised.

The Court of Appeals held that the two claims of breach could not be plead in the same count as they were two different claims: "The count combines two distinct causes of action: First, a breach of the express warranty that the automobile "was sound, free from defects in workmanship and material," etc.; and, secondly, a breach of a contract on the part of the defendants "to keep the same in satisfactory running condition, without expense to the plaintiff, for a period of one year from the date of said purchase." It was proper for the plaintiff to have embodied in his declaration in separate counts both causes of action."     White Auto Co. v.

_____

[15]"An assurance that a truck would perform in a certain way for a given period of time in the future constituted an express warranty because it had reference to the existing quality, capacity or condition of the goods. An assurance that the seller would, at some time in the future, perform certain services in the event that the goods should not conform to the representation, so that the warranty was breached, constituted an executory promise or contractual undertaking because it had reference, not to the existing quality, capacity or condition of the goods, but rather to the assumption of an affirmative contractual duty to be performed on the future."  347 A.2d at 258 (interpreting the Maryland Commercial Law Code sections relating to the definition of warranties under the Maryland Commercial Law Code).

Dorsey, 86 A. 617, 619 (1913)  (McCarty was based upon White).

Thus, the action for breach of a promise to repair the truck (or in this case the MRI unit) is not an action alleging that the unit did not meet the promised quality[16] and it is only a promise to carry out repair work.[17]   Thus, the only applicable limitations period is the three year period of §5-101 of the Court and Judicial Proceedings Code, and thus this action is timely brought.

The Defendant is asserting that a claim for breach of an agreement to provide free service accrues as of the time of the delivery of the equipment and is time barred four years later. Under that rubric, the Defendant could and should sell along with its equipment an agreement to provide service for ten or twenty years.   Any customer making a claim for service could be safely denied service with the statement that they could not bring suit for the breach as the claim would be time barred.   Of course, this position is baseless.   A promise to repair equipment is an executory promise.   The right to bring an action for such breach accrues only at the time of the breach and lasts for three (or four applying the Uniform Commercial Code) years.   Therefore, this claim is timely brought.

Moreover, even applying the four year limitations period of the Commercial Law Code, this action is still timely brought.  The Maryland Commercial Law Code §2-725 provides that the warranty period begins on the date of delivery of the goods to the buyer, "when tender of delivery is made."   In this case, the seller has not made tender of delivery until it has

---

[16]Especially as the Contract at Exhibit 1 explicitly disclaimed all such special qualities.

[17]Indeed, it is a bit confusing in that the term "warranty" was used in this agreement to refer only to a promise to fix damaged components, while the "warranty" contemplated by the terms of the Maryland Commercial Law Code refers to a promise as to the present qualities of the goods sold at the time of sale or some future point.   It is only made more confusing by the fact that an express warranty as per the Maryland Commercial Law Code need not be phrased as a warranty either.   Maryland Commercial Law Code Annotated §2-313(c)(2).

accomplished all that it is required to do under its contract, namely to install the equipment and fully calibrate that equipment and make it ready for patient care.

Just because power was turned on to the equipment does not mean that it is ready for patient care. As set forth earlier, this does not involve the sale of a large food processor. Indeed, in that context tender of delivery is considered to be made at the point where the equipment has been fully made ready for all aspects of patient care to be performed by it, and the buyer accepts the tender as nothing else remained to be done by the Seller for the delivery of the equipment.

As set forth in Exhibit 2, acceptance of the goods sold would be done after final calibration and required training (all of which were provided for in the Order Detail at Exhibit 1). Only at that point, when tender of the equipment has been made and accepted, does the buyer have the equipment so that he or she can determine if the warranty is breached,[18] and thus the four year period of limitations would only begin at that time. Thus, even if the four year period had begun at that time, (e.g. at the earliest October 1, 1998) this case would still be timely brought on or about May 30, 2002.

This is in accord with the provisions of §2-301 of the Maryland Commercial Law Code that requires the buyer to accept delivery when the seller is tendering delivery. Thus, the two obligations are concurrent in time, acceptance being at the point where tender is made. Just as acceptance was to be done only after all other steps were complete, so too tender of delivery was only done when all steps were complete to install the equipment and the equipment was ready for acceptance by the buyer.

Defendant has asserted that it cannot be held liable for loss of profits to the Plaintiff as

---

[18]Even assuming that this case is incorrectly analyzed through the prism of the warranty of merchantability and fitness for particular purpose as the Defendant seeks.

there is a clause limiting its promise to repair equipment to repair and absolving it from liability for loss of profits. However, this assertion is totally baseless. TAMS promised to repair broken equipment for a period of one year. In the instant case, the case is brought as TAMS did not follow its own executory promise to repair or to replace the broken equipment and thus the remedy available to the Plaintiff is to sue for damages for the action of TAMS in not repairing or replacing the equipment. TAMS in effect is asserting that its only obligation was to repair or replace the equipment, and as TAMS wrongly refused to do either of those actions, it cannot be held liable for damages as its obligation was to repair or replace the equipment, which it did not do. This argument is circular to say the very least, and is also rather specious. Once TAMS failed to make good on its promise to repair the equipment, TAMS became liable for the damage as a result of that failure.

**Intentional Interference Claim**

The Plaintiff Complaint claim damages not just for breach of promise but also for intentional interference with their contracts and economic relationships. In this case, TAMS refused to provide service that they knew, by their own records, was withing the free service period. As such, there was an intentional interference by TAMS for which they are liable. As to that claim, there is no separate limitations period under §2-725 of the Commercial Law Code. The only limitations period is three years from the date of the interference, and thus this action, brought prior to July 5, 2002, was timely brought.

In fact, Mr. Low sent a letter to TAMS, in evidence as Exhibit 23, which indicated that he felt that TAMS was acting wrongfully and with malice in refusing to provide service.

## <u>CONCLUSION</u>

For all these reasons, Plaintiff contends and concludes as follows:

A.    This action is not time barred;

B.    TAMS was within the required contractual period;

C.    TAMS was required to fix the equipment and failed to do so;

D.    For these reasons, the Motion for Summary Judgment must be DENIED and the Court should hold the Defendant liable and the Cross Motion for Summary judgment should be GRANTED.

Respectfully Submitted,


Samuel Sperling

SS24135