## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DIAGNOSTIC RESOURCE GROUP, LLC  *
      Plaintiff

v.                     *

TOSHIBA AMERICA MEDICAL     *
  SYSTEMS, INC.
        Defendant      *

**U.S. District Court Civ. No. RDB-02-3020**
Removed from Baltimore County Circuit
Court Case No.: 03-C-02-006016

\*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANT TOSHIBA'S REPLY AND MEMORANDUM TO ANSWER AND OPPOSITION AND RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

## TABLE OF CONTENTS

Introduction ...... 3

Argument and Factual Commentary ..... 7

Discussion and Analysis of each Exhibit ..... 7

Legal Argument .... 18

Alleged statements by non-TAMS personnel .... 21

Alleged experts and Lack of Any Demonstrated Qualification .... 22

Course of Dealing ... 26

## EXHIBITS

Exhibits attached [identified using exhibit numbers previously; new exhibits begin with letter Q]

Q. Signorelli Affidavit

R. Signorelli Affidavit exhibit of patients scanned and service calls

S. Letter of John Hutton of June 14, 1999 re warranty expiration

T.  Affidavit of Kevin Abbott

U.  Affidavit of Lynda M. Morvik

V.  Letter from Plaintiff counsel Kreshtool of July 8, 1999
     alleging dispute over warranty and lost profits and other expenses

W. Cover letter and Consent Order between De Lage Lande and Plaintiff
     September 4, 2001 produced by Defendant, Bates #226-232

X. Letter of Plaintiff counsel Kreshtool of November 12, 1999 asking to have MRI
     removed

Y.  Lessor Tokai Financial Services, Inc. notice to real property landlord re ownership by lessor
     Tokai dated Oct. 30, 1997

Z.  TAMS Document Request

Now comes Defendant Toshiba America Medical Systems, Inc. ("TAMS"), by its counsel, Brooke Schumm III, of Daneker, McIntire, Schumm, Prince, Goldstein, Manning & Widmann, P.C. and for its Reply to Answer and Opposition of  Plaintiff Diagnostic Resource Group, Inc. (DRG") to Defendant Toshiba's Motion for Summary Judgment and Cross Motion for Summary Judgment and Memorandum in support thereof, (collectively "Plaintiff's Response") states as follows:

Pending before the Court is Defendant TAMS' Motion for Summary Judgment on the basis of statute of limitations.   Plaintiff has cross-moved for Summary Judgment.

<u>Introduction</u>

The undisputed facts, based on Plaintiff's business records, and never rebutted by Plaintiff, are that the OPART MRI machine (Magnetic Resonance Imaging) was installed and installation was complete because the MRI was used to treat patients commencing in April, 1998. Those patients were billed and they paid.  Installation of the machine was complete in April, 1998.

The contractual relationship between the parties is governed by the document entitled "Quotation/Order" (hereafter the "MRI Sales Agreement" or "contract") attached as Exhibit A-1 and A-2  to the TAMS Supplemental Motion of June 26, 2003 and Exhibit 1 to Plaintiff's Response.  The MRI Sales Agreement contains an "integration clause" in paragraph 19 of the Terms and Conditions on the second page stating that the agreement comprises the entire contract and may only be modified by a writing executed by both parties.

On December 30, 2002,  Plaintiff DRG stated in its Memorandum in Support of Answer and Opposition to Toshiba's Motion for Summary Judgment, "This [referring to completion of

3

installation] is only logical as until the equipment was ready for use in patient care, the buyer

could not tell if there were defects or problems that needed fixing as part of a service plan, rather

than being problems that reflected the fact that the installation of the machine was not complete."

Plaintiff asserted then, and the MRI Sales Agreement provides, that the one year repair or

replace warranty commenced one year from "date of completion of installation." As Plaintiff

states when "the equipment was ready for use in patient care," that is when the warranty would

commence. The machine was ready for patient care on April 10, 2003, but for purposes of this

Motion, the clear date of when the machine was ready for patient care is April 16, 2003, when

the first patient was scanned. The attached affidavit of Lawrence W. Signorelli (Exh. Q)

authenticates the summary prepared by him attached as Exhibit R. The Court can see that

installation was clearly complete as 10 patients were seen in April, 1998, 29 in May, 1998, and

so on. See Signorelli Affidavit, Exh. Q and Exh. R.

Mr. Low, the President of the Plaintiff, asserts:

"I have reviewed Exhibit P to the Defendant's Motion for Summary Judgment which is a record
indicating that a payment of $708 was made to Diagnostic Resource Group, L.L.C. in the month
of April, 1998 and that there was an accounts receivable of under $13,000 for that month:..."
He intimates in the next paragraph 4 of Exh. 24 that the exact amount was $12,702.00.

Plaintiff's Response Exh. 24 ¶3.

Plaintiff thus admits that patients were treated in the month of April, 1998. Installation

was complete in April, 1998. The entirety of the papers filed by Plaintiff in this case are simply

an effort to modify the terms of the MRI Sales Agreement, and to salvage a case filed beyond

four years after April, 1998. No oral representation was made modifying the MRI Sales

Agreement, nor is there any signed writing or written documentation of any such modification to

the MRI Sales Agreement.

Because the Plaintiff's claim is barred by limitations, Plaintiff's answer and opposition is an effort to attempt to establish that because Plaintiff was allegedly dissatisfied with the MRI machine, the installation was therefore not complete.

Plaintiff utilized this complex $850,000.00 OPART magnetic resonance scanning machine to scan patients, and sent those scans to physicians for treatment of life-threatening illnesses, billed patients and collected money from them. This was done repeatedly in April and May, 1998. To argue in hindsight that the installation was not complete is ridiculous.

Alternatively, again without any legal or documentary support, Plaintiff argues that because it had failed to sign an acceptance of the equipment, installation was not complete. The facts are undisputed that installation was complete and the machine was used to treat patients more than four years before the case was filed. The contract, which could only be modified by a writing signed on behalf of Toshiba America Medical Systems, Inc., established by agreement that the warranty expired one year from the date of installation. That expiration date was April 10, 1999. No warranty existed after that date, and this cause of action for breach of warranty was not filed within three years of April 10, 1999.

Plaintiff argues without any foundation that some notification was necessary to trigger the expiration of the warranty. The contract did not so provide. In fact, a letter was sent concerning the warranty expiration by Mr. Hutton on June 14, 1999. See Exh. S.

The Court should be mindful that there was another lawsuit filed by Plaintiff against Defendant in November, 1999, but never prosecuted. Supp. Motion Exh. K, L. Notwithstanding that lawsuit, Plaintiff destroyed or lost all of its business records. The only records left, despite

the asserted claim and litigation are patient records from April-November, 1998 and some financial records from March-October, 1999. All the rest of Plaintiff's business records are gone. The evidence for this spoliation is set forth in "Defendant 's Response to Plaintiff DRG's Supplemental Motion for Discovery Preclusion of Issue," and the exhibits thereto, filed on July 24, 2003, which are adopted by reference. As testified by Mr. Low, all of the Plaintiff's business records were either destroyed, disposed of, or have gone missing after a claim had been asserted on July 8, 1999 by Plaintiff's counsel, and while a lawsuit was pending in Baltimore County against the Defendant. That conduct is classic spoliation. It certainly bars the Plaintiff, having destroyed or lost all correspondence, financial, maintenance and service records, from attempting to claim that he did not receive notice. The Plaintiff does not if it did or did not receive notice; all the records are destroyed. This is a clear spoliation case: failure to preserve documents after a claim has been asserted and after a lawsuit has been filed.

