## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DIAGNOSTIC RESOURCE GROUP, L.L.C.          *

      Plaintiff

                                *          RDB-02-3020

vs.

TOSHIBA AMERICA MEDICAL          *
SYSTEMS, INC.

      Defendant          *

---

## REPLY TO ANSWER AND OPPOSITION TO
## CROSS MOTION FOR SUMMARY JUDGMENT

Defendant in its pleading appears to have ignored certain facts as well as certain provision of law which must and will be indicated, BUT Plaintiff will seek to avoid impugning any person or party.   Additionally, Plaintiff will attempt to avoid repeating matters and arguments raised in its earlier pleading.   This should not be taken to mean that these arguments or matters are withdrawn.

I.          ***Defendant's Contentions in its Introduction***

The basic position of the Plaintiff in this litigation is simple.   An item is completely installed when nothing remains to be done in order to have the item operating as promised.   Exhibit 2 to Plaintiff's earlier pleading, created by TAMS, specifically provides for an acceptance to occur as part of Installation Progress, to quote the title of that document.   The lease crafted by TAMS specifically calls for acceptance to be done when the equipment is operating up to manufacturer's specifications. As set forth in the various affidavits provided earlier, the Plaintiff accepted the equipment once those issues had been addressed.   That is the point when installation is complete, when nothing else needs to be done, not at a point where some operations can be done.

When a service plan lasts for one year from the time installation is complete, that means that

Reply to TAMS Answer and Opposition- Page 1

the one year begins when nothing more remains to be done to get the equipment fully operational. TAMS' own document (Exhibit 2 to prior pleading) identified the completion of installation as acceptance.[1]   The lease, crafted by TAMS and signed for TAMS,[2] provides for signing of an acceptance.   When the installation was completed and the equipment operating properly (see Stehman Affidavit) an acceptance was signed.   Thus, the one year service plan began then.

According to the Defendant, it could craft a sale, and if parts of the equipment do not work, then it could wait out the problem for one year and never have any responsibility.   This is ludicrous, and certainly not in accord with the policies and premises of the Uniform Commercial Code or Maryland law or that of any advanced commercial jurisdiction.[3]

Furthermore, the Defendant asserts that the Plaintiff is calling this a modification of agreement.   This is false.   The Plaintiff's case is based upon the language of TAMS's own agreements and the interpretation of when the one year period would begin.

However, in a spirit of flexibility, if TAMS wishes, this case could be analyzed (in legal terms) as a contract modification with the same results.   Gary Hall, acting for TAMS,[4] stated that

---

[1]Nowhere in the record has any assertion been produced that the Plaintiff delayed its acceptance of the equipment.

[2]Though TAMS now seeks to provide an affidavit asserting that the person who signed that lease was never a TAMS employee, that assertion, first made 4.5 years after the signing is irrelevant.   That lease was incorporated by reference by TAMC/TFS which has an agreement with TAMS to act as assignee of TAMS leases, and which promised to make all customers think that TAMC is an agent of TAMS.

[3]Although it should be noted that considering that TAMS had enshrined by contract an agreement that TAMC would cause customers to think that TAMC was operating on behalf of TAMS while TAMS in fact denied that relationship and there was no agency relationship, (in practice causing customers to rely on the supposed existence of a relationship that did not exist) one could wonder just how civilized TAMS business practices truly are.

[4]Based on exhibits supplied by TAMS, the relationship between TAMS and TAMC was so incestuous that people who TAMS claims to be TAMC staff (in the affidavit relating to employment at Exhibit U of Defendant) felt comfortable signing leases for TAMS.   In any event,

Reply to TAMS Answer and Opposition- Page 2

the lease would run from the time of acceptance.  After April 16, 1999, TAMS continued to provide service to the equipment, stating on the service orders that the service was not billable to the customer.  As set out by Mr. Hutton in his deposition, this showed that the customer was still on a service plan.  Exhibit 19 to earlier pleading at 77-78 & 81-82 as well as Exhibits 20 and 21.

Under Maryland law, even a contract with a no modification clause can be orally modified.  Thus, even looking at this case as a contract modification, once again the Plaintiff is entitled to relief as the service plan extended beyond July 5, 1999.

The Defendant is also seeking to introduce a claim that this case was not timely brought as this case, a suit for failure to keep an executory promise to repair equipment, said failure occurring on July 5, 1999, accrued in 1998.  This is baseless and is not supported by Maryland law which clearly differentiates between the warranties of merchantability and fitness for a particular purpose, (which the Defendant in its contract specifically foreswore) and an executory promise to carry out some action.

After TAMS refused to keep its promise, Plaintiff asked TAMS to remove the equipment.  TAMS failed to do so, and thus the Plaintiff sued, seeking to have the equipment removed.  The complaint in that case is cited by TAMS.  As the equipment was removed, the suit was moot.  Nothing in that suit related to losses from the failure to fix the equipment.  Additionally, as stated by Ms. Stehman in her deposition (in earlier pleading at page 97, at Exhibit 10, as the Plaintiff could not use the equipment which TAMS chose not to fix, the landlord locked the Plaintiff out, and thus the Plaintiff lost control of its records.  (This was part of the testimony of Ms. Stehman cited in Plaintiff's earlier pleading.  Ms. Stehman ran the center itself, Exhibit 26 at 18.)  There was no

---

TAMS released equipment valued at over $800,000 based on that lease (as the lease document between TFS and Plaintiff incorporated the TAMS lease.

spoliation, which is the deliberate destruction of evidence to prevent its disclosure.