The Court is asked to focus on the rules of evidence: a summary judgment motion must be rebutted by competent, material and admissible evidence.

Several examples exist of inadmissible evidence: in Exhibit 3, Mr. Low's opinion is expressed in paragraph 7 that "this has been the pattern and practice in the diagnostic imaging business, and is in accord with my experience as well." This opinion evidence is not admissible as no foundation of expertise has been laid. Mr. Low was allegedly designated "to offer opinions relating to the financial and business prospects of the Plaintiff business as well as with regard to the sources of referrals and business available to the Plaintiff business." 'See para. 6 of Plaintiff's expert Designation, Dec. 5, 2002 filing. Mr. Low did not submit an expert's report. Mr. Low was not offered for and has no qualifications to opine as to pattern and practice.

As another example of inadmissible evidence, Plaintiff in Exhibit 15 cites a string of e-mails obtained allegedly from De Lage Lande which are alleged to be copies of Tokai Financial Services, Inc. e-mails. This is multiple hearsay and inadmissible.

As another example, Exhibit 12A appears to be a current download of July 23, 2003 of current TAMS marketing material. It has no relevance to events of five and six years ago and is facially improper to cite.

As to the Cross-Motion for Summary Judgment by Plaintiff, the motion is filed late. Last October, 2002, in the Scheduling Order, Judge Legg directed that all dispositive motions had to be filed by March 24, 2003. This Motion is four months late. The only dispositive motion pending on that date was Defendant's Motion for Summary Judgment. Briefing of any Supplement to the Defendant's Motion for Summary Judgment and any response was set, and the only matter set for hearing on September 5, 2003 was the Motion on the issue of statute of limitations. The Cross-Motion should be summarily denied as filed late.

The Court should also be aware of some of the names which are referenced. Toshiba America Medical Systems, Inc. (TAMS) has a program for finance leasing of MRI's which was conducted at the time of the Agreement between the parties by Tokai Financial Services, Inc. ("Tokai"). Tokai was authorized to conduct the program and trade under the name Toshiba America Medical Credit ("TAMC"). Plaintiff and Tokai entered into a lease, see, e.g. Exh. 12. Subsequently, the leasing business of Tokai was taken over by De Lage Lande, a Netherlands based equipment financing company. See, Exh. T, Affidavit of Kevin Abbott. De Lage Lande is the entity which sued Plaintiff and obtained the judgment referenced in paragraph 10 of the Amended Complaint. Toshiba America Medical Systems, Tokai, and De Lage Lande are all

7

separate companies as Mr. Low testified he knew.  The principal contact at Tokai and De Lage Lande was an employee of Tokai and then De Lage Lande named Mr. Gary Hall.

<u>Argument and Factual Commentary</u>

<u>Discussion and Analysis of each Exhibit</u>

**Exhibit 1** is the contract between the parties with the terms of the agreement concerning the sale and the warranty and is admissible.

**Exhibit 2** is a business record of TAMS signed by both parties and is admissible

**Exhibit 3** is an Affidavit of Jeffrey Low.  Mr. Low was not designated as an expert with any knowledge of, nor has he been qualified an expert, nor has he submitted an expert report of how to install or operate a magnetic resonance imaging machine.  Mr. Low was designated as an expert "to offer opinions relating to the financial and business prospects of the Plaintiff business as well as with regard to the sources of referrals and business available to the Plaintiff business." He does not know how to calibrate the machine.  He is not a radiation technologist.  He attempts to opine that when the power was "turned on, the equipment was in no way ready for patient care;... and states "it can often take several weeks or longer for equipment to be fully calibrated and ready for patient care;..."  As Exhibit A to the Supplemental Motion and Exhibit R hereto show, patients were treated beginning on April 16, 1998.  In fact, over 30 patients were treated by the end of May.  See Supp. Motion Exh. A and Exh. R hereto.  Mr. Low's statement in Exh. 3, ¶12 that "I and Toshiba had agreed that the warranty would start from that time, e.g. from the time that the acceptance was signed;..."  is a bare oral assertion and incorrect.  He has no foundation to allege such an agreement.  Any oral agreement is barred by the express terms of the MRI Sales Agreement, Exhibit 1, paragraph 19.  Further, in his deposition on March 23, 2003,

8

Mr. Low testified that he knew as of November, 1998 that he desired a six month extension of

the warranty in the following colloquy:

[page] 225

```
3      Q.  Okay.  Had Gary Hall ever told you that the
4   warranty was extended by six months?
5      A.  I don't remember Gary telling me that, no.
6      Q.  Anybody else tell you that from Tokai Financial
7   Services, Inc. or Toshiba America Medical Credit?
8      A.  I, I just recall the six months as per that
9   delivery and acceptance letter that was signed by Dr.
10  Templeton.
11     Q.  All right.  And this is, is the one that was not
12  signed by anybody else; is that right?
13     A.  I, I believe you're right.
14     Q.  So at least when Dr. Templeton signed that document [in October, 1998]
15  you knew that you wanted that warranty extension by six
16  months, didn't you?
17     A.  Could you ask that again, please?
18        MR. SCHUMM:  Could you repeat the question?
19        (Whereupon, the Reporter read back the last
20  question.)
21     A.  I must have.
```

Low Dep. 3/23/2003 at 225.  Plaintiff's Response Exh. 18 at 225.

Mr. Low therefore testified he knew the warranty would expire.  He testified he wanted

an extension.  The undocumented oral assertions in his Affidavit and Plaintiff's Response are

not facts, they are unfounded assertions. DRG did not obtain any sort of extension.  As Exhibit 8

contrasted with Exhibits 9, 12 and 13 show, DRG may have wanted an extension, but neither

the final signed contracts or forms executed by and with Tokai Financial nor the MRI Sales

Agreement with TAMS reflected any extension.

Paragraph 18 is clearly hearsay, and inadmissible.

**Exhibit 4**: This is another Jeffrey Low affidavit.  Again, he falsely assets that it took a "period

9

of months for the equipment delivered by Toshiba to be calibrated and ready for patient care..."
Since all maintenance or service call records of Plaintiff have been lost, there is no evidence of
Plaintiff that the machine was maintained by Plaintiff or any calls for served were made or any
defects occurred.; the only evidence is that patients were treated and billed for scans starting in
April, 1998.  The prior discussion on Exhibit 3 is adopted by reference.

**Exhibit 5** is an affidavit of Ms. Stehman.  Ms. Stehman was designated as an expert as follows:
"She will render opinions regarding the workability of the equipment delivered by Defendant to
Plaintiff at various times relating to this case.  However, in her affidavit, Plaintiff attempts to
use here to offer her opinion on the "sale and installation" of "these devices."  This is outside
the bounds of her designation, and no expert report was submitted for Ms. Stehman on any
subject.  Ms. Stehman, who also does not know the whereabouts of any business records of
Plaintiff, alleges that "It was only on July 5, 1999 that Toshiba asserted for the very first time
that the warranty had expired;..."  ¶12 of Stehman Aff. Exh. 5.  She was not an officer, director
or shareholder.  Mr. Low has testified that he knew.  Her opinion is inadmissible, and her
testimony as to the date that she thinks TAMS first made an assertion is irrelevant as she was
not an officer, director or shareholder, and not authorized to sign the MRI Sales Agreement
between the parties.  Exh. 1.