Moreover, Defendant has never asserted that it had sent an offer for a new service plan to the Plaintiff. Mr. Hutton said this would have been done prior to April, 1999 if the service plan would expire at that time, Exhibit 19 to earlier pleading at 44-45 and 48. Thus, the statement that the Defendant continued to fix the equipment after April 1999 without charge and that the service plan was in force at that time is based more upon the Defendant's own records than any statement by the Plaintiff, and is certainly not contradicted by the Defendant. Therefore, whatever maxims Defendant quotes cannot affect the statements of the Defendant in this case, which show that the plan was in effect.

Defendant asserts that the Plaintiff cannot introduce evidence of course of dealing and trade usage by fact witnesses, when the proof of such issues is based upon personal knowledge of individuals. Nothing requires that proof of course of dealing or trade usage must be done by expert testimony, especially as it does not require scientific or technical training to understand. In any event, the persons listed by the Plaintiff were well familiar with industry practices.

The Defendant at several points refers to the fact that Mr. Low and Ms. Stehman submitted no expert reports. The expert designation of Plaintiff stated that these persons were mixed fact and opinion experts, and as such no report was required. Maryland Local Rule 104.10.

The Defendant also asserts that business records of TAMC, which the Defendant asserts to be its program at Exhibit 12 to Plaintiff's earlier pleading, and which is required to act to make people believe it to be proprietary to the Defendant, Section 6 of Exhibit 14 of Plaintiff's earlier pleading, should not be admitted. This is baseless. They are hearsay, but are business records kept in the course of business. Nothing shows them to be prepared in support of litigation. Exhibit 12A of Plaintiff shows that even now TAMS considers TAMC to be part of its "us." It is relevant to the

Reply to TAMS Answer and Opposition- Page 4

proposition that TAMC's representations bind the Defendant as an agent.

The Defendant also asserts that the Plaintiff's cross motion is filed untimely. Local Rule 105 requires that if two parties are considering filing cross motions for summary judgment they should have one party file a first motion, and the other party then file a response and cross motion for summary judgment. In this case, the Defendant filed a motion for summary judgment long ago. In reviewing the discovery, Plaintiff's counsel saw that the main issues of its response came from the Defendant's own testimony and documents, and thus felt that a Plaintiff's Motion for Summary Judgment was proper, which under the Local Rules of the Maryland District Court can be filed only by way of a cross motion. In any event, Defendant is not prejudiced in any way.

At page 7 of its pleading, Defendant refers to the various names by which business is done. While not stipulating to the accuracy of the Affidavit of Mr. Abbott, Plaintiff will use the name TAMS to refer to Defendant, TAMC to refer to Toshiba America Medical Credit and Tokai Financial Services. Nothing in the name of Tokai Financial Services leads to any inference that Tokai is not part of TAMS. Mr. Low did testify that he now knew that the entities were not the same, stating that he knew "now" that they were not the same. See excerpts of Low Deposition attached as Exhibit 26 at page 223. Thus, Defendant had tricked Mr. Low into believing that he could rely on statements of TAMC personnel, in line with the agreement between TAMC and TAMS. Therefore, TAMS must be held to follow TAMC's promises made in its name.[5]

II.    *Exhibit Analysis*

---

[5]Defendant does go into much discussion of the UCC being "pro" or "anti" contract whatever its relevance. In this case, Exhibit 14 to Plaintiff's earlier pleading shows that TAMC and TAMS agreed that customers such as Plaintiff were supposed to be (mis)led to believe that the TAMC spoke for and was proprietary to TAMS, while in fact that was not true. In short, customer deception. The UCC is not "pro" that. Thus, Defendant is bound by Mr. Hall's promises and representations.

1.    This is the contract between the parties and is admissible;

2.    This is an installation progress form prepared by TAMS and specifically calling acceptance of the equipment part of the installation;

The Following four affidavits relate to persons who testified at deposition and were noted as mixed fact and opinion experts.   Their testimony herein relates to their fields of experience and the nature of the issues as to which they were designated as experts.   The affidavits further contain factual observations as well as  testimony as to the operation of MRI businesses.   These are matters within their expertise.   The Defendant asserts that their testimony is not admissible for various reasons, such as the fact that there are no documents supporting their testimony, they are not owners of the company or other reasons.   These assertions are baseless.   They may go to the weight of the testimony, but not its admissibility.

3.    Mr. Low's Affidavit.   It is admissible and sets out, among other things, information based upon his observation  of industry usage, installation of MRI equipment, as well as describing the facts that he observed;

4.    Mr. Low's second Affidavit, which is also admissible.   It is his oral testimony.   Even if oral modifications are barred by a contract, oral modifications are enforceable.   Additionally, Mr. Low never called this an extension of the service plan, but related to the initial warranty period.   This does not exclude or detract from the fact that if the Defendant wants to consider the time to be a modification from a *legal* standpoint, the facts would remain the same, namely that TAMS showed by its conduct and representation that the service plan would be in effect until one year from the date of the acceptance;

5.    Ms. Stehman's Affidavit is likewise admissible;

6.    Exhibit 6 is admissible;

Reply to TAMS Answer and Opposition- Page 6

As to both of Ms. Stehman's Affidavits, her testimony as to when the equipment was ready for full use is certainly in line with the purpose for which she was designated.