**Exhibit 6** is an affidavit of Ms. Stehman that is identical in substance to Mr. Low's affidavit
attached as Exhibit 4.  Ms. Stehman is apparently not aware that patients had been treated, billed
and had paid for treatment and scans since April, 1998.  No personal knowledge of the date
Jeffrey Low signed the acceptance of the equipment is shown.    The earlier comments regarding
Exhibits 3 and 4 are adopted by reference.

**Exhibit** 7 is a copy of the Expert Designation by Plaintiff filed in this Court and is admissible as a court copy to show what was filed in the Court, but not as evidence of any fact in the underlying case.

**Exhibit 8** is entitled a "Delivery and Acceptance Certificate" and is a copy of a document not signed by the counter party. No foundation is laid as to whether this is a business record. Mr. Low testified that this was never signed by any other party. The second page of exhibit 8 was not a business record. No one seemed sure of when this second page was prepared or who prepared it. It is not a business record. It allegedly is dated October 1, 1998. By then some 159 patients had been scanned. Exh. R.

**Exhibit 9** is also entitled a "Delivery and Acceptance Certificate" and is a copy of a document produced by De Lage Lande, the equipment financier (as shown by the Bates Stamp beginning D30016). The document is not admissible in evidence for lack of foundation. The document is admissible for purposes of impeaching that Exhibit 8 was ever delivered to De Lage Lande, since Exhibit 8 was not produced by De Lage Lande, and this is a later dated document. This document is signed by Jeffrey Low, the President on November 29, 1998; Dr. Templeton was allegedly the Secretary. By this time at least 207 patients had been scanned. Exh. R.

**Exhibit 10** is a copy of part of Ms. Stehman's deposition. The only testimony admissible is non-opinion testimony that is within her personal knowledge. Just because a question was asked and an answer given does not make the testimony admissible.

**Exhibit 11** is a copy of Dr. Templeton's deposition. He too has lost or destroyed all documents though he acknowledges at page 2 that he guesses he had an official position at Plaintiff DRG. Dr. Templeton was not designated as an expert and no expert report was delivered. The only

testimony admissible from this deposition are facts upon his personal knowledge that are relevant and material about DRG. Again, just because a question was asked and an answer given does not make the testimony admissible.

**Exhibit 12** is a copy of a lease produced by De Lage Lande (D 30006). The document is most notable in that it too contained an "Entire Agreement" clause, i.e. an integration clause, and required modification of any agreement in writing. Moreover, there is in fact a "Master Lease Agreement Addendum" signed by Mr. Low signed on November 29, 1998 reflecting that section 13 was modified. Mr. Low clearly understood how to negotiate and implement a modification to any agreement and understood how important modifications were. At paragraph 6 of the Master Lease Agreement, Plaintiff DRG undertook an affirmative duty to "record in a log book all maintenance and repair performed on the Equipment" and produce the same on request. This log book was either not maintained or lost. Deposition testimony suggests the log book was lost or destroyed. There is no document stating that this is the complete Master Lease Agreement with De Lage Lande and the document is hearsay as to Defendant.

**Exhibit 12A** appears to be a current download of July 23, 2003 of current TAMS marketing material. It has no relevance to events of five and six years ago and is inadmissible.

**Exhibit 13** is a signed clarification by a Master Lease Schedule of the exact payment terms produced by De Lage Lande and signed by Diagnostic Resource Group, LLC and Tokai Financial Services, Inc. The document is signed by Mr. Low on November 11, 1998, and on behalf of Tokai Financial Services, Inc. on February 26, 1999. There can be no genuine dispute of material fact by Plaintiff that Mr. Low and Plaintiff knew that a separate company Tokai Financial Services, Inc. was their finance lessor, and that Plaintiff knew Tokai Financial

Services, Inc. was a separate company from Toshiba America Medical Systems, Inc.  Any

argument that Tokai was an agent of TAMS or of agency by estoppel is undercut by the actual

fact acknowledged by the signature of Mr. Low to this document in November, 1998, well prior

to the expiration of the one-year warranty on April 10, 1999 under  the MRI Sales Agreement

between Plaintiff and Defendant.  Further his earlier quoted deposition testimony from page 225

of Mr. Low's deposition makes clear he understood the distinction.  See, *supra* at 8-9.

**Exhibit 14** is a business record of TAMS and is admissible.  The agreement provides that TFS

[Tokai Financial Services] and TAMS are separate entities, who have entered into this

Agreement for independent business reasons.  Neither TFS nor TAMS have acted, act or shall

be deemed to have acted or act, as an agent for the other.  As Exhibit 13 shows, Mr. Low

understood that TFS was a separate entity and testified at page 225 of his deposition that he

dealt with a Mr. Gary Hall on behalf of TFS trading as Toshiba America Medical Credit, who

was an employee of TFS.

Paragraph 7  of that agreement provides that "In the event a Lessee defaults in its Lease

obligations, and alleges that the default is due to TAMS' failure to comply with its material

representations and warranties affecting Lessee as set forth in this Agreement TFS shall notify

TAMS in writing of the Lessee's default and the Lessee's allegations.  ¶7 at page 20-21. No

such notice exists.  Plaintiff never produced any such notice of breach of warranty given to De

Lage Lande, nor did De Lage Lande.  De Lage Lande took a judgment against Plaintiff in the

United States District Court for the Eastern District of Pennsylvania based on the Master Lease

Agreement and the exhibits produced by Plaintiff in discovery.  See Exh. W hereto.  De Lange

Lande is clearly a separate entity from TAMS.

13

**Exhibit 16** is actually two documents.  The first document was produced by De Lage Lande and is D30173-30176.  That document is hearsay and inadmissible.  The second document was produced by De Lage Lande is D30126-30127.  It is also hearsay though at least it is signed by Mr. Low and on behalf of Tokai Financial Services, Inc.

**Exhibit 17** is a document produced by De Lage Lande and is hearsay.  Its relevance is undeterminable.

**Exhibit 18** contains excerpts of Mr. Low's deposition.  The only testimony admissible from this deposition are statements upon his personal knowledge that are relevant and material about DRG.  Again, just because a question was asked and an answer given does not make the testimony admissible.

**Exhibit 19** contains excerpts of Mr. Hutton's deposition.  He is an Area Service Manager for TAMS.  Depending on the question and level of knowledge, generally these statements by Mr. Hutton are admissible.

**Exhibit 20** contains excerpts of maintenance records of TAMS and the documents are admissible.

**Exhibit 21** contains excerpts of maintenance records of TAMS and the documents are admissible.

**Exhibit 22** contains excerpts of Mr. Stansbury's deposition.  He is a Senior Customer Engineer for TAMS.  Depending on the question and level of knowledge, generally these statements by Mr. Stansbury are admissible.  Counsel attempts to use Mr. Stansbury's testimony to modify the terms of the MRI Sales Agreement, which Mr. Stansbury did not do.  Such attempts are why a writing is required by agreement of Plaintiff and Defendant.  Just because Mr. Stansbury

facilitated obtaining a new Arctic Chiller as part of the warranty in June 199**8**, is not proof of any modification of the terms of the agreement.

**Exhibit 23** is an unsigned letter of Mr. Low. This document is hearsay absent further foundation. It is not admissible for the truth of the matters asserted.

**Exhibit 24** is another affidavit of Jeffrey Low. It is inadmissible on its face. The statement "All opinions that I raised in my deposition were stated to a reasonable degree of certainty" is a sham effort to make an expert out of a non-expert and introduce lay testimony as expert testimony. Mr. Low never delivered an expert report.