7. Exhibit 7 is a pleading showing the nature of the designation of Mr. Low and Ms. Stehman;

8. Exhibit 8 is a document produced by TAMC and signed by Mr. Low and the subject of ample testimony;

9. Exhibit 9 is a later acceptance, which has no conditions, in marked contrast to Exhibit 8 which has conditions;

10. Ms. Stehman's deposition is admissible;

11. Dr. Templeton's deposition is admissible;

12. Exhibit 12 is an agreement signed for TAMS by a person who TAMS now claims was not its employee. (Exhibit U). Non-employees can sign a document as an agent, and do so every day and bind their principal. This agreement was entered into for TAMS and is incorporated as the document by which TAMS released the MRI in this case. It is admissible and it specifically calls for an acceptance to be signed when the equipment is made to work to specifications, (which in simple English could be called when the installation is complete as in the other agreement crafted by TAMS- Plaintiff's Exhibit 1- said acceptance being called for as part of installation progress in Plaintiff's Exhibit 2);

12A. Does TAMS hold out TAMC to the public as it agent? Plaintiff's Exhibit 14 shows that it did. Plaintiff's Exhibit 12A shows that it still does. This is evidence to show that TAMS is bound by the work of TAMC;

13. This document relates to this case. Nothing shows that Tokai is not related to TAMS, or is not its agent, and it is unclear why Defendant asserts that Mr. Low knew that TAMC and TAMS were separate. Additionally, Mr. Low never considered the six month period to be

an extension but rather the natural close of the service plan as per TAMS's own documents. Nothing bars a subsidiary or agent from having a name different from its principal;

14.    This is an agreement between TAMS and TAMC.    It provides that TAMS will assign its leases to TAMC.[6]    It also requires TAMC to operate such that customers such as Plaintiff will believe that TAMC is a proprietary service of TAMS, in line with Exhibit 12A. (Section 6.)    Though the parties agree that no agency relationship exists between them as Defendant states, customers such as Plaintiff were intended to be deceived by the relationship.    This customer deception should not be honored by the Court, and TAMS is bound by the actions of TAMC.    Though Defendant asserts that somehow notice was not given to TAMS of non-payment, that is for Defendant to take up with its partner, TAMC;

15-18.    These are all business records produced by TAMC in response to subpoena and they relate to the actual transaction.    They are admissible.    A copy of the subpoena is attached hereto as Exhibit 25B;

19.    Mr. Hutton was a designee of the Defendant.    Whatever he says is admissible.    Defendant, in a display of consistency, seeks to ignore its oral as well as its written words.    A copy of the Notice of Designee Deposition is attached hereto as Exhibit 25A;

20-21.    Maintenance records of Defendant which are admissible;

_____

[6]As Defendant submits by Exhibit, the Plaintiff had been shown documentation showing that TAMC was an assignee of a TAMS lease and thus TAMC would be a holder in due course and unaffected by the breach of promise by TAMS.    See Exhibit 14 to earlier pleading by Plaintiff at page 1.    For that reason, Plaintiff had to enter into a consent judgment.    Now, Defendant is trying to say that there is no holder in due course status for TAMC, but that TAMC bought equipment and leased same to Plaintiff.    Defendant has shown no contract of sale to TAMC (although given their close relationship maybe none was needed).    However, if TAMC bought the MRI unit and leased it to Plaintiff, TAMC would again be entitled to payment from Plaintiff despite the breach of promise by TAMS, and thus once again the Plaintiff rightly entered into a consent judgment with TAMS.

22.   Mr. Stansbury was a designee of the Defendant.   Whatever he says is admissible.     Mr. Stansbury said that the chiller was covered by the warranty.   He is the designee and he has spoken.  A copy of the Notice of Designee Deposition is attached hereto as Exhibit 25A;

23.   This is a business record of Plaintiff;

24.   This Affidavit addresses certain issues raised by Defendant's pleading and further states that testimony given by deposition is given to the requisite level of certainty for expert opinion.   Mr. Low was deposed as a designee and thus he had to make this Affidavit relating to his statements therein.   It is simply a means of closing the circle and making all evidence clear;

25.   This is admissible as a written form of the business available to the center as prepared by Mr. Low, instead of detailing each customer separately.    The issue of business available to the Plaintiff is foursquare the designation of Mr. Low, and this spreadsheet is a written record of those opinions and beliefs.   Nothing was destroyed to prevent its disclosure.  As Mr. Low said, quoted by Defendant at page 18, the document may not even have been saved.  If Mr. Low had  used a calculator to get his numbers straight, there would be no spoliation as the calculator's operations were not preserved.   This spreadsheet is used to show the number of referrals that Mr. Low felt would be available.   The underlying numbers are all printed out.   If Defendant sees an error in calculation, that could certainly impeach Mr. Low's credibility, but does not eliminate the admissibility of this sheet as a record of the business available;

III   ***Defendant's Legal Discussion Section***

Some government agency presumably regulates MRI devices.  (Defendant has provided no authority for this point, but some form of regulation definitely exists, FDA or otherwise.)   The Defendant takes this point to mean that therefore at the point that the first patient scan was done the installation of equipment was complete.  Simple English and the facts state otherwise.  When is

installation complete?   The simple answer is that it is complete when nothing more remains to be done.   This is reflected in Exhibit 12 referring to a time when the equipment was working at manufacturer's specifications, as well as the term complete.   If the oven bakes but it does not broil, is installation complete?   No.   Exhibit 2 prepared by Defendant refers to acceptance as a step in the progress of the installation.   Thus, once the equipment was working an acceptance was signed. That would be the proper time to assert that the installation was complete.

While Toshiba did not warrant that the machine would operate uninterruptedly, when the machine is not working properly from the start and technicians are coming out to get it working properly, then installation is not complete, even if the machine is able to do part of its operations.

Exhibit 12, prepared by TAMS and signed for TAMS,[7] shows that acceptance is to be done at the point when the equipment is working fully, and Exhibit 2 prepared by TAMS as well calls acceptance a part of the installation process.   Defendant never shows any record of a claim by any party that Plaintiff withheld acceptance after the equipment was fully operational, and thus presumably makes no such claim.   In fact, TAMC was careful to be sure that the equipment was working properly before the transaction was even approved, after which acceptance was signed.