In paragraph 2 of Exhibit 24, Mr. Low asserts more opinion "to a reasonable degree of certainty." Whatever expert opinion he intends to offer is inadmissible.

In paragraph 3, Mr. Low makes the important admission that a patient made a payment in April, 1998, and that there were accounts receivable for that month of April, 1998.

Paragraphs 4 through 8 contains inadmissible opinion evidence for which no foundation is cited, no expert report was delivered and for which no business records exist.

**Exhibit 25** is an alleged spreadsheet. Mr. Low testified that he prepared this document sometime before he met with his expert in this case, Mr. Epstein. Low Dep. 3/13/2003 at 126. In other words, he prepared the document in 2002. Low Dep. 3/13/2003 at 124 lines 6-7. The spreadsheet is a document created for this litigation and is inadmissible. Mr. Low was asked about the spreadsheet. When asked for the underlying program, he said he had failed to retain it during this litigation. Low Dep. 3/13/2003 at 126.

121

12    Q   Now, Mr. Epstein referenced a cash flow
13    projection that you prepared for him.

15

14      Do you know where that document is in this
15  group of documents?  It's a single-page document.
16  That might it beside you.
17      A   Yes.
18      Q   Where is the cash flow projection that you
19  prepared?  Client projections he called them.
20      A   That would be it.
21      Q   This is it.  Okay.
22      A   But what I said is that I couldn't find any

                            122
1   of the other documents that I originally prepared,
2   and I don't know why that one has MD Imaging on the
3   heading.  It does, however, reflect I believe closer
4   to the -- and it also doesn't make since because MD
5   Imaging's equipment has never even been close to this
6   number.  I can tell you MD Imaging's equipment was
7   significantly higher than that number,
8   significantly.
9       MR. SPERLING:  So what does this reflect?
10      THE WITNESS:  It reflects, to the best of
11  my knowledge, giving him what I gave Toshiba Credit.
12      MR. SPERLING:  With regard to what company?
13      THE WITNESS:  With regard to DRG.
14  BY MR. SCHUMM:
15      Q   Well, is this the document that he refers
16  to on page 6 of 6 called client projections that you
17  gave to him?
18      A   Yeah, that definitely could be.
19      Q   I'm not interested in what it could be.
20      Where is the client projections that you
21  gave to him?
22      A   That would be it.

                            123
1       Q   This is it.  Okay.
2       How many pages was it?
3       A   That was it.
4       Q   Just one page?
5       A   Yes.  There were no assumptions or
6   breakdowns of any of the salaries or anything like
7   that.
8       Q   Okay.  And when was this document prepared

                            16

9  by you?
10     A    Years ago.
11     Q    This particular document was prepared years
12  ago?
13     A    Yes.
14     Q    I thought you said you didn't have any more
15  projections anymore when I asked you previously about
16  that.
17     A    For DRG.
18     Q    Yeah.
19     A    That says, MD Imaging.
20     Q    Where did this document --
21        What's this document?
22     A    That was an MD Imaging document which I

### 124

1  basically, to the best of my knowledge, changed the
2  amount financed, and possibly some of the other
3  numbers, to reflect more closely what I had given DRG
4  originally -- what I had given for DRG originally or
5  what DRG has given -- gave Toshiba Credit.
6     Q    When was this document prepared?
7     A    That was prepared some time before I met
8  with Larry Epstein.
9        (Low Deposition Exhibit 7 was marked for
10  identification and attached to transcript.)
11  BY MR. SCHUMM:
12     Q    Okay.  The document we've been speaking of
13  is Exhibit 7, but just to make the record a little
14  cleaner, why don't you identify Exhibit 7.
15        MR. SPERLING:  What's the Bates stamp?
16     A    This was cash flow projections that I
17  prepared for Larry Epstein.
18     Q    To the best of your knowledge, when he
19  prepared his report, did he independently verify
20  these numbers?
21     A    Yes.
22     Q    How do you know that?

### 125

1     A    To the best of my knowledge, just from our
2  discussion that we had.
3     Q    When you say he verified, did he go out and

17

4  conduct an investigation?

5      A    That I don't know.

6      Q    You stated that the monthly payment was

7  $18,105 per month.

8          How did you arrive at that number?

9      A    I took the ballpark number of $850,000 and

10  multiplied it by the money factor that was given to

11  me by the Credit salesperson, Toshiba Credit

12  salesperson.

13     Q    And when was that given to you?

14     A    I guess a while back.

15     Q    When you say a while back, how long ago?

16     A    I don't recall.

17     Q    Was it this year or last year --

18     A    No.

19     Q    -- or was it five years?

20     A    It was probably over a year ago, two years

21  ago.

22     Q    Do you remember the name of the person?

                                126

1      A    Gary Hall.

2      Q    So you took a number of .0213 that he had

3  given you several years ago, and that's what you

4  plugged into this --

5      A    Correct.

6      Q    -- last November or October when you

7  prepared this; is that right?

8      A    Uh-huh.  That's correct.

9      Q    Where is the computer copy of this

10  document?

11     A    I'm sorry?

12     Q    This is done on a spread sheet.

13         Where is the electronic copy of this

14  document?

15     A    Like the disk or something you want?

16     Q    Uh-huh.

17     A    I don't know.

18     Q    What happened to it?

19     A    I guess I just did the document, and then

20  I -- I don't know if there is -- I don't even know if

21  it's saved on my disk.

                                18

The spreadsheet and any opinions based on it are inadmissible.   The spoliation and failure of production of a spreadsheet prepared after the lawsuit commenced that Mr. Low testified he gave to his economic damages expert is sanctionable.

<u>Legal Discussion</u>

The Court, under Rule 56 and applicable cases, is charged with examining whether, given all of the material facts which are not in genuine dispute, the party seeking a summary judgment can prevail.   There is a false impression that because there is a dispute, there can be no summary judgment.  This is fallacious.  Moreover, Plaintiff must set out specific facts that would be admissible in evidence, including based on admissible documents, or affidavits made on personal knowledge.  The plethora of opinion and argument by Plaintiff are not specific facts showing a genuine issue for trial and summary judgment against Plaintiff in favor of Defendant must be entered.

This is one of those cases where there is plenty of non-genuine dispute, but the documents of the complaining party set forth the important undisputable facts.  Even the Plaintiff does not genuinely dispute the terms of the MRI Sales Agreement.  Nor does Plaintiff genuinely dispute that the MRI was installed, was operated, and was used to treat patients who were legitimately billed which generated receivables in April, 1998.  The warranty only ran for one year from April, 1998.

The Plaintiff, given the material facts which cannot be genuinely disputed, resorts to arguing that event though the MRI was installed, was operated, and was used to treat patients, installation was not "complete."  This defies any ordinary person's meaning of the expression "completion of installation" in paragraph 8 of the MRI Sales Agreement.

19

As the Court is no doubt aware, medical devices are heavily regulated by the Food and Drug Administration. Approvals have to be obtained under the Food Drug and Cosmetic Act for medical devices. No reasonable person can argue and no Court should accept the argument that completion of installation had not occurred prior to May 29, 1998 when some 40 patients had already been treated with the machine on various scans. Plaintiff covenanted in paragraph 7 of the MRI Sales Agreement entitled "Equipment Operation and Indemnity" that "Customer agrees that all Equipment purchased under this Agreement will be operated exclusively by duly qualified technicians and/or medical doctors in a safe and reasonable manner in accordance with Toshiba's written instruction, applicable laws and regulations and for the purposes for which such Equipment was intended."