Defendant asserts that the Plaintiff could not claim installation was not complete as Plaintiff was billing for patients.   This is meaningless.   Plaintiff was trying to get the equipment working properly as was the Defendant, at which point an acceptance could be signed and the installation would be complete.   If the Defendant had done its job and made sure that the equipment was fully operational, then of course the installation would have been complete, and the one year service plan would have begun.   As the Defendant failed to do so, it was not.

_____

[7]Though TAMS now for the first time seeks to ignore this lease signed on its behalf and based upon which it released equipment (as the Addendum with TFS specifically incorporates the lease with TAMS), a disavowance that should not be credited by this Court.

Reply to TAMS Answer and Opposition- Page 10

The Defendant has asserted that the Plaintiff automatically accepted the goods because it did not reject them. There is one flaw in this statement: It is not true. Under the terms of the sales agreement, the Defendant would provide a one year service plan from the date that the installation was completed, meaning that there was nothing more to do. The installation progress form provided that there would be an acceptance by the Plaintiff, which is only logical, as that would show that the product had been delivered and completely installed. This is in accord with the lease signed by TAMS (Exhibit 12) and the course of trade usage testified to by Mr. Low, Ms. Stehman and Dr. Templeton. This is not a matter of expert opinion with regard to these matters, only factual testimony. Indeed, Dr. Templeton's experience includes transactions performed with TAMS itself as he stated in his deposition. Moreover, this testimony is within the scope of the expertise of Mr. Low and Ms. Stehman even if expert testimony were needed to show course of dealing/ trade usage.[8]

After April, 1999, Defendant continued to provide service, stating, at Exhibits 20 and 21, that said service was not billable to the customer. As Mr. Hutton said in his deposition, that indicated that the service was provided under an ongoing service plan. Exhibit 19 at 75-80.

The Defendant is asserting that the Plaintiff should have sued the Defendant based upon the alleged delivery of the equipment in April, 1998, when there was no ground for suit at that time. The Defendant was not liable for breach of the UCC warranties as to which the period of limitations accrues at the time of delivery, as the Defendant rejected those warranties in lieu of a promise to fix the equipment for one year from the date of completion of installation. Thus, Plaintiff sued on the executory promise within the proper limitations period for that promise, three years (which perhaps may be four years from the date of the breach under 2-725).

---

[8]Such course of dealing and trade usage are part of the agreement of parties to a contract. Maryland Commercial Law Code Annotated ¶1-205.

The Defendant could call its promise anything it wished, (warranty, contract, ham on white with mayo), but the UCC limitation applies to the UCC warranties as a statute is interpreted consistent with its provisions.  Indeed, breach of a provision of a contract of sale other than a warranty would not accrue at the time of delivery as the UCC provides that provision only as to the UCC warranties.   This case is properly brought, and brought within the proper time frame.

Plaintiff is relying heavily on simple English as well as the statements of Defendant's personnel as well as the statements of Mr. Hall (whose statements do bind Plaintiff as will be addressed in the next section), and the actions and documents provided by the Defendant.   This is all proper documentation and proper sources, defendant's posturing notwithstanding.

Indeed, the Defendant's Exhibit T is, if anything, not admissible evidence as it is a statement by TAMS about the business affairs of another entity.   To the contrary, Plaintiff has submitted only proper business records of TAMC.   Thus, these are admissible documents.

Plaintiff further seeks to show that the Defendant agreed that the warranty was in force after April, 1999 from the fact that, after that time, TAMS continued to provide service and stated that the service was not billable.   As set out in the earlier pleading of the Plaintiff, Mr. Hutton advised that the service department would not send a bill/list service as non-billable only because that service was under a service plan.   Otherwise, the service department, whose job is to generate revenue for TAMS, would of course issue a bill.   This is the testimony of Mr. Hutton, TAMS designee.   This is not a stratagem but rather a simple strategy.   TAMS own documents and personnel show that the warranty/service plan was in force.  Therefore, Plaintiff is entitled to judgment.

IV.    ***Statements of Gary Hall and TAMC Personnel***

As set out in Exhibit 14 to Plaintiff's prior pleading, the Defendant had an agreement with TAMC by which the Defendant would issue leases and then assign these leases to TAMC.   In terms

of interpretation of the one year service plan, it was represented to Jeffrey Low that the plan would run for one year after the date of the acceptance.   Exhibit 26 at 204.   This was further stated by Mr. Hall in a conversation at which a TAMS representative was present.   Exhibit 26 at 221.   Mr. Low understood that Mr. Hall spoke for TAMS, as he was intended to, (earlier Exhibit 14, §6.1.

Mr. Low advised that most of the discussions that he had had relating to the lease acquisition were with Mr. Gary Hall, even more so than the discussions with the MR sales specialist.   Exhibit 26 at 221-222.   Mr. Hall was, in the words of Mr. Low, an employee of TAMC.   *Ibid.*.

Mr. Low was then asked if he knew that TAMC was in fact Tokai Financial Services.   Mr. Low advised that he now (e.g. on the date of the deposition) knew that fact.   He was asked if he had known that fact, that TAMC was in fact Tokai, when he signed the documents.   He said that he did not know as he had not seen, "anything with Tokai Financial Services compared to in the beginning with Toshiba American [sic] Medical Credit."   Exhibit 26 at 223.

Mr. Low advised that he had no other documents.   However, these documents were produced in response to subpoena and are in the record as Exhibits 12 and 13 to the Plaintiff's earlier pleading, showing a lease by TAMC a program of TAMS, signed by TAMS (Exhibit 12) and then an addendum showing the Lessor as Tokai.   A reasonable observer, such as Mr. Low,  would understand that Tokai was in fact TAMC which was in fact a proprietary program of TAMS, owned by TAMS,[9] and that Mr. Hall, who made all of the communications, spoke for it.   TAMS never called to see if an additional service plan was desired.   Exhibit 26,  282-283.