This is a case about Plaintiff, in order to protect its claim, attempting to leverage alleged defects in the MRI into a suggestion that because there were alleged defects, "completion of installation" had not occurred. Notably, in the same paragraph 8 of the MRI Sales Agreement, the parties agreed that "Toshiba does not warrant operation of the Equipment will be uninterrupted." Thus, the fact that operations may have been interrupted, by the very terms of the MRI Sales Agreement, did not mean "completion of installation" had not occurred.

Plaintiff resorts to two basic stratagems to evade the terms of the MRI Sales Agreement. The first stratagem is to argue that Plaintiff's timing of acceptance for purposes of the financing lease is controlling. Nowhere in the MRI Sales Agreement is acceptance the operative event. In fact the term "accept" only occurs as a root to the word acceptance in the terms regarding the enforceability of the MRI Sales Agreement upon acceptance by signature. As later explained, acceptance clearly occurred here under Article 2 of the UCC in April, 1998 because the goods

20

were never rejected.

In a variant on this theme, Plaintiff alleges that in the lease signed with Tokai Financial Services, "Plaintiff agreed to accept the equipment once the equipment was operating up to the Manufacturer's Specifications." Plaintiff seeks to engraft this term from the Plaintiff's Agreement with Tokai onto the MRI Sales Agreement. Plaintiff wants to have its proverbial "cake and eat it too." Plaintiff is satisfied to treat patients and bill them and obtain revenue with a machine that is installed and operated according to laws and regulations of the FDA, but Plaintiff also wants to argue that the machine was not in condition to treat patients and bill them and obtain revenue, and further argue that the machine was not installed according to laws and regulations of the manufacturer's specifications approved by the FDA. Plaintiff is estopped by the facts (and its own statement in its Dec. 30, 2002 response ¶5) to argue lack of "completion of installation." Patients were treated, scanned, billed and made payments. Now, having not purchased a warranty, Plaintiff wants a free ride, and is trying to generate a legal theory that does not fit the facts.

The second strategem to evade the terms of the MRI Sales Agreement is that Plaintiff argues that because TAMS fixed the MRI after April, 1999, the warranty was automatically extended. Plaintiff has lost virtually all of its records and alleges it did not receive Mr. Hutton's letter of June 14, 1999 requesting advice from Plaintiff as to how it wanted service obligations handled and the pricing of those obligations. The MRI Sales Agreement speaks for itself, and Mr. Hutton's letter only affirms that MRI Sales Agreement. And, as Mr. Low testified, he knew he needed the extension in November, 1998. Low Dep. at 225. Plaintiff's Response Exh. 18.

There were no surprises here, just delay by the Plaintiff. And now, in an attempt to

excuse the delay, Plaintiff asserts a string of makeweight, unfounded arguments.

Mr. Low asserted by counsel on November 12, 1999, Exh. X, that he was installing a new machine and asked to have the TAMS OPART MRI removed. Mr. Low caused suit to be filed by DRG against TAMS in Baltimore County in November, 1999. Supp. Motion 6/26/2003 Exh. L. He dropped that suit. Supp. Motion 6/26/2003 Exh. K.

DRG failed to file suit within four years of the date of completion of installation, which occurred at least prior to April 16, 1998 when DRG began treating patients. DRG's warranty expired by contract at least by April 16, 1999, one year later. This suit was filed more than three years after April 16, 1999, and more than four years after April 16, 1998. Mr. Hutton notified DRG in writing of the expiration of the warranty, which pending expiration Mr. Low was aware of in November, 1998 (Low Dep. at 225) and asked DRG what it desired. DRG did nothing.

Limitations having run, Plaintiff having inexplicably dropped its prior suit (Supplemental Motion Exh. L), virtually all records of the business having been abandoned and/or destroyed, summary judgment in favor of Defendant must be entered.

Alleged statements by non-TAMS personnel:

Plaintiff cavalierly asserts that certain representations were made by Mr. Gary Hall, an employee of Tokai. Those representations are hearsay. Mr. Hall is not an employee of TAMS, nor engaged as an agent or contractor for TAMS. See, Exh. U, Affidavit of Lynda M. Morvik. Mr. Low testified that Mr. Hall was employed by Tokai Financial Services t/a Toshiba America Medical Credit. Low Dep. at 222-223. Ms. Sparta was also not an employee of TAMS, nor engaged as an agent or contractor for TAMS. See, Exh. U, Affidavit of Lynda M. Morvik.

As discussed previously, Mr. Low testified as follows:

22

"Q:  Okay. Had Gary Hall ever told you that the warranty was extended by six months?

A: I don't remember Gary telling me that, no.

Q: Anybody else tell you that from Tokai Financial Service, Inc. or Toshiba America Medical Credit?

A: I, I just recall the six months as per that delivery and acceptance letter that was signed by Dr. Templeton.

Q.  All right.  And this is, is the one that was not signed by anybody else; is that right?

A:  I, I believe you're right."

In sum, the evidence is clear that DRG's President, Mr. Low, wanted an extension, but never was promised one by Mr. Hall and never obtained an extension in writing as required under the MRI Sales Agreement.  The argument of apparent agency and agency by estoppel are not supported by any case law (and none is cited), and more importantly, they are not supported by any facts.

Plaintiff's accountant produced a record from October 30, 1997 that was signed by the Debtor's Landlord that specifically reference Diagnostic Resource Group, L.L.C. and "That the said Equipment is owned by Tokai Financial Services, Inc. ("Lessor") and is leased or will be lease to the above described Lessee."  See Exh. Y page B 25055.

While the allegation is made that a note or obligation was assigned from Toshiba American Medical Systems to Tokai or De Lage Lande, the facts do not support this allegation. First, as Exh. Y, page B 25055 shows, DRG dealt directly with Tokai.  Second, the machine had been delivered in April, 1998 long before the Master Lease Agreement Addendum (DRG Response Exh. 12, page D30012 was allegedly signed on November 29, 1998, and signature by Lisa Sparta of February 26, 1999 (DRG Response Exh. 12, page D30008).  See also Exh. 13, signed February 26, 1999.

23

<u>Alleged experts and Lack of Any Demonstrated Qualification:</u>

Experts and expert opinion testimony are governed by Fed. R. Evid. 706 and the

Supreme Court case of <u>Daubert v. Merrill Dow Pharmaceutical, Inc.</u>, 509 U.S. 579 (1993). The

Court is respectfully directed to the expert designation by DRG which limits the area of

testimony, and to the lack of expert reports, except from Mr. Epstein.

Only one expert report was delivered for Mr. Epstein, a C.P.A.. He relied on projections

composed by a non-expert, Mr. Low, the President, which were generated and destroyed after

this litigation commenced. His testimony and report, with all due respect, are not likely to be

admitted in evidence.

Neither Ms. Stehman nor Mr. Low may offer expert testimony in the absence of a report

or any opinion testimony. Mr. Low is not qualified as an expert and has not delivered any expert

report. Ms. Stehman is not qualified as an expert and has not delivered any expert report. At

deposition, she was asked:

Q: And do you have any professional licenses or certifications?
A: Yes.
Q: And what are they?
A: X-ray and CAT scan
Q: Now,when you say you have a certification in x-ray, what does that mean?
A: Licensed to practice.
Q: Licensed to practice what?
A: X-ray.