Prior to the signing of the acceptance, there had been much discussion about the status of the equipment even on that date, with a representative from TAMS, further indicating that the

_____

[9]Which is exactly the impression that he as a customer was supposed to get, as per Section 6 of Exhibit 14 to Plaintiff's earlier pleading.

transaction was not completed and that the signing of the acceptance, as contemplated by TAMS in Exhibit 2 of the Plaintiff's earlier pleading, would mark the completion of the installation. If the installation had already been completed, then there would have been no reason for continued discussion with TAMS about the matter. Clearly, the transaction had not been completed until that time in the eyes of TAMS either. Exhibit 26 at 283. In fact, TAMS personnel continued to promise that all would be fixed both before and after the acceptance was signed. Exhibit 26 at 291-292.

Mr. Hall never said that there would be a warranty or service plan extension, as stated by Plaintiff earlier. The primary contention of the Plaintiff is that the initial service plan was to last until one year after acceptance, as that was the time that service had been completed.

Thus, Plaintiff was intended to believe that Mr. Hall spoke for TAMS, as shown by Exhibit 14 and the fact that Mr. Low dealt primarily with Mr. Hall in this whole process. Mr. Hall represented that the service plan would last until one year after acceptance, a statement that binds TAMS as Mr. Low for Plaintiff was intended to rely on Mr. Hall and he did so, in short, apparent agency and agency by estoppel. Moreover, TAMS did not contradict this statement, leading to the conclusion that there was an adoptive admission of this point by TAMS as well.

Finally, it must be remembered that until September, this transaction had not been authorized by TAMC, and thus could have been rejected. The chance cannot be ignored either that TAMS made these representations and accepted them in order to induce Plaintiff not to reject the equipment., and thus to preserve a sale. For all these reasons, the Defendant is bound by the statements of Mr. Hall. As Mr. Hall stated, in the presence of TAMS staff no less, that the service plan would run for one year from acceptance, that admission/agreement binds TAMS., whether it is called an extension or not.

V.    ***Expertise***

Reply to TAMS Answer and Opposition- Page 14

The Plaintiff designated five persons to provide expert testimony.   Four of these persons were to provide mixed fact and opinion testimony.   As such, they were not required to provide any expert report under the provisions of Maryland Local Rule 104.10.   The designation statement of the Plaintiff specifically stated that these persons were to provide mixed fact and opinion testimony. These persons testified based upon their training knowledge and experience in their fields.   Mr. Low testified from his college training in economics and his health care business experience as well as being an owner of the Plaintiff business and as such presumed to be aware of the facts relating to his business.   Ms. Stehman testified based upon her training and wide ranging experience in the operation of MRI and other radiological equipment.   It is irrelevant that she was not certified in other areas, as she was certainly trained enough that she could provide care in these areas, and she further had a great deal of experience in the operation and use of this equipment.  Also, there is no certification required in order to operate MRI machines.   Exhibit 27, Deposition of Kimberly Stehman, at 154-155.

Dr. Templeton was not called as an expert.   His testimony was based upon his observations as part of the Plaintiff business.  He further testified to trade usage and course of dealings between University of Maryland and TAMS.   This is factual testimony, and does not require expert status.[10]

Finally, Larry Epstein, a certified public accountant and certified valuation analyst gave opinions, backed up by the required report.   Despite defense counsel's discussion and assertion that his testimony would be excluded, the simple fact remains that he performed the required research and interviews with relevant persons including the owner of the business, and produced his opinion.

---

[10] Plaintiff's counsel has found no law showing that expert testimony is required to prove trade usage, especially as regards Dr. Templeton's own testimony as to TAMS own usage. (There is one case requiring expert testimony to prove that a 70 year old industry code of ethics established an industry standard of due care for a defamation case, but that is unrelated.)

Experts are permitted to base their opinions on hypothetical examples as well as on such other materials as they consider to properly aid them in furnishing a reliable opinion, even if those materials are not in themselves admissible in court as evidence. There is no reason to believe that this opinion should be excluded.

It is of note that the *Daubert* case cited by defense counsel primarily establishes new ground in evidence law in the realm of scientific evidence. Defendant does not appear to cite to any specific point or principle of the case either. This case does not concern scientific matters so much as it concerns business matters and matters relating to the operation of an MRI machine. The persons who have provided evidence for the Plaintiff, which was primarily factual testimony, to the extent of their offering opinions, were offering opinions in the areas in which they had been designated as well as in areas directly relating to, to quote the Federal Rules of Evidence, their, "training, knowledge, and experience."

One further point applies. Under Maryland and federal law, the opinions of the persons listed herein relate not to what these persons formed as opinion for the instant litigation, but rather relate primarily to their everyday experience and specifically their experience as actors involved in the operation of the Plaintiff company. As such, their testimony is not subject to being barred even if there was a so called lack of disclosure or the disclosure did not state their abilities so broadly. To the same extent and for the same reason, the testimony of these persons as to the trade usage and TAMS practices is also admissible even if the Court should feel that expert testimony is required to identify trade usage. See Advisory Committee Comment to Federal Rule of Civil Procedure 26(b)(4).

Reply to TAMS Answer and Opposition- Page 16

VI.   *UCC Statute of Limitations*[11]

The Defendant appears to want to have its cake and to then eat it too.   Some vendors would make the implied warranties of the Uniform Commercial Code, (merchantability and fitness for the purpose it was sold and/or fitness for a particular purpose) and retain the benefit or protection of the Uniform Commercial Code, §2-725, which provides that a claim for breach of warranty accrues at the time of delivery.   Such a vendor would have to contend with the loss provisions of the Code and damages that are available.   Some vendors would choose to abjure those warranties and instead, perhaps, provide a fixed free service plan.   Defendant chose to provide the free service plan, and to disclaim all possible liability for lost profits etc. due to the machine not working, by providing a one year free service plan.   However, the Defendant then asserts that this plan is a warranty as provided under the Uniform Commercial Code.   This is baseless.