Q: Okay. You mentioned before that you were certified on x-ray and CAT scan. So what do you
do to get certified on x-ray?
A: You have to complete the required program, and then you take a national test. And when
you say you complete the required program and then you take a national test.
Q: And when you say you complete the required program, where or how do you do that?
A: That's what I did when I was at Mercy.
Q: Okay. So you completed a program in x-ray.
In anything else?

A: No.

Stehman Dep. Plaintiff Response Exh. 10 at 17-19.

This last answer of "no" establishes that Ms. Stehman is not even certified in any

program other than X-ray. And is only license in X-ray and CAT scan.  An MRI is neither of

those machines.  Thus, Ms. Stehman does not even demonstrate a bare training requirement on

an MRI machine, much less evidence or qualification to give expert or opinion testimony under

Daubert.

Mr. Low testified he has an economics degree he earned in 1989.  He testified that he

had not taken any other advanced course work or graduate school or anything else, held no

professional licenses or qualifications, had no technical background or technical expertise,

meaning scientific, mechanical or engineering.  Low Dep, . Plaintiff Response Exh. 18 at 167-

168.  He did not and does not have any specialized knowledge or expertise enabling him to give

any opinion or expert evidence.

Any opinion testimony from Mr. Low or Ms. Stehman is improper.   Because Plaintiff

relies on their opinions to oppose the summary judgment, rather than on the underlying facts, or

otherwise relies on hearsay and inadmissible documents, the response is not well-taken and

leaves Defendant's recital of the facts in its Motion undisputed. Cf. Response at unnumbered

page 17 relating Ms. Stehman's opinion as to industry standard.  There is no foundation for that

incorrect and glib statement of an alleged industry standard.

The references to Dr. Templeton and his opinion are not proper.  He was not named as

an expert, did not furnish an expert report, and in Plaintiff's Response, Plaintiff conceded the

doctor's narrow expertise: "he further stated that the scans performed at that time would most

likely have been on joints of the body etc. which was not his field of practice and as to which he did not feel that he was qualified in any event to render an opinions[sic] as to the quality of the scans obtained." Response at unnumbered page 16. Dr. Templeton also stated that "I wasn't notified, you know, when the machine was down or something like that." Templeton Dep. Plaintiff's Response Exh. 11 at 64-64. Dr. Templeton testified that he had been to the premises six times from April, 1998 to July, 1999. Dr. Templeton's testimony is not on personal knowledge and is either hearsay, or non-expert opinion, and therefore, inadmissible. Dr. Templeton is cited in the Memorandum for his opinion (again, he was not designated as an expert, establishes no qualifications and presented no report) that while he was at the University of Maryland, he believes the initial service period began upon acceptance of the equipment. This non-expert opinion of Dr. Templeton, a board-certified radiologist, is not evidence that is relevant or admissible in this case. He may be qualified to testify to the professional standard care for a radiologist (which is not at issue in this case); he is not qualified for any other opinion or expert testimony.

<u>Legal Argument</u>

<u>UCC Statute of Limitations</u>

Plaintiff spends a great deal of paper without citation of a single case except in the instance of the accrual of the cause of action for breach of warranty.

The starting point of analysis is the UCC. Section 2-725 is entitled "Statute of limitations in contracts for sale" and reads in pertinent part:

"(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

26

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

As is clearly set out in Exhibit 2 to Plaintiff's Response, tender of delivery occurred on March 30, 1998. Mr. Hutton's letter states April 10, 1998 should be the operative date for commencement of the one-year warranty period. Patients were first scanned and treated on April 16, 1998, though Dr. Templeton says he saw some scans on April 10, 1998.

Under subsection 1, the cause of action accrued, at the latest, on April 16, 1998. It may not be extended under the terms of the statute beyond April 16, 2002. This case was filed on May 30, 2002.

This turns the analysis to subsection 2 of UCC §2-725. Plaintiff's Response sums it up: "This was based upon long discussion with TAMS about the problems that had been occurring with the system supplied to the Plaintiff...These involved problems that had been present from the time that the system had first been delivered to DRG." Plaintiff Response at unnumbered page 14. "These problems occurred consistently from the time of the delivery of the system." Plaintiff Response at unnumbered page 12. Clearly, whatever cause of action Plaintiff alleges had accrued and was discoverable from April, 1998.

Plaintiff has signed a document showing tender of delivery. Plaintiff's records show delivery must have occurred by April 16 when the first patient was treated. Plaintiff admits in its Response that problems occurred from the outset.

Thus, the Complaint is barred under the applicable statute of limitations.

Attempting to circumvent the four year statute running from April, 1998, Plaintiff tries

27

to smoothly cover over that fact alleging that duties were created under the MRI Sales Agreement which extended to July 5, 1999, and this suit is filed within three years of that date. However, the MRI Sales Agreement provides only for one year warranty from completion of installation. The word accept or acceptance as related to completion of installation never occurs in the Agreement. Plaintiff needs this Court to graft words into the Agreement; this the Court cannot and should not do.

Plaintiff again asserts this is a breach of contract case in paragraph 13. Yet the Plaintiff can show no contract in writing on July 5, 1999. The only contract is exhibit 1 to Plaintiff's Response. It has a one-year-from-completion-of-installation warranty.

Plaintiff sinks its own case: either there is no contract with obligations by TAMS on July 5, 1999 because the terms of the written contract expired; or Plaintiff is limited by the four-year UCC statute starting on April 10 (or 16th), 1998.

The basis of the argument that there is no warranty is untenable: The MRI Sales Agreement at paragraph 8 begins: "For the warranty period described below by product,..." Later reference is made to "During the warranty period..."

The language further states: "IN LIEU OF ALL OTHER WARRANTIES..."

The argument there was no warranty is not credible under the facts of the MRI Sales Agreement.[1]

---

[1]Plaintiff cites McCarty v. E.J. Korvette, Inc., 347 A. 2d 253 (Md. App. 1975) for the proposition that a promise to provide future repairs is not a warranty but is an executory promise. In McCarty, the court in fact found a warranty, and found it breached. The Court also held that a limitation of remedy was enforceable and characterized a replacement warranty as a limitation of remedy. The underlying premise of McCarty is that a contract existed: here, Defendant can show no contract except the MRI Sales Agreement whose repair or replace terms had ended prior to July 5, 1999.

Course of Dealing Argument

Plaintiff also tries the "course of dealing" argument to modify the MRI Sales Agreement

and obtain an extension of the warranty period beyond April 10 or April 16, 1999.  The law in

Maryland regarding modification of a contract by a course of dealing in a goods contract

governed by the UCC is well-settled.  The Maryland Court of Special Appeals, in Snyder v.

Herbert Greenbaum & Associates, Inc., 38 Md. App. 144, 380 A. 2d 618 (Md. App. 1977)

addressed a fact pattern involving a sale and installation of carpet.  The Court looked to the

UCC and held:

> the parol evidence rule, as found in Md.Code (1974), Commercial Law Article § 2-202, governs
> this case.  That section provides:

>> "Terms with respect to which the confirmatory memoranda of the parties agree or which are
>> otherwise set forth in a writing intended by the parties as a final expression of their
>> agreement with respect to such terms as are included therein may not be contradicted by
>> evidence of any prior agreement or of a contemporaneous oral agreement but may be
>> explained or supplemented

>> (a) By course of dealing or usage of trade (§ 1-205) or by course of performance (§ 2-208);
>> and

>> (b) By evidence of consistent additional terms unless the court finds the writing to have
>> been intended also as a complete and exclusive statement of the terms of the agreement."