The UCC warranties apply to the qualities of the good at the time of delivery and thus a claim for breach of that warranty of quality accrues at that time.   But if the warranty in question promises that the goods will remain in proper order for a fixed period of time, then the accrual of the claim applies when the warranty is breached.   Maryland Commercial Law Code Annotated §2-725.

In this case, the promise to fix a broken good is not a warranty within the scope of the UCC warranties, nor is it within the scope of the UCC warranty limitations.   In this case, the language of the agreement specifically provides that the promise to fix the good is in lieu of the UCC warranties and thus the Defendant cannot claim it to be a UCC warranty.   This is especially so as the entire logical basis for the application of the accrual at time of delivery standard of the UCC could not apply to this agreement which is a repair promise.

---

[11]The arguments in this section are in addition to the arguments raised in Plaintiff's earlier pleading that even if this case is reviewed using §2-725, the Plaintiff's claim is timely brought.

The UCC warranties covered by §2-725 of the Maryland Commercial Law Code are warranties as to how the equipment would operate *at the time of delivery.*   As Mr. Hutton said in his deposition, Exhibit 19 to earlier pleading at 31-32, this was an offer to fix the equipment for free, not a promise as to how it would perform.    Thus, this is not a UCC warranty.   Defense counsel knows that a statutory scheme must be interpreted with reference to the whole scheme at section, and thus the limitation period of UCC warranties applied to warranties under the UCC.[12]   *Collins v. Collins,* 798 A.2d 1155 (Md. App 2002), *Blitz v. Beth Isaac Adas Israel Congregation*,  720 A.2d 912 ( Md. 1998).

Also, where the legislature used differing terms it typically intended differing results.   In this case, the only type of provision as to which the time of accrual is specified as delivery is a claim for breach of UCC warranty.   Other parts of a contract of sale are not considered to have accrual at the time of delivery.   Thus, as to this breach of a provision that is not a UCC warranty, the Maryland General Assembly clearly intended to allow for accrual at the time of the breach of promise.   Viewed pragmatically, a cause of actions accrues when suit could have been filed.    Breach of a UCC warranty could be brought one moment after delivery as the case is based upon the quality of the good at the time of delivery.   As Defendant rejected UCC warranties, the Plaintiff had no claim until the Defendant breached its promise, and the claim accrues then.

Alternatively, if the Defendant wishes to have this promise to fix broken goods viewed as a UCC warranty of fitness or merchantability, then it is in essence and effect a promise that the goods will remain fixed for one year from the time that delivery is complete.   As such, the accrual of the cause of action would be at the time that this did not occur, July 5, 1999.   Therefore, once again this

---

[12]According to Defendant, it could sell a ten year free service plan with equipment and then refuse to fix the equipment after four years, safe in the knowledge that limitations had run. This is wrong.   The warranties of fitness and merchantability apply to the condition of the goods at the time of delivery, and as such breach occurs then.   To the contrary, the breach in this case occurred when there was a refusal to fix the goods.   In another environment, Plaintiff would have wished to sue the Defendant for providing equipment that did not work and the loss occasioned thereby.   However, Defendant rejected that UCC promise, in lieu of which it promised to fix the equipment for one year.   It is not too much for the Defendant to keep its word.

case is timely brought.

VII.    ***Course of Dealing Argument***

The Plaintiff referenced testimony as to trade usage, (which was clearly trade usage but which Plaintiff in error referred to at some point as a course of dealing.)    This testimony included information as to the industry in general as well as being reflective of TAMS's own dealings.

This case involves a question as to the interpretation of an agreement which provides that a one year service plan shall be in affect from the time that installation is completed, with an Installation Progress Form prepared by TAMS specifically referencing acceptance of the equipment as being a step in the installation progress, along with a lease executed by TAMS as the means of delivery of this equipment that also referred to an acceptance being signed once the equipment was working to manufacturer's specifications.    The Plaintiff's position is that installation is complete when there is nothing more to be done with regard to the equipment.    The Defendant does not like that position.    Plaintiff sought to provide clarification based upon trade usage as this agreement is ambiguous in its application as it does not provide a set benchmark other than acceptance. Defendant does not like the time of acceptance as being a benchmark either.

Thus, Plaintiff has sought to provide evidence and testimony that based on trade usage and TAMS own operations in other deals, the service plan was still in force on July 5, 1999.

This is not *ab initio* an attempt to prove modification.

If Defendant wishes to look at this case as an issue of modification, then that can be accommodated.    After April, 1999, Defendant provided service without charge to the Plaintiff. Defendant's own handwritten and computerized records show that the service was not billable, which Mr. Hutton indicated meant that there was a service plan in effect.    Mr. Hall stated that the service plan was in effect until one year after the date of acceptance.

A modification to a contract can be done orally even if there is a no oral modification clause in the agreement. *Mayor and City Council of Baltimore v. Ohio Cas. Ins. Co.,* 438 A.2d 933, 936 50 Md. App. 455 (1982) (collecting cases).    The modification requires no new consideration. *Hercules Powder Co. v. Harry T. Campbell Sons Co.*, 144 A. 510, 156 Md. 346 (1929).    Proof of

Reply to TAMS Answer and Opposition- Page 19

the modification may be made by proof of the conduct of the parties, such as continuing to fix the equipment while stating in records that the service was not billable to the customer. *Cole v. Wilbanks*, 171 A.2d 711, 226 Md. 34 (1961). Thus, even if this case were to be viewed as a case of modification with an extension of the service plan, there would still be proof of that modification.