> By the terms of § 2-202 itself, § 2-202 applies to the contract in this case.  This contract
> was made after negotiations between the parties, and intended to be a final expression of their
> agreement with respect to the terms embodied therein....

> The terms of the agreement, therefore, may be "explained or supplemented" as allowed
> by subsections (a) or (b).

> Subsection (a) provides for the admission of extrinsic evidence showing a "course of
> dealing" between the parties.  "Course of dealing" is defined in § 1-205(1) as:

>> "(A) sequence of previous conduct between the parties to a particular transaction which is
>> fairly to be regarded as establishing a common basis of understanding for interpreting their

expressions and other conduct."

The import of § 1-205(1) is that "course of dealing" is an interpretive device to give meaning to the words and terms of an agreement. This function is underlined by Comment 2 of the Official Comment to § 2-202, which notes that:

"Paragraph (a) makes admissible evidence of course of dealing . . . to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. . . .Unless carefully negated they have become an element of the meaning of the words used." (Emphasis added.)

See State ex rel. Yellowstone Park Co. v. District Court, 160 Mont. 262, 502 P.2d 23 (1972).

That which appellants advance as a "course of dealing" does not serve as an interpretive device, but as an agreement that adds terms to the contract. Therefore, the evidence offered does not properly fall under the rubric of "course of dealing", but is properly under the requirements of Subsection (b) of § 2-202, dealing with "additional terms". See Division of Triple-T Service v. Mobil Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191 (1969). [footnote omitted]

Subsection (b) allows evidence of additional terms subject to two prerequisites to admission. The first is that the writing or contract must not be found by the court to have been intended as a complete and exclusive statement of the contract terms. Second, the "additional terms" must not be inconsistent with the contract and its terms.

Comment 3 of the Official Comment to § 2-202 explains the first requirement as:

"If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."

38 Md. App. at 149-151; 380 A. 2d 622-623

Applying the Snyder case to the facts at hand, the first observation is that in fact Mr. Low, the President of the Plaintiff, conceded that no one told him the warranty was extended. Thus, not only would parol evidence be barred, there is not any parol evidence, much less a signed writing extending the warranty.

Second, this MRI Sales Agreement clearly contains a contract integration term which states that the Agreement "contains the entire agreement between the parties and supersedes all prior or concurrent agreements between the parties, whether oral or written, relating to its subject matter." Plaintiff's Response Exh. 1, MRI Sales Agreement Exhibit 19.

Third, no evidence is offered of "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." There is no pattern alleged nor does any exist between DRG and TAMS; this was the first and only contract between the parties. The Snyder court found there was not a sequence of previous conduct. The Snyder court also held that the "course of dealing" was not merely serving "as an interpretive device in its case, but as an agreement that adds terms to the contract. Therefore, the evidence offered does not properly fall under the rubric of "course of dealing", but is properly under the requirements of Subsection (b) of §2-202, dealing with "additional terms". In order to admit the additional terms, the court would have to find the writing or contract was not intended as "a complete and exclusive statement of the contract terms. Second, the 'additional terms' must not be inconsistent with the contract and its terms." Id. at 151.

Clearly, here, DRG is attempting to graft a new term onto the contract. DRG wants this Court to change the term-of warranty language from one year from "completion of installation" to one year from "acceptance for purposes of the financing lease." Notably, DRG wants this Court to change the terms of the MRI Sales Agreement from an objective

standard of whether or not the machine is installed and useable on patients to a unilateral standard determinable by DRG.  There is no rubric under which this Court can utilize subsection (b).  The MRI Sales Agreement was stated to be the complete expression of terms and the term requested is inconsistent with the terms of the MRI Sale Agreement. The Plaintiff's argument fails the Snyder requirements for a course of dealing modification.

The UCC is a "freedom-of-contract" statute, and here the parties contracted concerning the warranty quite clearly, which the Plaintiff does not like in hindsight, but the express terms of the contract control.  The warranty was over on April 10, 1999, or taking the most hopeful construction for Plaintiff, one year from when the first patient was treated on April 16, 1998.  The Plaintiff, under Article 2, accepted and retained the goods treated hundreds of patients.

Plaintiff misunderstands the UCC as to delivery, acceptance, rejection, revocation of acceptance, and damages.  If goods are non-conforming, they may be rejected, and returned. If not rejected after reasonable opportunity to inspect the goods, because the UCC is a pro-contract statute, the goods are accepted.  The Plaintiff accepted these goods under Article 2. Plaintiff never revoked that acceptance within a reasonable time after the buyer discovers or should have discovered the ground for it."  UCC §2-606 and 2-608.  Thus, the entire acceptance argument of the Plaintiff is ill-founded. The good were accepted by Plaintiff. Plaintiff may have delayed signing the acceptance certificate, but it did not change the fact that Plaintiff accepted the goods and used them to scan and treat patients and generate revenue.   Plaintiff really needs a new contract term added that says, "the warranty lasts one year from acceptance, acceptance being acceptance for purposes of a financing lease."  The

Court cannot do this.  Under the UCC, Plaintiff accepted the goods and never revoked that acceptance in any lawful way.  Moreover, under the UCC, this suit will fail because the buyer failed within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and ...."  UCC §2-607. There was no notice sent to TAMS, and all records have been lost or destroyed related to or evidencing such notice.

The intentional interference claim is unsupported by any evidence. Under Maryland law, a breach of contract case is a breach of contract case; the Maryland Court of Appeals "has refused to adopt any theory of tortious interference with contract or with economic relations that 'converts a breach of contract into an intentional tort.'" Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc., 336 Md. 635, 650 A. 2d 260 (Md. 1994).  This is a dispute over when a warranty commenced and whether it was breached, and if so, are there any damages.   If the warranty ended on April 10, 1999, the suit fails in its entirety.

Spoliation:

The leading case is the White v. Public Defender Office of Maryland, 170 F.R.D. 138 (D. Md. 1997) case in this Court.  The facts involved a discrimination case in which the Plaintiff and withheld from production and destroyed an autobiographical sketch book which was ultimately lost or destroyed, in order to protect herself from embarrassment.  The Court entered the sanction of dismissal of that plaintiff's suit setting out a four part test beginning on page 148 of the case:

"(1)  Destruction of evidence obviously includes physical destruction..., but such acts as

alteration or removal of evidence beyond the reach of the court would also qualify.
(2) Discoverable evidence, as might be expected, extends beyond admissible evidence and includes evidence 'reasonably calculated to lead to the discovery of admissible evidence, ...reasonably likely to be requested during discovery, and/or [which] is the subject of a pending discovery request....
(3) Intent means knowledge, actual or constructive, that discoverable evidence is relevant to pending litigation, although it has also been held to extend to knowledge of imminent or reasonably foreseeable litigation. ...Finally, parties have been deemed to know that documents are relevant to litigation when it is reasonably foreseeable that a lawsuit will ensure and that thee evidence will be discoverable in connection with that suit....
(4) Occurrence of the act of destruction after litigation has begun makes the imposition of sanctions especially appropriate, although again destructive acts occurring prior to the filing of a complaint where the potentiality of litigation is clear may also merit sanctions."

[citations omitted].  170 F.R.D. at 148-149.

This Court concluded later in the <u>White</u> opinion that "'It is a maxim of law, bearing chiefly on evidence, but also upon the value generally of the thing destroyed, that everything most to his disadvantage is to be presumed against the destroyer (spoliator), *contra spoliatorem omnia praesumuntur*.'" White, 170 F.R.D. at n. 9.