Defendant says that Plaintiff is trying to graft a new term on the contract. That is not so. Exhibit 12 written by Defendant refers to acceptance as does Exhibit 2, an installation progress from written by Defendant. Defendant says that it tendered delivery on March 30, 1998. That is absurd as the progress form written then (Exhibit 2 to Plaintiff's earlier pleading) specifically addresses other steps in installation, the final one being acceptance.

The UCC may be a freedom of contract law, a pro contract law or any other term Defendant wishes to attach to it. At its heart it requires parties to live up to their promises. Was the installation complete when the equipment could not be made to work fully? No. This is especially true as the Defendant references the FDA's possible regulation of these devices. If these devices are regulated by the FDA and the device was not fully operational in accord with those standards and for that reason was not accepted, then even Defendant should agree that its installation was not complete. Clearly, all parties to this agreement understood (until it was to Defendant's advantage not to do so) that installations are complex and can take time. For that reason, Exhibit 2 of Plaintiff's earlier pleading shows that acceptance is the final step in installation. Exhibit 12, the lease crafted by Defendant, refers to the machine operating to manufacturer's specifications.

The Defendant itself knew and knows that these installations can take time to complete and for that reason begin the service plan only once the installation is completed. Nowhere has the Defendant presented any evidence that it felt that the Plaintiff unduly delayed acceptance of the equipment. Defendant also cannot argue that it did not do so as it (TAMS) had already been paid for the equipment by its agent and program, TAMC. Exhibits to Plaintiff's earlier pleading show that payment was not made to TAMS until September as the transaction was not authorized until that time by TAMC, in all likelihood due to the fact that the equipment was not working, for which reason TAMC demanded that TAMS produce $50,000 to aid the Plaintiff. (These facts are

Reply to TAMS Answer and Opposition- Page 20

contained in the exhibits drawn from TAMC records- namely Exhibits 15 and 16 primarily.)

The Plaintiff did not reject or send back the equipment as TAMS was still trying to get the installation properly completed and calibrated to enable acceptance, the final step of the Installation Progress form of TAMS (Exhibit 2 to Plaintiffs earlier Pleading), to take place, as it eventually did. This is not an acceptance of the equipment by lack of rejection.[13]    It is exactly what was contemplated by the agreement between the parties, though TAMS now seems to hide from this.

Of course, the Plaintiff also could not send back the equipment to TAMS as TAMS rejected all UCC warranties.  Thus, Plaintiff had to work with TAMS to get the installation completed.  Suit could only be brought when TAMS decided not to honor its promise.

Apparently, to TAMS, a party seeking to honor its promise and trying to work with TAMS to get the equipment promised installed properly is dilatory in protecting its rights.  The UCC is not pro this conduct, nor is it part of any freedom to contract.   The Plaintiff did exactly what it had to do by contract, and is not prejudiced from exercising its rights thereby.  TAMS carefully crafted this contract to assure that Plaintiff (and others) could not send back equipment by claiming or suing for breach of warranty.  Plaintiff notified the Defendant of the problems, and the Plaintiff's remedy was to try to get these issues fixed.    Plaintiff does not lose its rights thereby.

Moreover, the acceptance and rejection remedy set out for the sale of goods under the UCC would belong to the buyer of the items, namely TAMC under the creative lease finance program set out in Exhibit 14, by which Plaintiff was to consider TAMC an agent of TAMS, though it was not. In Exhibit 14 of Plaintiff's earlier pleading at page 14 (§5.2(d)) TAMS and TAMC agree that title of the equipment passes from TAMS to TAMC when TAMC pays for funding amount for the contract, which  occurred in September, 1998.  TAMC in fact did not approve the deal until September, and thus title did not transfer until then, and acceptance or rejections would not be an issue until then.   Thus, Defendant's claims with regard to acceptance and rejection under the UCC

---

[13]Plaintiff specifically incorporates herein by reference the testimony of Ms. Stehman - Exhibit 10 of prior pleading- as to the items that could not be made to work and the exhibits showing those things that were not working as of 09/1998- Exhibit 8 to prior pleading-).   For completeness of the record, those portions of testimony are again attached herein.

are baseless.

The Defendant cites to one line in the matter of *Alexander & Alexander* in which the Maryland courts have stated that breach of a commercial agreement is not in itself intentional interference with contract.   However, the Maryland Courts have in more recent opinions focused on the question of duty.   Did the party that interfered with the business of another have a duty to do the task which they refused to do?   In *Lyon v. Campbell,* 707 A.2d 850 (Md. App. 1998)*,* the Court of Special Appeals addressed a case wherein a shareholder refused to enlarge the loan guaranty that he had signed, thereby causing the business of which he was a part owner to fail.   The analysis of the Court was as follows:   As the shareholder had no duty to enter into he increased guarantee, thee was no interference by the refusal to sign.   Similarly, the Maryland courts have held in other cases that a mistaken breach of contract by a company does not constitute an intentional interference. See also *Mesmer v. Maryland Auto. Ins. Fund*, 725 A.2d 1053 , 1058 (Md.1999.).

In this case, the business records of TAMS show that they recognized that the customer was entitled to service and they still refused to provide same.    This is an intentional breach of a known contractual duty and is a basis for a claim.   TAMS knew of the affect of the breach due to the letter of Mr. Low (Exhibit 23 to Plaintiff's earlier pleading), and still refused to provide service.   This is an intentional interference with contract and economic relationship by wrongful means, for which the Defendant is liable.