In examining the facts testified to by Mr. Low on behalf of DRG as set forth in Defendant Toshiba's Response to DRG's Supplemental Motion for Discovery Preclusion of Issue and the exhibits thereto, Mr. Kreshtool, counsel for Plaintiff, contacted TAMS on July 8, 1999 asserting damages.  Exh. V hereto.  Mr. Kreshtool followed that letter by a suit by DRG.  Exh. K and L  to TAMS Supp. Motion 6/26/2003.  Sometime after July 8, and likely after the institution of the lawsuit on October 28, 1999, all business records held by DRG with the exceptions noted were lost or destroyed.  See TAMS Discovery Preclusion Response.

TAMS sent a comprehensive list of document requests to Plaintiff DRG.  Exh. Z.

The DRG records lost or destroyed by DRG were records related to maintenance,

34

service, and use by the machine on patients. The loss of patient records violated a variety of statutory schemes under Maryland and federal law.

Those records go to the very heart of the case: when was the machine first used, when were patients treated, when did performance, service or maintenance failures occur, and what financial losses or damages were sustained if any.

Similarly, Plaintiff similarly argues that a course of dealing was established because it did not get a bill. Having lost or destroyed all of its records, Plaintiff is presumed to have received a bill, and certainly cannot argue it did not get one and then jump from that unsupported allegation to an alleged modification of course of dealing.

Plaintiff cannot now audaciously argue that it should be able to obtain a summary judgment that limitations has not run when it has destroyed the very records underlying its claim, including the records that reflect the operation of the scanner and any damages in this case.

What records of DRG that are left clearly show that installation was complete and patients were treated and scanned in April and May, 1998, and thereafter. The suit should be barred. The fact a claim was alleged and sued on in Baltimore County within three months (even if later dropped) and the records were destroyed is sanctionable conduct by this Court.

Plaintiff, under this Court's law, has intentionally destroyed discoverable records while Plaintiff knew it would assert a claim.

The key point with respect to intent is that the Court held that once a claim is made or asserted, or foreseeable to be asserted, and documents are lost or maintained by the party

35

is whose care they are kept, the failure to properly retain the documents entitles the

opposing party to at least an inference that the contents of those documents would have

been unfavorable to Plaintiff, if not the ultimate sanction of dismissal.

How does this impact this case? All financial records of the Debtor prior to March,

1999 are lost.  Sporadic documents exist after that time and a few here and there prior to

that time.  All financial projections, balance sheets, check registers, income statements, and

cash flow statements are lost.  All patient records after November, 1998 are lost.  All billing

records are lost except for some here and there prior to November, 1998.  All marketing

documents are lost.  All referral lists and business plans are lost.  All maintenance and

service records, and telephone records and logs are lost.

Mr. Kreshtool, Esq. asserted a claim on July 8, 1999.  Exh. V.  He sued in October,

1999.  Complaint, Supp. Motion Exh. K, L .  The records were intentionally not retained

because the business was failing and there was no reasonable claim.

Mr. Hutton, the TAMS Area Services Manager, has testified in his affidavit that the

June 14, 1999 letter notifying of the expired warranty was sent to DRG.   Because of the

destruction of all correspondence prior to July 5, 1999, notwithstanding Mr. Low's protests,

that letter is presumptively received under the "mailbox rule" and conclusively presumed

received because there are no business records from which to show an absence of business

record; the presumption is against Plaintiff, i.e., Plaintiff destroyed the material to conceal

the receipt of the notice.

The Cross-Motion:

Plaintiff moves for three determinations as a matter of law:

A. This action is not time barred ;

B. TAMS was within the required contractual period;

C. TAMS was required to fix the equipment and failed to do so:..."

Response at last page [all pages except first two pages are unnumbered on electronic document filing].

On March 26, 2003, Judge Legg directed that the summary judgment motion on the issue of limitations would be taken up first. The effort at a Cross-Motion for Summary Judgment is improper and simply calculated to burden the Defendant. It violates the letter and spirit of the Court's direction. Defendant filed a Motion for Summary Judgment last December, 2002.

The Scheduling Order of last year, October 11, 2002, by Judge Legg directed that all dispositive motions had to be filed by March 24, 2003. Scheduling Order at p.2. Defendant duly filed its motion timely.

The Cross-Motion for Summary Judgment is filed out of time and should be denied.

As to the merits of the Cross-Motion, it must be denied because there are clearly genuine issues of material fact. First, as already explained, clearly installation was completed of the MRI by April, 1998 because, based on Plaintiff's own records, patients were treated, scanned, billed, and made payments. The MRI Sales Agreement provided that the warranty expired one year after completion of installation. There is no basis to argue that as a matter of law the warranty had not expired. The machine was clearly in place and delivered in April, 1998. Over four years passed under the most generous statue of limitations and the terms of the MRI Sales Agreement before this suit was filed.

37

With respect to the argument that TAMS was "within the required contractual period," both the argument of the prior paragraph, and Mr. Hutton's letter of June 9, 2003 place that contention in genuine and material dispute. There is no foundation for the Court to determine as a matter of law, stripping the Defendant's right to trial, that the warranty had no already expired.

As to the argument that TAMS was required to fix the equipment and failed to do so, this turns on two issues in material dispute. First, the arguments based on the undisputed facts recited in the prior paragraphs that the warranty had expired, and second, on the issue of the terms of the MRI Sales Agreement. The MRI Sales Agreement does not warrant parts made by a third party such as the chiller. The Court cannot find as a matter of law based on the undisputed contractual terms in Plaintiff's Exhibit 1 that TAMS was obligated to repair or replace the chiller.

In addition, for all the reasons stated in the main argument of this Reply, and the discussion and analysis of Exhibits., the terms of the MRI Sales Agreement control and bar any claim. To the extent a fact-based modification is alleged, TAMS disputes there was any modification relying on the terms of the MRI Sales Agreement and admissions by Plaintiff that no one promised any warranty extensions, particularly in writing.

Last, Defendant intends to argue, if this case goes to trial, that much of Plaintiff's relief is barred. The wholesale loss or destruction of evidence and documents while a claim is asserted, and while litigation in Baltimore County was pending, is the ultimate spoliation. It is unacceptable conduct in the federal and state courts; it bars claims. It destroys the discovery system. The rebuttal to many of Plaintiff's arguments and assertions

38

rests in the destroyed documents. Defendant will be entitled to inferences against Plaintiff for the destroyed records. Plaintiff has in essence barred any summary judgment and perhaps any claim at all in its favor. The destruction of patient records and billing records required to be maintained as a matter of law is irresponsible and unconscionable.

The Cross-Motion is untimely and without foundation and must be denied.

WHEREFORE, Defendant Toshiba American Medical Systems, Inc. prays that the Court hold the statute of limitations had expired prior to the filing of the case.

/s/_____
Brooke Schumm III, Esquire
Fed. Bar No.05001
Daneker, McIntire, Schumm, Prince,
  Goldstein, Manning & Widmann, P.C.
One North Charles Street, Suite 2450
Baltimore, MD 21201

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of August, 2003, due to inability to scan Exhibit W and Y on the 18th of August, whcih will be filed separately with a line, and a copy of the foregoing was electronically served on Samuel Sperling, Law Office of Leonard J. Sperling, 1777 Reisterstown Road, Commercentre West, Suite 212, Baltimore, MD 21208.

_/s/_____
Brooke Schumm III