VIII.    *Spoliation Argument*

The Plaintiff offered testimony that the Plaintiff business could not operate the MRI unit due to the Defendant's refusal to fix same.    The landlord therefore locked the Plaintiff out of the premises.  See Deposition of Kim Stehman, attached as Exhibit 27 hereto, at pages 163-164.   Thus, there has been no intentional destruction of evidence.   Moreover, there has been no intentional destruction of evidence while in the course of this litigation over loss from refusal to repair the equipment.   The prior litigation was of course a suit seeking to have the scanner removed (which it was) and did not address loss of profits by the refusal to fix same in any way.

Moreover, the ability of a Court to dismiss a case based on destruction of evidence requires

an intentional destruction of evidence to make sure that it is not discovered.   Here, there is no evidence of such a destruction.   Second, the dismissal is possible only as a sanction (no motion for sanctions has been filed) and further requires that the party be under the jurisdiction of the possibly dismissing court.   In this case, there has been no destruction of any kind by the Plaintiff, (but rather a lockout by the landlord), and any alleged destruction was well before the instant case was brought, and in fact was done at a time when the intention of the Plaintiff, if anything, was to try to resuscitate its business by getting the scanner removed, and thus avoid the need for suit over the loss of profits.

Finally, at the time that suit was brought, it asserted that the Plaintiff, ( in error), believed that there had been a release between TAMS, TAMC and Plaintiff.   Thus, when the suit was brought there was clearly no intent to sue TAMS for loss of profits as the suit was brought when Plaintiff erroneously believed that there had been a waiver agreement by which the scanner would be returned and the Plaintiff could seek to revive its business.   Furthermore, if there had been a dismissal, that would have to be a factor of the Baltimore County Circuit Court, not a federal court.

Additionally, the Defendant vastly overstates the nature of the spoliation rule in its effect. As set out, the rule applies only to intentional destruction, not the fact that the Plaintiff could not stop the landlord from locking it out.   Second, while the law presumes that destroyed materials are construed against the destroyer, nothing allows the creation of materials that did not exist.   The Plaintiff has stated that no notice was ever given to it of the alleged close of the service period.   This is in accord with the reports of TAMS showing that the service was not billable to the customer, and moreover, the Defendant is saying that Plaintiff must have received the letter as the letter was not produced.   Thus, presumably, the only way that Plaintiff could show it did not receive the letter (according to Defendant) is to have produced the letter from its files.   Thus, by not having the letter, Defendant assumes that the Plaintiff had the letter.   This is Joseph Heller (of Catch 22) at his best.

The Plaintiff did produce a sizeable quantum of records including patient treatment logs, (which Defendant cites to), certain check records, business records, lease records and other documents.   The Plaintiff did advise that whatever was not produced was lost when the landlord locked the Plaintiff out.   The Defendant also has its own records showing service calls.   The

Plaintiff has produced the list of problems with the installation that still existed in September, 1998, (when the list attached to Plaintiff's earlier Exhibit 8 was prepared).    The only materials that were not produced were those taken when the landlord locked the Plaintiff out.    The principle of evidence spoliation applies where specific items are destroyed such as the diary destroyed in the *White* case. Nothing in that rule allows for the construction of materials that do not exist and then to determine that those would have been negative.    Additionally, other correspondence was provided.    Thus, there is no basis for dismissal of the case, nor is there any legal grounds to do so.

IX.    *Cross Motion*

The substantive issues relating to the Cross Motion for Summary Judgment are addressed herein and in Plaintiff's earlier pleading.    Procedurally, under the Rules of the United States District Court for the District of Maryland, when two parties are filing dispositive motions, the first party is to file, and the second party is then to file a cross motion along with its response.    Local Rule 105. At the time that the Defendant first filed a Motion for Summary Judgment, discovery had not been completed and the various records and the admissions of Mr. Hutton and Mr. Stansbury had not been obtained.    Nor had the documents received from TAMC been obtained.    Therefore, Plaintiff could file no motion for summary judgment.

In this case, the Defendant first filed a motion for summary judgment in the relatively early stages of this case.    That motion was still pending on March 24, 2003 and was still pending when supplemented on June 26, 2003.    Thus, the only way in which the Plaintiff could have filed a dispositive motion was to file that pleading by way of cross motion as part of his response.    This is exactly what the Plaintiff did in this case.

One issue (page 38 of defense pleading) is that of the chiller.    The defendant's own designee stated that the chiller was covered by the service plan.    Plaintiff sees no reason why that designee statement should not be accepted as a matter of law.

The Defendant also argues that the loss of documents should bar the claim or summary judgment.    There is one problem with this position.    Plaintiff did not destroy any documents.    The landlord took them when he locked the Plaintiff out.    This was the testimony of Ms. Stehman,

Reply to TAMS Answer and Opposition- Page 24

Exhibit 27 at 163-164, who was the manager of the site, Exhibit 26 at 18.

The Defendant also points to Mr. Hutton's alleged letter relating to a claim that the service plan expired on or about April 9, 1999.   First, Defendant now backs off of this position and thus calls into question the validity of this letter.   Second, after that time, and indeed after the alleged date of that letter, a service call was made on June 17, 1999, and there is no bill listed to the customer, which, as Mr. Hutton stated in his deposition, means that the customer was not billed as the service was under a service plan. Exhibit 19 to earlier pleading at 77-78.

The Defendant also argues that records are missing.   However, patient treatment records were provided for the relevant period between April 1998 and November, 1998, (which is the relevant period for determining when the equipment was up and running), as well as income records from that time.   Therefore, there is simply no reason that the Cross Motion should be denied and in fact it should be granted.

WHEREFORE, your Plaintiff respectfully prays that the Motion for Summary Judgment be DENIED and the Cross Motion for Summary Judgment be GRANTED.

Signed,

_____
Samuel Sperling- Bar Number 24135
Law Office of Leonard J. Sperling
1777 Reisterstown Road
Commercentre West Suite 212
Baltimore, Maryland 21208
410-653-0141
Counsel for Plaintiff